IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **FUJIREBIO DIAGNOSTICS, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. _____ |
| | ) |
| **QUANTERIX CORPORATION,** | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Fujirebio Diagnostics, Inc. ("Fujirebio"), by and through its undersigned counsel, files this Complaint against defendant Quanterix Corporation ("Quanterix") seeking declaratory relief with respect to U.S. Patent No. 11,275,092 (the "'092 patent"). In support of this Complaint, Fujirebio alleges as follows:

**NATURE OF THE ACTION**

1. This is a civil action for declaratory judgment of patent non-infringement, arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

**PARTIES**

2. Fujirebio is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 201 Great Valley Parkway, Malvern, Pennsylvania 19355.

3. Quanterix is a corporation organized and existing under the laws of the State of Delaware, having a place of business at 900 Middlesex Turnpike, Billerica, Massachusetts 01821,

and having the following registered agent in this judicial district: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

4. As this is a civil action for declaratory judgment of patent non-infringement, arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201.

5. Quanterix's public statements about the '092 Patent and its threats toward Fujirebio give rise to an actual and justiciable controversy between Fujirebio and Quanterix as to non-infringement of the '092 Patent. Absent a declaration of non-infringement, Quanterix's continued wrongful assertion of infringement related to Fujirebio's diagnostic assays used to detect phosphorylated Tau 217 ("pTau 217") in patient blood plasma will cause Fujirebio harm.

6. This Court has personal jurisdiction over Quanterix because it is a corporation organized under the laws of the State of Delaware and maintains a registered agent in this judicial district.

7. Venue is proper in this District under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.     The '092 Patent**

8. The '092 Patent issued on March 15, 2022. Quanterix claims to be the owner of all legal rights, title and interest in the '092 Patent, including the right to enforce the '092 Patent. A true and correct copy of the '092 Patent is attached as Exhibit A.

9. The '092 Patent is entitled "Methods Of Determining A Treatment Protocol For And / Or A Prognosis Of A Patient's Recovery From A Brain Injury."

10. The '092 Patent claims a method for producing a patient bodily fluid sample having an analytically quantified amount of endogenous tau protein using an assay that is highly sensitive.

## B. The Dispute Between Fujirebio and Quanterix

11. Relevant to this dispute, Fujirebio manufactures and sells two commercially available diagnostic assays used for the quantitative measurement of pTau 217 in human blood plasma: the "Lumipulse G pTau 217 Plasma Assay" and the "Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay."

12. The Lumipulse G pTau 217 Plasma Assay (hereinafter, the "Lumipulse Plasma Assay") is used to detect and quantify the amount of a single protein, pTau 217, in human blood plasma to aid in the diagnosis of Alzheimer's disease. The Lumipulse Plasma Assay is currently sold for research use only ("RUO") to Fujirebio's customer LabCorp.

13. The Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay (hereinafter, the "Lumipulse Plasma Ratio Assay") is capable of detecting and quantifying the amount of two proteins, pTau 217 and β-amyloid 1-42, in human blood plasma. The Lumipulse Plasma Ratio Assay calculates the numerical ratio of the levels of these two proteins. This ratio is then correlated to the presence or absence of amyloid plaques in the patient's brain as an indicator of the presence of Alzheimer's disease. As explained further below, on May 16, 2025, the United States Food and Drug Administration ("FDA") cleared the Lumipulse Plasma Ratio Assay for commercial marketing as the first in vitro diagnostic device that tests blood to aid in diagnosing Alzheimer's disease.

14. Both the Lumipulse Plasma Assay and the Lumipulse Plasma Ratio Assay (collectively referred to herein as the "Lumipulse Tau Assays") utilize Fujirebio's pTau 217

3

immunoassay cartridge to detect endogenous Tau levels in blood plasma of patients suspected of having Alzheimer's disease.

15. On March 20, 2024, Fujirebio's customer LabCorp announced "the launch and immediate availability of its test to identify the presence or absence of phosphorylated tau 217 (P-Tau217), a pivotal blood biomarker designed to aid in the diagnosis of Alzheimer's disease and the subsequent monitoring of patients undergoing treatment with new Alzheimer's disease therapies." The test referred to in this LabCorp press release is the Lumipulse Plasma Assay, manufactured and supplied by Fujirebio.

16. Just two days after Labcorp's announcement, on March 22, 2024, Quanterix issued a press release concerning the '092 Patent. In that press release, Quanterix stated as follows regarding its patent portfolio, and the '092 Patent in particular:

> Quanterix has secured over thirty U.S. patents protecting our innovative ultra-sensitive research products and high-definition diagnostics, and we continue to secure additional patent protection, both in the United States and abroad. Multiple patents—including U.S. Patent No. 11,275,092—are directed specifically to our novel approach to measuring Tau protein levels in biologic samples.

17. Quanterix went on to state that "[p]arties currently measuring Tau protein in relation to a neurological condition in a research or diagnostic setting on any other platform risk infringement of Quanterix's intellectual property" (emphasis added).

18. Following its issuance of that press release, Quanterix conducted a special public conference call on March 25, 2024. During that conference call, Quanterix's CEO Masoud Toloue stated as follows: "We want to emphasize that those testing Tau quantities using the innovative approach claimed by the 092 patent risk infringing on our intellectual property. Specifically, a Tau test -- a test for Tau that quantitates risks infringing our patent if the testing measures levels of Tau

4

protein in blood or blood derived samples less than about 5 picograms per milliliter and has a limit of quantitation less than about 0.2 picograms per milliliter."

19. During that conference call, Mr. Toloue contended that the '092 Patent has a very broad scope, saying *inter alia*:

- The '092 Patent "refers to any test that measures Tau quantities in bodily fluid at levels identified in the band, irrespective of platform. So at a high level, a test that measures level of Tau protein in blood-derived samples less than about 5 picograms per ml and has a limited quantitation than about 0.2 picograms per ml risks infringement."

- "It's irrespective of immunoassay or mass spec platform."

- "[W]e do want to emphasize that those offering testing of Tau quantities in a bodily fluid at levels claimed in our patent, they do risk [in]fringing on our intellectual property."

20. Mr. Toloue and his colleague on the call, Quanterix's CFO Vandana Sriram, indicated that the company could initiate litigation against alleged infringers. Mr. Toloue said that "we believe it's now the appropriate time to address any potential infringement," and "from a customer perspective, we believe that our license is the only avenue to offer Tau-based testing at the levels they identified in our patent." And when asked about the cost of litigation, Ms. Sriram said that "we do have a strong balance sheet, and we will take the appropriate steps to both grow and protect the business. And frankly, if that comes with some level of short-term costs, we'll balance that out. But clearly, we have the balance sheet and the cash resources to do so."

21. On May 2, 2024, Laurie Churchill, Senior Vice President and General Counsel of Quanterix, sent a letter to Monte Wiltse, President and CEO of Fujirebio.

22. In her letter, Ms. Churchill wrote that "[m]ultiple of our patents - including U.S. Patent No. 11,275,092 (the '092 patent) - are directed specifically to our novel approach to measuring Tau protein levels in blood and blood-derived samples."

23. Ms. Churchill continued as follows:

> Currently, the only products on the market that are permitted to use the novel approach claimed in the '092 patent are Quanterix's Simoa® Tau Kits. No other manufacturers in the biomarker detection field are authorized by Quanterix to sell devices or kits that perform the novel method of measuring Tau that is claimed in the '092 patent.

24. Ms. Churchill expressly stated that Quanterix was prepared to take action to enforce its patents, writing as follows: "Quanterix has invested significant resources in its technology and patent portfolio and is prepared take whatever steps are necessary to prevent others from using our inventions without our permission."

25. Ms. Churchill contended that "Quanterix has reason to believe that the use of Fujirebio's cartridges to test for pTau 217 in human plasma practices the novel method of measuring Tau that is claimed in the '092 patent . . . . [T]he testing that Labcorp provides, using Fujirebio's LUMIPULSE G chemiluminescent enzyme immunoassay, likely practices one or more claims of the '092 patent."

26. Ms. Churchill then wrote as follows:

> It is important that we discuss this matter to ensure that Fujirebio is not selling and/or offering for sale products whose use infringes upon Quanterix's intellectual property rights. If you contend that the use of Fujirebio's immunoreaction cartridges for use with the LUMIPULSE G System to perform a quantitative measurement of pTau 217 in human plasma-by Labcorp or others-does not practice one or more claims of the '092 patent, I would like to understand the basis for your belief. Conversely, if, after reviewing the '092 patent, you conclude that Fujirebio is selling and offering for sale products that practice the patent's claim(s), then Fujirebio should cease doing so immediately.

6

27. Ms. Churchill concluded her letter by writing that "Quanterix would prefer to explore with you resolution to this potential dispute, *but it remains prepared to enforce its intellectual property if necessary.* Please contact me so we can discuss how best the parties can proceed going forward" (emphasis added).

28. Quanterix and Fujirebio subsequently exchanged further communications concerning their dispute about the '092 Patent and the Lumipulse Plasma Assay.

29. On January 16, 2025, Quanterix and Fujirebio entered into a Non-Disclosure Agreement (the "NDA") governing communications and confidential information relating to the dispute.

30. Quanterix and Fujirebio have been unable to resolve their dispute regarding the '092 Patent and the Lumipulse Plasma Assay.

31. On May 1, 2025, Fujirebio sent to Quanterix a notice of termination of the NDA.

32. Pursuant to Fujirebio's May 1, 2025 notice of termination, the NDA was terminated effective May 15, 2025.

33. On May 16, 2025, the FDA cleared the Lumipulse Plasma Ratio Assay for marketing as "the first in vitro diagnostic device that tests blood to aid in diagnosing Alzheimer's disease." *See* FDA News Release entitled "FDA Clears First Blood Test Used in Diagnosing Alzheimer's Disease," issued May 16, 2025.

34. In its news release, the FDA stated that the Lumipulse Plasma Ratio Assay "is for the early detection of amyloid plaques associated with Alzheimer's disease in adult patients, aged 55 years and older, exhibiting signs and symptoms of the disease . . . . This new Lumipulse test only requires a simple blood draw, making it less invasive and much easier for patients to access . . . . [T]he new blood test can reliably predict the presence or absence of amyloid pathology

associated with Alzheimer's disease at the time of the test in patients who are cognitively impaired."

35. The FDA granted Breakthrough Device designation for the Lumipulse Plasma Ratio Assay. This is a process designed to expedite the development and review of devices that provide for more effective treatment or diagnosis of life-threatening or irreversibly debilitating diseases or conditions. In its news release, the FDA noted that the Lumipulse Plasma Ratio Assay "measures two proteins, pTau217 and β-amyloid 1-42, found in human plasma, a component of blood, and calculates the numerical ratio of the levels of the two proteins."

**C.      Fujirebio's Lumipulse Tau Assays**

36. Both of Fujirebio's Lumipulse Tau Assays require the use of two separate components: (i) the LUMIPULSE G1200 Analyzer (the "analyzer"); and (ii) the "pTau cartridge".

37. The analyzer is a fully-automated, immunoassay instrument that can be used to detect dozens of different analytes at a speeds of over 120 tests per hour. The analyzer has achieved wide-spread adoption and use throughout the scientific community, over more than 30 years.

38. The pTau cartridge is a single-use disposable cartridge containing several immunoassay reagents reactive to pTau 217 analyte.

39. Together, the analyzer and pTau cartridge can be used to measure the concentration of pTau 217 in a blood plasma sample with a limit of detection at or below that claimed in the '092 Patent to aid in the potential diagnosis of Alzheimer's disease.

**D.      Fujirebio's Lumipulse Tau Assays Do Not Infringe the '092 Patent**

40. The '092 Patent has one independent claim, claim 1, which recites as follows:

> A method of producing a bodily fluid sample of a patient suspected of having a neurological condition containing an analytically quantified amount of endogenous tau protein, said method comprising:

> (A) obtaining a volume of bodily fluid comprising blood, or a blood component selected from plasma and serum,
>
> (B) diluting the volume of bodily fluid, and
>
> (C) quantifying through the use of an analytical protein concentration measurement assay a concentration of tau protein in the volume of bodily fluid to produce the bodily fluid sample containing the analytically quantified amount of endogenous tau protein;
>
> wherein the analytically quantified concentration of endogenous tau protein contained in the bodily fluid sample is less than about 5 pg/nil, and a limit of quantification of the analytical protein concentration measurement assay used in step (C) for quantifying the concentration of tau protein is less than about 0.2 pg/mL.

41. The specification of the '092 Patent describes only one type of assay that can be used to detect low concentration analytes, namely a well-known assay called a single-molecule array ("SIMOA").

42. As the name implies, a SIMOA assay interrogates analytes at the level of a single (individual) molecule. SIMOA assays typically utilize plate arrays comprising thousands to millions of tiny wells or compartments that each hold a femtoliter of liquid (i.e., a volume equal to one quadrillionth ($10^{-15}$) of a liter). Thus, each well is capable of housing a single molecule or reaction event.

43. Physical separation and dilution play critical roles in a SIMOA assay to ensure that the concentration of target molecules is low enough for individual events to be spatially and temporally resolved. If the sample is too concentrated, multiple molecules may occupy the same well, leading to signal overlap and inaccurate measurements. Thus, the analyte sample must be diluted prior to beginning quantification with the assay.

44. Furthermore, the diagnostic methods claimed in the '092 Patent require three separate steps that must be performed in sequential order. That is, the "diluting" step—step (B)—

must be performed after the volume of bodily fluid is first "obtained" (step A), and before the concentration of tau protein is then "quantified" (step C).

45. The ordered process set forth in the claims of the '092 patent is consistent with the operation of the singular SIMOA assay disclosed in the specification.

46. Moreover, during prosecution, both the Applicant and the Examiner expressed their mutual understanding that the only assay taught in the specification and covered by the claims of the '092 patent was a SIMOA assay used to detect low concentrations of tau in blood (and not *any* assay capable of detecting low concentrations of tau in blood, as asserted in Ms. Churchill's May 2, 2024 letter, and by Mr. Toloue in his March 25, 2024 conference call).

47. The method claimed in the '092 Patent is different from that practiced by Fujirebio's Lumipulse Tau Assays.

48. Fujirebio's Lumipulse Tau Assays are not SIMOA assays. Instead, they are a fundamentally different type of assay, namely a chemiluminescent enzyme immunoassay. The Lumipulse Tau Assays are premised on quantifying analyte using an undiluted sample in a single reservoir.

49. Unlike the SIMOA assays disclosed and claimed in the '092 Patent – wherein a plasma sample is first diluted and then spread across thousands of femtoliter-sized reaction vessels in order to isolate a single molecule of tau in each reaction vessel to be quantified – Fujirebio's Lumipulse Tau Assays perform neither of these steps. In the Lumipulse Tau Assays, there is no "dilution" of the sample prior to quantification of the analyte. Moreover, in the Lumipulse Tau Assays, the entire sample is contained in a single reaction chamber wherein numerous molecules (potentially in the thousands) are analyzed together.

50. In view of the fundamental differences between the assay claimed in the '092 patent and Furjirebio's Lumipulse Tau Assays, the manufacture, sale, and use of Fujirebio's Lumipulse Tau Assays does not infringe the claims of the '092 patent.

## COUNT I
**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 11,275,092)**

51. Fujirebio restates and incorporates by reference each of the allegations of the paragraphs above.

52. Quanterix claims to be the owner of all legal rights, title and interests in the '092 Patent, including the right to enforce the '092 Patent.

53. An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, has arisen and exists between Quanterix and Fujirebio concerning whether Fujirebio has infringed any valid and enforceable claim of the '092 Patent, as a result of Quanterix's contentions as to the breadth of the claims of the '092 Patent; Quanterix's statements that measuring Tau protein within a certain range in relation to a neurological condition risks infringement of Quanterix's intellectual property; Quanterix's statements that it is prepared to enforce the '092 Patent; and the parties' unresolved dispute as to whether the cartridges used to test for pTau 217 in Fujirebio's Lumipulse Tau Assays come within the scope of the claims of the '092 Patent.

54. Fujirebio has not infringed and does not infringe – directly, contributorily, or by inducement – any claim of the '092 Patent.

55. Fujirebio seeks and is entitled to a declaration of non-infringement of the '092 Patent pursuant to Title 35 of the United States Code.

56. A judicial declaration is necessary and appropriate at this time so that the parties may proceed in accordance with their respective rights and duties determined by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, Fujirebio prays for the following relief:

a. A judgment declaring that Fujirebio does not infringe, and has not infringed, the '092 Patent in any manner;

b. An award to Fujirebio of all of its costs in this action;

c. An order finding that this is an exceptional case, and an award to Fujirebio of its reasonable attorneys' fees under 35 U.S.C. § 285 or otherwise; and

d. Such other and further relief that the Court may deem just and proper.

Date: May 28, 2025

Respectfully Submitted,

*/s/ Monté T. Squire*
Monté T. Squire (No. 4764)
**DUANE MORRIS LLP**
1201 N. Market St., Suite 501
Wilmington, DE 19801
Tel.: (302) 657-4918
Fax: (302) 397-2543
MTSquire@duanemorris.com

Anthony J. Fitzpatrick, Esq.
(*pro hac vice* forthcoming)
Christopher S. Kroon, Esq.
(*pro hac vice* forthcoming)
Poornarchita H. Dwarakanath, Esq.
(*pro hac vice* forthcoming)
**DUANE MORRIS LLP**
100 High Street, Suite 2400
Boston, MA 02110-1724
Tel.: (857) 488-4220
ajfitzpatrick@duanemorris.com
cskroon@duanemorris.com
pdwarakanath@duanemorris.com

Thomas J. Kowalski
(*pro hac vice* forthcoming)
**DUANE MORRIS LLP**
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, NY 10017-4669
Tel.: (212) 692-1025
TJKowalski@duanemorris.com

*Attorneys for Plaintiff Fujirebio Diagnostics, Inc.*