**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FUJIREBIO DIAGNOSTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-cv-00659 (GBW) |
| | ) | |
| QUANTERIX CORPORATION, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| QUANTERIX CORPORATION, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FUJIREBIO DIAGNOSTICS, INC. and | ) | |
| FUJIREBIO EUROPE N.V., | ) | |
| | ) | |
| Counter-Defendants. | ) | |
| | ) | |

**PLAINTIFF AND COUNTER-DEFENDANT FUJIREBIO DIAGNOSTICS, INC.'s
OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
QUANTERIX CORPORATION'S AMENDED COUNTERCLAIM
PURSUANT TO FED. R. CIV. P. 12(B)(6)**

Monté T. Squire (No. 4764)
1201 North Market Street, Suite 501
Wilmington, DE 19801
Phone: (302) 657-4900
mtsquire@duanemorris.com

**OF COUNSEL:**

Anthony J. Fitzpatrick (Admitted *Pro Hac Vice*)
Christopher S. Kroon (Admitted *Pro Hac Vice*)
Poornarchita H. Dwarakanath (Admitted *Pro Hac Vice*)
DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110-1724

Thomas J. Kowalski (Admitted *Pro Hac Vice*)
DUANE MORRIS LLP
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, NY 10017-4669

*Attorneys for Fujirebio Diagnostics, Inc.*

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     RELEVANT BACKGROUND FACTS.....................................................................1

III.    LEGAL STANDARD..................................................................................................2

IV.     ARGUMENT ...............................................................................................................3

        A.      Claims 1 and 12 of the '092 Patent are Representative of All Claims .................. 3
        B.      Step 1:  The Asserted Claims are Directed to a Natural Phenomenon .................. 5

                1.      Elevated Blood Levels of Tau in Patients with a Neurological Disorder is a
                        Natural Phenomenon................................................................................. 6
                2.      Viewed as a Whole, the Claims Are Directed to the Natural Phenomenon.
                        ................................................................................................................ 6

                        a.      Claim 1 Recites Admittedly Conventional Methods of
                                Detecting the Natural Phenomenon. ................................................7
                        b.      The Steps of Claim 12 Also Are Admittedly Routine. .................12

                3.      The Claims of the '092 Patent are Analogous to Diagnostic Claims the
                        Supreme Court and Federal Circuit have Uniformly Invalidated............ 14

        C.      Step 2:  The Claims Do Not Recite an Inventive Concept. ................................. 19

IV.     CONCLUSION...........................................................................................................20

## TABLE OF AUTHORITIES

**Federal Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014) ...............................3, 5, 18

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371 (Fed. Cir. 2015) ..........5, 15

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 742 (Fed. Cir. 2019) ...........................................................................................................*Passim*

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018)...................................................4

*CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020).........................3, 7

*Cleveland Clinic Found. v. True Health Diags. LLC*, 859 F.3d 1352 (Fed. Cir. 2017) .................................................................................................................. 7, 15-17

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014)...........................................................................................3

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016)...................................14

*Genetic Techs. Ltd. v. Merial, LLC,* 818 F.3d 1369 (Fed. Cir. 2016)..............................18

*Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 952 F.3d 1367 (Fed. Cir. 2020) ..................... 14, 16-18

*Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 967 F.3d 1319 (Fed. Cir. 2020) .......................... 16-17

*Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) ..................... 5-6

*Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.,* 730 F.2d 1452 (Fed. Cir. 1984) .............................................................................................................10

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012) .........................*Passim*

*Natera, Inc. v. Neogenomics Labs., Inc.*, No. 1:23-cv-629, Dkt. No. 577 (M.D.N.C. Aug. 28, 2025) ......................................................................................................19

*PureCircle USA Inc. v. SweeGen, Inc.*, No. SACV1801679JVSJDEX, 2022 WL 1769118 (C.D. Cal. May 23, 2022), *aff'd,* No. 2022-1946, 2024 WL 20567 (Fed. Cir. Jan. 2, 2024) ........................................................................................................19

*Rapid Litig. Mgmt. Ltd. v. CellzDirect*, 827 F.3d 1042 (Fed Cir. 2016)................................ 16-18

*Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317 (Fed. Cir. 2023)...............................2, 9

*Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989 (Fed. Cir. 2003) .....................9

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017) .........19

*V-Formation, Inc. v. Benneton Group SpA*, 401 F.3d 1307 (Fed. Cir. 2005) ..................................3

**Federal Statutes**

35 U.S.C. § 101 ................................................................................................1, 3, 18, 20

**Rules**

Rule 12(b)(6) ..........................................................................................................3

**Other Authorities**

PTAB-IPR2025-01060, EX-1005 ...............................................................................13

PTAB-IPR2025-01060, Paper No. 2 .............................................................................2

PTAB-IPR2025-01060, Paper No. 9 .............................................................................2

U.S. Patent No. 11,275,092 .............................................................................*Passim*

**Suspects**

Section IV.B.2.b. ............................................................................................. 4, 9-11

*id.* at 6:60-7:7, 30:9-12, 34:1-7 ...............................................................................10

*id.* at 35:55-59 ....................................................................................................12

## I. INTRODUCTION

Laws of nature and natural phenomena are not eligible for patent protection. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 79-80 (2012). Quanterix's patent claims here recite precisely the same type of ineligible subject matter addressed in *Mayo*: a natural phenomenon, with only conventional, well-known steps for observing it. The natural phenomenon described in the U.S. Patent No. 11,275,092 ("the '092 Patent" (D.I. 1-1)) is a scientific fact—*i.e.*, humans suffering from a neurological disorder have an elevated level of tau protein in their blood. The asserted claims—although artfully drafted as a "method of producing … a sample"—cover nothing more than detecting the natural phenomenon using conventional and admittedly known techniques. The preamble language does not change that the claims start with the natural phenomenon (the presence of tau in blood) and end with the natural phenomenon (detecting the presence of tau in blood), with no non-conventional steps in between that modify the natural phenomenon. The claimed method does ***not*** create a new type of preparation, and does ***not*** detect the natural phenomenon in any innovative manner, as would be needed to pass muster under *Mayo* and its progeny. *Mayo* warned that laws of nature should not be removed from the public sphere by virtue of the "draftsman's art" in crafting patent claims. 566 U.S. at 72. That warning applies here.

The '092 Patent's claims should be held invalid under 35 U.S.C. § 101, and Quanterix's Counterclaim (which has already been amended) should be dismissed, with prejudice, as any further amendment would be futile.

## II. RELEVANT BACKGROUND FACTS

Tau is a protein found in the human body that is mainly expressed in neurons in the brain responsible for sending and receiving messages within the body. Brain injuries and other neurological disorders result in tau detaching from and disrupting communication between

neurons. Consequently, as the '092 Patent admits, "[t]au is known to be elevated in the cerebrospinal fluid (CSF) of patients with neurodegenerative disease and head injuries." '092 Patent, 1:65-67. Tau also diffuses across the blood brain barrier, and thus is present in blood in low concentrations that were believed to be difficult to reliably detect and measure. *Id*. at 1:49-2:13. The '092 Patent purports to have "discovered" that tau concentrations can be reliably measured in a patient blood sample using assay techniques. But not only does the '092 Patent describe these assay techniques as "known in the art" and even "commercially available" (*see, e.g.*, *id.* at 1:42-45; 16:27-17:41; 27:60-65), but Quanterix has admitted that "[b]oth concepts – existence of the assay, and general suggestions to search for tau in blood – appear in prior art references…." *See* Squire Decl. Ex. B (PTAB-IPR2025-01060, Paper No. 9) at pp. 1 &12.[1]

The recognition that tau can be detected in blood using conventional, commercially available techniques is not patent eligible. Supreme Court and Federal Circuit precedent requires more—namely, the application of the natural phenomenon (the presence of tau in blood) in a non-conventional, non-routine way not well-understood in the art at the time of the invention. The '092 Patent's claims fail to achieve this end, and are thus ineligible for patent protection.

## III.     LEGAL STANDARD

"Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Mayo*, 566 U.S. 71 (quotations omitted). Patent eligibility must not "depend simply on the

---

[1] On May 28, 2025, Fujirebio Diagnostics, Inc. ("FDI") filed a Petition for *Inter Partes* Review (IPR). *See* Squire Decl. Ex. A (PTAB-IPR2025-01060, Paper No. 2). Quanterix recently filed a Brief in Support of Discretionary Denial, requesting that the USPTO Acting Director deny institution of FDI's IPR. *See* Squire Decl. Ex. B. Quanterix's Brief is part of the intrinsic record of the '092 Patent, and can properly be considered in connection with this motion. *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023).

draftsman's art" without reference to the "principles underlying the prohibition against patents for [natural laws]." *Id.* A process that focuses upon the use of a natural law must also contain other elements or a combination of elements, sometimes referred to as an "inventive concept," sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself. *Id.*

Courts employ a two-part test to determine whether patent claims reciting natural phenomena are patent eligible: (1) whether the patent is directed to the natural phenomenon; and, if so, (2) whether the claims recite an inventive concept "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014); *see also Mayo*, 566 U.S. at 72-73.

A Section 101 motion to dismiss is proper at the pleading stage if it is apparent from the intrinsic record (*i.e.*, the patent, its prosecution history (including IPR proceedings)), and cited references) that the asserted claims are not directed to eligible subject matter. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372-73 (Fed. Cir. 2020) (in a Rule 12(b)(6) context, courts "consult the plain claim language, written description, and prosecution history"); *V-Formation, Inc. v. Benneton Group SpA*, 401 F.3d 1307 (Fed. Cir. 2005) (describing materials that make up the intrinsic record). Further, a court need not address all challenged claims individually if the court identifies a representative claim. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (citations omitted).

## IV.  ARGUMENT

### A.  Claims 1 and 12 of the '092 Patent are Representative of All Claims

All claims of the '092 Patent focus on a natural phenomenon:  an elevated level of tau protein in the blood of a patient with a neurological condition.

Independent Claim 1 is representative of Claims 4-11 and 14-21, and dependent Claim 12 is representative of Claims 2-3 and 13. Claim 1 recites three routine and conventional steps:[2]

- obtaining a volume of bodily fluid (blood, plasma or serum) from a patient;
- diluting the volume of bodily fluid;
- quantifying the concentration of tau protein in the volume of blood "through the use of an analytical protein concentration measurement assay" to produce the bodily fluid sample containing the quantified amount of tau.

'092 Patent, 37:22-33. Claim 1 further defines parameters for the bodily fluid sample and the assay that likewise were known in the art:

- the quantified concentration of tau in the bodily fluid sample is less than about 5 pg/ml; and
- the limit of quantification (LoQ) of the assay is less than about 0.2 pg/ml.

*Id.* at 37:34-40.

The second representative claim, Claim 12, further defines the quantification step of Claim 1 (*i.e.*, Claim 1 step (C)) by reciting additional conventional steps, including:

- "suspending" capture objects in the diluted blood volume that have an affinity for tau;
- "immobilizing" tau molecules with respect to the capture objects; and
- "interrogating" the capture objects to determine the concentration of tau.

*Id.* at 38:23-40.

Claims 1 and 12 are representative of the other claims for multiple reasons. First, they are the only claims for which the Counterclaim provides specific allegation of infringement and, thus, Quanterix chose them as representative (D.I. 20-1 at Ex. B). *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) ("Courts may treat a claim as representative in certain situations, such as if . . . the parties agree to treat a claim as representative."). Second, all

---

[2] Section IV.B.2.b, *infra*, demonstrates that the steps of Claims 1 and 12 were routine and conventional.

remaining claims are linked to the same natural phenomenon—elevated levels of tau in the blood of patients with a neurological disorder. And, third, any variations between Claims 1 and 12 and the remaining dependent claims are immaterial under both steps of the *Alice* test. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 n.9 (Fed. Cir. 2016) ("Addressing each of the asserted claims is unnecessary when all the claims are substantially similar and linked to the same abstract idea.") (internal quotation omitted). Representative Claims 1 and 12 are addressed below.

**B.  Step 1:  The Asserted Claims are Directed to a Natural Phenomenon**

Claims "directed to detecting the presence of a naturally occurring thing or a natural phenomenon" using only "well-understood, routine, and conventional" techniques uniformly are found not to be patent-eligible. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1376-77 (Fed. Cir. 2015). Under the first step of the *Mayo / Alice* analysis, such claims are directed to the natural phenomenon itself. *See Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 742, 751-52 (Fed. Cir. 2019).

Here, the claims of the '092 Patent are directed to a natural phenomenon: They start with a natural phenomenon—elevated levels of tau in the blood of patients with a neurological disorder. And end with the natural phenomenon—detecting the level of tau in patients with neurological disorders. Between the start and the end, the claims recite nothing more than the use of admittedly conventional and well-known techniques. *See Ariosa*, 788 F.3d at 1376 (method claims that began and ended with natural phenomenon were directed to naturally occurring subject matter). Such claims are not patent eligible.

1. **Elevated Blood Levels of Tau in Patients with a Neurological Disorder is a Natural Phenomenon.**

There is no dispute that patients suffering from a neurological disorder have elevated levels of tau proteins in their blood. It is a natural phenomenon that was known in the prior art. The '092 Patent acknowledges this natural phenomenon, explaining that "[t]he concentration of certain biomarkers [in the brain] may become elevated as a result of neuronal damage and death." '092 Patent, 1:61-63. Tau is provided as an example of such a biomarker, which the '092 Patent acknowledges can diffuse across the blood brain barrier and, thus, be present in the blood, albeit in low concentrations. *Id.* at 1:64-2:6; 5:14-49. The '092 Patent claims detection of this natural phenomenon using then-known techniques. *E.g., id.* at 5:63-6:4.

2. **Viewed as a Whole, the Claims Are Directed to the Natural Phenomenon.**

To determine whether claims are "directed to" the natural phenomenon or instead are a patent-eligible application of the natural phenomenon, the claims are considered as a whole. *Athena*, 915 F.3d at 750. For this analysis, courts consider whether the claims recite an improvement upon a technological process, based on both the written description and claims of the patent. *Id.*; *see also Intellectual Ventures*, 838 F.3d at 1317 ("The written description is particularly useful in determining what is well-known or conventional").

Here, the claims seek to patent that a known natural phenomenon—elevated levels of tau in the blood of patients with a neurological disorder—can be detected using any of numerous admittedly known prior art processes. '092 Patent, 1:65-67, 14:33-35, 16:27-17:41, 27:60-65, 35:21-59. That is, rather than limit the claims' reach to a new application of a natural phenomenon, the claims "recite only the natural law together with standard techniques for observing it." *Athena*, 915 F.3d at 752. Invariably, claims that involve "detecting a natural law

'with no meaningful non-routine steps'" are held to be "directed to" that natural law. *Id.* (quoting *Cleveland Clinic Found. v. True Health Diags. LLC*, 859 F.3d 1352, 1361 (Fed. Cir. 2017)).

> a. **<u>Claim 1 Recites Admittedly Conventional Methods of Detecting the Natural Phenomenon.</u>**

The intrinsic record of '092 Patent confirms the conventionality of the recited steps for detecting tau and, thus, that the claims are "directed to" a natural phenomenon. *See CardioNet,* 955 F.3d at 1372-73. The steps of Claim 1 represent a standard technique for detecting the concentration of tau in blood using any of a variety of well-known assays. Because tau has a high barrier of transportation across the blood brain barrier, the '092 Patent acknowledges that it was known that its concentration in the patient's blood would be relatively low. This low concentration naturally necessitates the use of immunoassays that have a limit of quantification (LoQ) and/or limit of detection (LoD) that is highly sensitive relative to conventional bulk analysis techniques (*e.g.*, so-called ELISA methods). '092 Patent, 1:67-2:4; 5:42-58; 14:33-43. However, the use of highly, or ultrasensitive, assays to detect proteins in blood was standard and conventional prior to the '092 Patent, as admitted in the '092 Patent. *Id.* at 14:33-38; 16:27-17:41; 20:61-63; 27:60-64; 35:21-59.

Indeed, the '092 Patent does not claim discovery of a "new assay" or even "new steps" for applying a known assay to a blood sample. Rather, according to the '092 Patent, the purported discovery was that "due to recent advancements in technology [made by others] which allow for the determination of the low concentrations of biomarkers in bodily fluids with sufficient accuracy and precision," low-level "variations in concentration [of tau can] be statistically significant and therefore, diagnostic." *Id.* at 5:63-6:4. But the '092 Patent does not purport to have contributed in any manner to the so-called "recent advancements" in detection techniques. And, under Supreme Court and Federal Circuit precedent, the recognition that a

natural phenomenon (a concentration of tau in blood) can be observed using known techniques is nothing more than "discovery" of the natural law itself. Natural laws and phenomena are not patent-eligible, and neither are conventional ways of observing them.

That the '092 Patent describes these ultrasensitive assay techniques as well-known at the time is not surprising. The '092 Patent acknowledges that those skilled in the art "will be aware of a variety of assay methods and systems that may be used in connection with the methods of the present invention." *Id.* at 14:33-38. Driving home this point, the '092 Patent identifies (and expressly incorporates by reference) more than *seventeen* examples of known ultrasensitive assay techniques for detecting biomarkers, including "various analyzers [that] are ***commercially available*** for the determination of the concentration of biomarkers." *Id.* at 27:60-64 (emphasis added); *see also id.* at 14:33-35 ("variety of known assay methods … may be used"), 16:27-17:41 (identifying and incorporating numerous prior art patent applications describing "ultra-sensitive" assays and techniques for "extending dynamic range in assays" for use in practicing '092 Patent methods), 35:21-59 (prior art citations of assays for use with working Examples 1 and 2). Further still, the '092 Patent instructs that the "assay methods and systems may employ a variety of different components, steps, and/or other aspects that will be known and understood by those of ordinary skill in the art." *Id.* at 20:61-63.

The fact that ultrasensitive assay methods with detection and quantification limits suitable for detecting tau in blood were known (and not actually all that "recent") is confirmed in the prosecution history. There, in an interview with the patent examiner, the applicant discussed "the general existence of multiple highly sensitive assay techniques being ***known for years*** prior to the effective filing date of this Application (***more than a decade***)." Squire Decl. Ex. C at p. 12 (Prosecution History, Reply to March 16, 2021 Office Action) (emphasis added). According to

the applicant's representative (Dr. Duffy), the only reason these known assays had not been used was because the industry did not expect that they would reliably produce "a clinically useful analytically quantified sample from blood." *Id.* at p. 10. These statements, made to convince the examiner to allow the claims over the prior art, are binding on Quanterix. *E.g., Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003) ("public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent").

So, too, Quanterix's statements to the PTAB are binding on Quanterix. *Sequoia Tech.*, 66 F.4th at 1327. In an effort to oppose institution of FDI's IPR, Quanterix readily admits that Dr. Duffy's prior art teachings (many of which are "incorporated by reference" into the '092 Patent) disclose "Patent Owner's Quanterix's ultra-sensitive assay technology for detecting analyte molecules or particles in a fluid sample like blood, and determining their concentration, including in subfemtomolar ranges." Squire Decl. Ex. B at 18; *see also id.* at 17 (admitting that another prior art publication to Rissin ("Rissin II"[3]) "is cumulative of Duffy…. Both describe Patent Owner Quanterix's ultra-sensitive assay for detection and measurement of proteins.").

Thus, there can be no dispute that ultrasensitive assays meeting the limitations of the claims of the '092 Patent were conventional. Quanterix admits that they were well-known in the prior art. They simply had not been used (according to Quanterix) to detect tau in blood. But a purported failure to previously use available and well-known assay techniques to detect naturally occurring tau does not transform the claims of the '092 Patent into patent-eligible subject matter.

*Mayo* and its progeny are particularly instructive on this point. In *Mayo*, the Supreme Court evaluated method claims that required analysis of a biological sample, *i.e.*, the blood of a

---

[3] *See* Section IV.B.2.b, *infra.*

patient treated with a thiopurine drug. The Court acknowledged that the preparation of the sample involved substantial human labor, *i.e.*, the administration of the drug to trigger the manifestation of a biological condition. *Mayo*, 566 U.S. at 77. Nonetheless, the Court concluded that because the biological condition was the consequence of how a human body metabolizes the drug (an entirely natural process) and the additional steps of the claim recited only "well understood, routine, conventional activity already engaged in by the scientific community," the claims were "directed to" the natural phenomenon itself. *Id.* at 79-80.

Here, like in *Mayo*, the claims of the '092 Patent recite conventional steps for detecting a natural phenomenon. Step (A) of Claim 1 – "obtaining" – simply identifies the obvious: to test a sample, a doctor must first "obtain" it. '092 Patent, 7:6-7 ("[t]hose of ordinary skill in the art will be aware of suitable systems and methods for obtaining a sample from a patient").

Step (B) – "diluting" – tells a doctor to prepare the sample in a manner routinely used to measure low-level analytes. This aspect of the method was so well-understood and routine, the '092 Patent offers scant guidance regarding the types of diluents or amount of dilution required. *E.g.*, *id.* at 6:60-7:7, 30:9-12, 34:1-7; *see Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick Co.,* 730 F.2d 1452, 1463 (Fed. Cir. 1984) ("[T]he specification need not disclose what is well known in the art."). This lack of guidance is not surprising given that it is a routine step in ultrasensitive assay techniques that Quanterix admits are prior art. *See* Section IV.B.2.b, *infra*, (identifying Rissin I's disclosure of dilution prior to use in the assay).

Step (C) – "quantifying" – tells a doctor to detect patients' tau levels using an analytical assay. Because suitable assay techniques admittedly were well-known in the art, this step simply tell doctors to engage in routine, conventional activity previously engaged in by scientists in the field. Such activity is not sufficient to transform an unpatentable law of nature into a patent-

eligible application of such a law. *Mayo*, 566 U.S. at 79-80. Indeed, the '092 Patent is replete with citations to prior art documents describing how to assay within the "wherein" clause of Claim 1. *See, e.g.*, '092 patent 14:33-35 ("variety of known assay methods … may be used"); 16:27-17:41 (identifying and incorporating numerous prior art patent applications describing "ultra-sensitive" assays for use in practicing '092 Patent methods); 35:21-59 (prior art citations of assays for use with working Examples 1 and 2).

Finally, the last part of Claim 1 – the "wherein" clause – simply tells a doctor about the concentration of tau present in the sample (a natural phenomenon) and the limit of quantification (the sensitivity) at which the natural phenomenon should be observed. The concentration of tau is entirely dependent on the patient and his neurological condition. It is a natural phenomenon. It is not the result of an active step or manipulation that alters the characteristics of tau from how it exists in nature. As to the limit of quantification, that parameter reflects nothing more than a standard characteristic of ultrasensitive assays that admittedly had been in use long before the '092 Patent. *See* Section IV.B.2.b, *infra* (discussing Rissin I and Rissin II). As such, as in *Mayo*, the additional (known) limitations in the "wherein" clause do not add "enough" to the natural law to render the claims patent-eligible.

Moreover, considering the steps of Claim 1 as an ordered combination adds nothing to the laws of nature and natural phenomenon that is not already present when the steps are considered separately. Using a known assay, with a known sensitivity, that has a known use for quantifying the concentration of proteins in blood, does not translate into a new and innovative test procedure or a preparation of a new type of sample for detecting a natural phenomenon. The recited steps add nothing specific to the laws of nature other than what is well-understood, routine, conventional activity, previously engaged in by those in the field. *Id.* at 79.

**b.** **The Steps of Claim 12 Also Are Admittedly Routine.**

As to Claim 12, its additional steps also were well-known and conventional, as the '092 Patent demonstrates by the lengthy list of prior publications directed to assay methods that it incorporates by reference. '092 Patent, 16:27-17:41, 35:21-59. These admittedly known methods include ultrasensitive assay techniques that include the same "suspending . . . capture objects," "immobilizing," "interrogating" and "determining" steps that Claim 12 recites, in addition to the "obtaining," "diluting", and "quantifying" steps and parameters that Claim 1 recites.

One example of a prior art patent application incorporated into the '092 Patent by reference is U.S. Patent Publication No. US2011/0245097 to Rissin et al. ("Rissin I"). *See id.* at 35:55-59. Rissin I discloses analytical assay techniques that have the sensitivity to accurately detect ultra-low concentrations of analyte molecules (*e.g.*, biomarkers) in a fluid sample, including between a range of 5000 fM (femtomolar) and 0.1 zM (zeptomolar) or less. Rissin I, ¶¶ [0002]-[0005], [0035].[4] Rissin I teaches that a blood volume containing the proteins of interest can be diluted by a factor of 10 or more prior to use in the assay, which corresponds to Step (B) of Claim 1. *Id.* at ¶ [0150]. Rissin I discloses working examples using its assay technique to quantify the concentration of PSA biomarkers in serum in a range between 136 pg/ml and 0.4 pg/ml, with limits of detection ranging between 0.008 pg/ml to 100 pg/ml. *Id.* at ¶¶ [0182] - [0183]. Claim 1's "wherein" clause requires a concentration of about 5 pg/ml or less and a limit of quantification of less than about 0.2 pg/ml, which is well within the disclosure of Rissin I.

---

[4] The LoD and LoQ of Rissin I are within the "wherein" clause of '092 Patent claim 1 as conversion of the pg/ml units of the '092 Patent to molar (M) units of Rissin I (and *vice versa*) uses a mathematical formula well-known to those of skill in the art. *See, e.g.*, "Weight to Molar Quantity (for proteins)" available at: https://www.bioline.com/media/calculator/01_04.html.

Relevant to Claim 12, Rissin I's technique suspends capture objects (*e.g.*, beads) to capture targeted protein in a fluid sample, as required by Claim 12, Step (i). Rissin I, at ¶ [0037]. Rissin I describes that the capture objects have an affinity for and serve to immobilize the targeted protein, as required by Step (ii). *Id.* The capture objects are then interrogated to detect and/or quantify the concentration of the protein in the sample, as required by Steps (iii) and (iv). *Id.* at ¶¶ [0038] – [0039]. *E.g.*, Rissin I, at ¶ [0035]. Plainly, all steps of Claims 1 and 12 are disclosed by Rissin I, which the '092 Patent admits was known art.

To the extent any uncertainty remains regarding whether the steps of Claims 1 and 12 were well-known, Quanterix disclaimed any such dispute in response to FDI's IPR petition. There, Quanterix admits that the Rissin II disclosure[5] describes the operation of these same prior art assays in detail, using the same conventional steps recited in Claim 12:

> Rissin [II] describes this digital assay as using 'arrays of femtoliter-sized reaction chambers' 'that can isolate and detect single enzyme molecules.' The assay operates by forming a sandwich antibody complex on microscopic beads [*i.e.,* "suspending… capture objects"], after which bound antibodies are labeled with enzymes. The sample is introduced to the labeled complex, whereby the labeled antibodies capture the target protein of interest [*i.e.,* "immobilizing"]. These complexes are then put into femtoliter-volume wells for isolation and detection of single molecules [*i.e.,* "interrogating" and "determining"]. Rissin [II]'s Figure 1 depicts this set up.

*See* Ex. B at 17. Rissin II's Figure 1 (to which Quanterix cites) is set forth below with annotations (added in red) to demonstrate how its prior art assay technique corresponds to the limitations of Claims 1 and 12:

---

[5] Rissin et al., "Single-molecule enzyme-linked immunosorbent assay detects serum proteins at subfemtomolar concentrations", Nature Biotechnology 28(6):595-9 and suppl. pages (Jun. 2010) (attached as Squire Decl. Ex. D (PTAB-IPR2025-01060, EX-1005)) ("Risin II"). Rissin II is cited on the face of the '092 Patent, is EX-1005 to FDI's IPR, and is part of the intrinsic record.



Squire Decl. Ex. D at 596 (red annotations added); *see also id.* Ex. A at 28, 42, 45, 48, 50.

Plainly, Quanterix does not dispute that the claimed steps for quantifying the concentration of tau protein in blood were standard and commercially available well before the '092 Patent. *Id.* The claims recite no improvements over these conventional assay techniques and no new and innovative applications of the techniques. That is, the claims "describe[] the claimed invention principally as a discovery of a natural law, not as an improvement in the underlying immunoassay technology." *Athena*, 915 F.3d at 751. Thus, the claims "only encompass the natural law itself." *Id.* at 752-53.

### 3. The Claims of the '092 Patent are Analogous to Diagnostic Claims the Supreme Court and Federal Circuit have Uniformly Invalidated.

In evaluating whether claims are directed to patent-ineligible subject matter, "both the Supreme Court and the Federal Circuit have found it sufficient to compare the claims at issue to those claims already found to be directed to [ineligible subject matter] in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). Here, the analogous cases show that the claims of the '092 Patent are akin to diagnostic method claims that the Supreme Court and Federal Circuit consistently have held to be patent-ineligible. *See Illumina, Inc. v. Ariosa*

*Diagnostics, Inc.*, 952 F.3d 1367, 1371 (Fed. Cir. 2020) ("Under *Mayo*, we have consistently held diagnostic claims unpatentable as directed to ineligible subject matter.").

Starting with *Mayo*, discussed above, the Supreme Court invalidated claims setting "forth laws of nature," because "the steps in the claimed processes (apart from the natural laws themselves) involve well-understood, routine, conventional activity previously engaged in by researchers in the field." 566 U.S. at 73, 77. Here too, the claims of the '092 Patent set forth a law of nature—an elevated concentration of tau in the blood of a patient having a neurological condition—and only admittedly well-understood, routine, conventional activity for observing it.

In *Ariosa Diagnostics*, the Federal Circuit found claims for detecting naturally occurring fetal cfDNA in a pregnant woman's blood using "method steps [that] were well-understood, conventional and routine" to be directed to a patent-ineligible subject matter. 788 F.3d at 1376-77. Here, too, the '092 Patent claims recite detecting naturally occurring tau protein in the blood of a patient with a neurological condition, without reciting any improvement over the admittedly well-understood, conventional, and routine assay detection techniques recited in the claims.

Similarly, in *Cleveland Clinic*, the Federal Circuit reiterated that claims that merely recite observing naturally occurring phenomena "with no meaningful non-routine steps in between" are directed to a natural law. 859 F.3d at 1361. There, the specification indicated that the claimed inventors discovered a natural relationship between an MPO molecule and cardiovascular disease. *Id.* at 1360-61. The claims at issue recited "seeing" MPO or other MPO-related products in a patient sample and then correlating that to cardiovascular disease. *Id*. at 1361. The court found that the claims were based on a natural phenomenon that "exists in principle apart from human action." *Id.* In holding that the claims were "directed to" the natural phenomenon and not to a patent-eligible laboratory method for detecting MPO, the court found that "[t]he

specifications of the testing patents confirm that known testing methods could be used to detect [the natural phenomenon], and that there were commercially available testing kits for [the natural phenomenon] detection." *Id*. The same is true here. The claims of the '092 Patent recite detecting tau protein in a patient's blood, but again recite no improvements over the known—and admittedly commercially available—assay techniques recited in the claims.

Likewise, in *Athena*, the Federal Circuit found that methods using admittedly known immunoassay techniques to detect certain auto-antibodies produced in patients suffering from a neurological disorder were not patent eligible. 915 F.3d at 754-55. The *Athena* Court held that "[c]laiming a natural cause of an ailment and well-known means of observing it is not eligible for a patent because such a claim in effect only encompasses the natural law itself"—despite that the steps of the claims were "set forth with some specificity" and involved use of a "man-made substance." *Id.* at 752-53. Similarly, the '092 Patent claims a natural phenomenon caused by an ailment—an elevated level of tau protein in blood of a patient having a neurological condition— and only well-known means of detecting it (*i.e.*, ultrasensitive assays). As in *Athena*, that the detection steps are recited with "some specificity" using human-defined parameters does not change the conclusion. The claims still are "directed to the natural law because they recite only the natural law together with standard techniques for observing it." *Id.* at 752.

Not only do the '092 Patent claims have striking similarities to the patent-ineligible diagnostic claims discussed above, the claims also are strikingly different than cases in which the Federal Circuit has upheld the patentability of claims directed to natural phenomenon. *See Rapid Litig. Mgmt. Ltd. v. CellzDirect*, 827 F.3d 1042 (Fed Cir. 2016); *Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 967 F.3d 1319 (Fed. Cir. 2020). Indeed, patent-eligible claims, such as those at issue in *CellzDirect* and *Illumina*, are inapposite for multiple reasons.

First, unlike here, none of the claims at issue in *CellzDirect* or *Illumina* were directed to conventional techniques for detecting a natural phenomenon. If they were, the *Illumina* court indicated that they would have been unpatentable. *Illumina*, 967 F.3d at 1325 ("This is not a diagnostic case. . . . Under *Mayo*, we have consistently held diagnostic claims unpatentable as directed to ineligible subject matter.").

Second, the result of practicing any of the claims upheld in *CellzDirect* or *Illumina* would be a "preparation" that does not exist in nature, *i.e.*, a fraction of cell-free DNA different than what is normally found in mother's blood as in *Illumina, id.* at 1326, and a select population of preserved liver cells that can survive being frozen and thawed multiple times as in *CellzDirect*, 827 F.3d at 1050-1051. By contrast, the claims of the '092 Patent detect and quantify a natural phenomenon—tau protein in blood—with the protein unchanged from how it exists in nature and with a concentration as it exists in the patient.

Third, in each of *CellzDirect* and *Illumina*, the Federal Circuit found that the claims recited new and improved laboratory techniques. *See, e.g., CellzDirect*, 827 F.3d at 1046, 1048 ("Repeating a step that the art taught should be performed only once can hardly be considered routine or conventional"); *Illumina*, 967 F.3d at 1326 (claims recite "methods for preparing a fraction of cell-free DNA" by the physical processes of "size discriminating and selectively removing DNA fragments above than a specified size threshold" not previously used). However, as discussed above, the '092 Patent does not disclose or claim such new or improved laboratory testing techniques. Nor do the claims purport to recite the preparation or creation of anything new, improved and unnatural. Notably, the Federal Circuit itself in *Cleveland Clinic* and *Athena* has distinguished *CellzDirect* on grounds that apply equally here. *See Cleveland Clinic*, 859 F.3d

at 1362 (distinguishing *CellzDirect* because it was directed to improved methods for preserving liver cells); *Athena*, 915 F.3d at 751-52 (same).

Finally, to the extent Quanterix relies on the claims' preamble to attempt to save the claims under the Step 1 analysis, such an argument would fail. Here, the preamble is drafted to posture the claims as a "method of producing a bodily fluid sample of a patient suspected of having a neurological condition." '092 Patent, 37:22-23. Regardless of how the preamble categorizes the claimed process, the drafter's language choice does not change "the end result of the process." *See CellzDirect*, 827 F.3d at 1048. That is, the end result is not a new type of sample or preparation as in *CellzDirect* or *Illumina*. Instead, the end result recited in the claims is detection of a patient's blood tau levels in the sample, observed by "well-understood, routine, conventional activity previously engaged in by researchers in the field." *See Mayo*, 566 U.S. at 73; *Genetic Techs. Ltd. v. Merial, LLC,* 818 F.3d 1369, 1376 (Fed. Cir. 2016) (claims involving no creation or alteration of the natural phenomenon and no novel detection techniques are directed to the natural law itself). The presence of elevated tau levels in patients with neurological disorders exists in nature apart from any human action. *See Athena*, 915, F.3d at 750 (finding there is "no dispute" that a natural phenomenon that exists without any human action "is an ineligible natural law"). None of the steps recited in the claims modify or alter that natural phenomenon. They are simply conventional steps for detecting it.

As the Supreme Court has warned, claims must not be "interpreted under § 101 in ways that make patent eligibility depend simply on the draftsman's art." *Alice*, 573 U.S. at 226 (cleaned up). Rather, whether claims are directed to patent-eligible subject matter requires examination of the claims as a whole, in light of the Court's precedents. "Otherwise, any diagnostic claim could be drafted as a method of preparation claim by rephrasing the claim as a

18

method of preparing a sample and then analyzing the sample with a diagnostic test." *PureCircle USA Inc. v. SweeGen, Inc.*, No. SACV1801679JVSJDEX, 2022 WL 1769118, at *6 (C.D. Cal. May 23, 2022), *aff'd,* No. 2022-1946, 2024 WL 20567 (Fed. Cir. Jan. 2, 2024); *see also Natera, Inc. v. Neogenomics Labs., Inc.*, No. 1:23-cv-629, Dkt. No. 577 (M.D.N.C. Aug. 28, 2025). Here, however artfully Quanterix may have drafted the preamble, the end result remains that the claims are "directed to" a natural phenomenon—the presence of elevated tau levels in the blood of patients with a neurological disorder.

Fundamentally, the claims begin with a natural phenomenon (a sample of patient's blood containing endogenous tau) and end with a natural phenomenon (a sample of patient's blood containing quantified endogenous tau). Following Supreme Court and Federal Circuit precedent compels the conclusion that the claims of the '092 Patent are directed to a natural phenomenon. The patent-eligibility analysis thus must proceed to the step-two inquiry.

### C. Step 2: The Claims Do Not Recite an Inventive Concept.

The claims do not pass Step 2 of the *Mayo* framework either, as they are devoid of an "inventive concept." "To save a patent" under Step 2, "an inventive concept must be evident ***in the claims***." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) (emphasis added). For this step, "the elements of each claim [are considered] both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Mayo*, 566 U.S. at 78, 79. "The transformative 'inventive concept' supplied by the claim elements not drawn to ineligible subject matter must be 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Athena*, 915 F.3d at 753. Here, the claims lack an inventive concept.

Again, as in *Mayo* and *Athena*, the specification of the '092 Patent does not suggest that the recited combination of steps is inventive or that their combination in any way represents an improvement over known and previously used techniques for detecting and quantifying biomarkers. The '092 Patent acknowledges that the combination was well-known in the art and even commercially available. '092 Patent, 14:33-38; 16:27-17:41; 20:61-63; 27:60-64; 35:21-59.

The fact that these known steps had not been used to detect tau does not provide the "inventive concept" required by the step-two inquiry. Rather, "to supply an inventive concept the sequence of claimed steps must do more than adapt a conventional assay to a newly discovered natural law; it must represent an inventive application beyond the discovery of the natural law itself." *Athena*, 915 F.3d at 754; *see also Mayo*, 566 U.S. at 78. Here, the claims of the '092 Patent differ from known assay techniques only in the protein that is selected for quantification (here, tau) and the clinical indication that is assessed (here, a neurological condition). Applying well-known assay techniques, as exemplified by those admitted in the '092 Patent and Quanterix to be prior art (including Rissin I, Rissin II and others), to the '092 Patent-admitted natural phenomenon of elevated levels of tau in the blood of patients having a neurological condition does not in itself create an inventive concept. It does not transform claims directed to a natural phenomenon into patent-eligible subject matter. Like the routine, known detection techniques found patent-ineligible in *Mayo* and *Athena,* the claims of the '092 Patent do not recite an inventive application of an assay technique and, thus, do not provide an inventive concept. They are not eligible for patent protection under 35 U.S.C. § 101.

## IV.    CONCLUSION

FDI respectfully asks the Court to grant its motion, find the claims of the '092 Patent invalid under 35 U.S.C. § 101, and dismiss Quanterix's Counterclaim, with prejudice.

Date:  September 5, 2025                    Respectfully Submitted,

**DUANE MORRIS LLP**


*/s/ Monté T. Squire*
Monté T. Squire (No. 4764)
1201 North Market Street, Suite 501
Wilmington, DE  19801
Phone: (302) 657-4900
mtsquire@duanemorris.com

**OF COUNSEL:**

Anthony J. Fitzpatrick (Admitted *Pro Hac Vice*)
Christopher S. Kroon (Admitted *Pro Hac Vice*)
Poornarchita H. Dwarakanath
(Admitted *Pro Hac Vice*)
DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110-1724

Thomas J. Kowalski (Admitted *Pro Hac Vice*)
DUANE MORRIS LLP
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, NY 10017-4669

*Attorneys for Fujirebio Diagnostics, Inc.*