# EXHIBIT A

Petition for *Inter Partes* Review of
U.S. Patent No. 11,275,092

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

Fujirebio Diagnostics, Inc.
Petitioner,

v.

Quanterix Corp.
Patent Owner.
_____

U.S. Patent No. 11,275,092
Issue Date: March 15, 2022

Title:
Methods of determining a treatment protocol for
and/or a prognosis of a patient's recovery from a brain injury

_____

*Inter Partes* Review No.: IPR2025-01060
_____

**PETITION FOR *INTER PARTES* REVIEW
OF
U.S. PATENT NO. 11,275,092**

*Mail Stop "**PATENT BOARD**"*
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

# TABLE OF CONTENTS

Page

I. GROUNDS FOR STANDING (37 C.F.R. § 42.104(a)) AND PROCEDURAL STATEMENT ........................................................1

II. SUMMARY OF THE ARGUMENT ...............................................1

    A. INTRODUCTION ...............................................................1

    B. OVERVIEW .......................................................................1

III. RELIEF REQUESTED (37 C.F.R. § 42.22(a)) .............................3

IV. REASONS FOR THE REQUESTED RELIEF ...............................3

V. IDENTIFICATION OF CHALLENGES .......................................4

    A. Challenged Claims ............................................................4

    B. Statutory Grounds for Challenges ....................................4

VI. BACKGROUND ............................................................................5

    A. Summary of the '092 Patent ..............................................5

    B. Prosecution History ..........................................................7

    C. Priority Date of the Challenged Claims ..........................10

    D. Claim Construction..........................................................11

    E. Person of Ordinary Skill in the Art .................................11

    F. State of the Art .................................................................12

        1. The Role of Tau in Alzheimer's Disease and Related Neurological Disorders .........................................12

        2. SiMoA and Detecting Tau .......................................18

VII.   IDENTIFICATION OF HOW THE CHALLENGED CLAIMS ARE
       UNPATENTABLE ..................................................................................28

       A.    Ground I:  Rissin in view of Todd ...............................................28

             1.    The Rissin Reference ..........................................................28

             2.    The Todd Reference ............................................................31

             3.    The Motivation to Combine the Teachings of Rissin in view of
                   Todd ....................................................................................34

             4.    Detailed Application of Rissin in view of Todd ......................37

       B.    Challenge 2: Claims 1-21 of the '092 Patent are invalid as
             obvious over Rissin in view of Voorheis ...........................................56

             1.    Voorheis ..............................................................................56

             2.    The Motivation to Combine Rissin in view of Voorheis ..........58

             3.    Detailed Application of Rissin in view of Voorheis .................61

VIII.  MANDATORY NOTICES UNDER 37 C.F.R. §42.8 ..................................72

       A.    Real Party-in-Interest (37 C.F.R. § 42.8(b)(1)) ...................................72

       B.    Related Matters (37 C.F.R. § 42.8(b)(2)) ............................................72

             1.    Judicial Matters ..................................................................72

             2.    Administrative Matters ........................................................73

             3.    Related Patents ...................................................................73

       C.    Lead/Back-up Counsel (37 C.F.R. § 42.8(b)(3)): ...............................74

       D.    Notice of Service Information (37 C.F.R. § 42.8(b)(4)): ....................74

IX.    CONCLUSION ........................................................................................74

## TABLE OF AUTHORITIES

**Statutes**

35 U.S.C. § 102(a) ......................................................................................5

35 U.S.C. § 102(b) ......................................................................................5

35 U.S.C. § 103 ......................................................................................1-2, 4

35 U.S.C. §§ 311 *et seq.* .............................................................................1

**Other Authorities**

37 C.F.R. §§ 42.1 *et seq.* ............................................................................1

37 C.F.R. § 42.8 ..........................................................................................74

37 C.F.R. § 42.8(b)(1) .................................................................................74

37 C.F.R. § 42.8(b)(2) .................................................................................74

37 C.F.R. § 42.8(b)(3) .................................................................................75

37 C.F.R. § 42.8(b)(4) .................................................................................75

37 C.F.R. § 42.22(a) ....................................................................................4

37 C.F.R. § 42.104(a) ..................................................................................1

37 C.F.R. § 42.106(a) ..................................................................................1

37 C.F.R. § 42.108 ......................................................................................1, 4

U.S. Patent No. 5,492,812 ...........................................................................5

U.S. Patent No. 11,275,092 .................................................................*Passim*

Petitioner's Exhibit List

| Exhibit # | Description |
|---|---|
| **1001** | U.S. Patent No. 11,275,092 ("the '092 Patent") |
| **1002** | Select portions of prosecution history of the '092 Patent, i.e., select portions of the file history of US application No. 16/522,237 ("File History") |
| **1003** | Declaration of Petitioner's Expert John Todd, PhD ("Todd Dec") |
| **1004** | Curriculum vitae of Petitioner's Expert John Todd, PhD |
| **1005** | Rissin et al., Single-molecule enzyme-linked immunosorbent assay detects serum proteins at subfemtomolar concentrations. Nat Biotechnol. 28(6):595-9 and Supplementary information (4 pages) available at https://static-content.springer.com/esm/art%3A10.1038%2Fnbt.1641/MediaObjects/41587_2010_BFnbt1641_MOESM21_ESM.pdf (Epub May 23, 2010) ("Rissin") |
| **1006** | John Todd, et al., How Low Can You Go? Next generation immunoassay systems and the revival of protein biomarkers. Drug Discovery World, Fall 2008 ("Todd") available at https://www.ddw-online.com/media/32/fall-08-immunoassay-systems.pdf. ("Todd") |
| **1007** | Voorheis, "Diagnostic Method For Alzheimer's Disease By Screening For Tau-Peptides in the Blood of a Patient", US Patent No. 5,492,812 ("Voorheis") |
| **1008** | File History of US application No. 08/159,969, filed November 30, 1993, which matured into US Patent No. 5,492,812 (Voorheis, EX-1011), and published February 20, 1996 with the issuance of Voorheis, EX-1007 ("Voorheis FH") (An electronic copy (pdf) is supplied with the filing of this Petition, and Petitioner also has a Certified Copy of Voorheis FH from the National Archives, available for filing by hand with the Board) |
| **1009** | Rissin & Walt, "Digital Concentration Readout of Single Enzyme Molecules Using Femtoliter Arrays and Poisson Statistics", Nano Lett. 6(3): 520-523 (2006) ("Rissin 2006") |

| Exhibit # | Description |
|---|---|
| **1010** | Rissin et al., "Simultaneous Detection of Single Molecules and Singulated Ensembles of Molecules Enable Immunoassays with Broad Dynamic Range", Anal. Chem. 83:2279-2285 (2011) ("Rissin 2011") |
| **1011** | Bourzac, "Next-Generation Diagnostics A startup can detect tiny traces of cancer markers in blood samples", MIT Technology Review, May 13, 2008, available at: https://www.technologyreview.com/2008/05/13/220548/next-generation-diagnostics/ |
| **1012** | Todd et al., "Ultrasensitive Flow-based Immunoassays Using Single-Molecule Counting", Clinical Chemistry 53(11):1990-1995 (2007) ("Todd 2007") |
| **1013** | Nam et al., "Nanoparticle-Based Bio-Bar Codes for the Ultrasensitive Detection of Proteins, Science 301: 1884-1886 (2003) ("Nam") |
| **1014** | Thaxton et al., "Nanoparticle-based bio-barcode assay redefines 'undetectable' PSA and biochemical recurrence after radial prostatectomy", PNAS 44:18437-18442 (2009) |
| **1015** | Duffy et al., US2010/0075407 ("the '407 publication" or "Duffy"), published March 25, 2010 |
| **1016** | Rissin et al., "Digital Readout of Target Binding with Attomole Detection Limits via Enzyme Amplification in Femtoliter Arrays", JACS Communications 19(128) 6286-6287 (2006) ("Rissin 2006a") |
| **1017** | Wunderlich et al., "Neuron-specific enolase and tau protein as neurobiochemical markers of neuronal damage are related to early clinical course and long-term outcome in acute ischemic stroke", Clinical Neurology and Neurosurgery 108:558-63 (Sep. 2006) ("Wunderlich") |
| **1018** | Mortberg, "Assessment of the Cerebral Ischemic/Reperfusion Injury after Cardiac Arrest", Acta Universitatis Upsaliensis Uppsala. Dissertation, 71 pages (2010) ("Mortberg") |
| **1019** | Ding et al., Transl Neurodegener 10:10 (2021). https://doi.org/10.1186/s40035-021-00234-5 ("Ding") |
| **1020** | Medeiros, et al., "The Role of Tau in Alzheimer's Disease and Related Disorders", CNS Neuroscience & Therapeutics 17: 514–524 (2011) ("Medeiros") |
| **1021** | Weingarten et al., "A protein factor essential for microtubule assembly", PNAS 72:1858-1862 (1975) ("Weingarten") |

| Exhibit # | Description |
|---|---|
| 1022 | Konzack et a., "Swimming against the Tide: Mobility of the Microtubule Associated Protein Tau in Neurons", J Neuroscience 27(37):9916 –9927l (2007) |
| 1023 | Vanmechelen et al., "Differential Diagnosis of Neurological Diseases", US Patent No. 6,670,137 ("Vanmechelen") |
| 1024 | April 9, 2004 "INNOTEST hTAU Ag" webpage of Innogenetics downloaded from "Wayback Machine", https://web.archive.org/web/20040914040003fw_/http://www.innogenetics.be/site/prodview.asp?id=38&lang=E&print=true, accessed January 11, 2025 ("INNOTEST") |
| 1025 | Galasko, "Biomarkers for Alzheimer's disease – Clinical needs and application", J Alzheimer's Disease 8:339-346 (2005) ("Galasko") |
| 1026 | Vandermeeren et al., "Detection of τ Proteins in Normal and Alzheimer's Disease Cerebrospinal Fluid with a Sensitive Sandwich Enzyme-Linked Immunosorbent Assay", J Neurochem. 61:1828-1834 (1993) ("Vandermeeren") |
| 1027 | Hulstaert et al. / Innogenetics N.V., "Tau as a Marker for Early CNS Damage", WO00/14546 (March 16, 2000) ("Hulstaert") |
| 1028 | Vandermeeren et al., "Monoclonal Antibodies Directed Against the Microtubule-Associated Protein Tau, and Hybridomas Secreting These Antibodies", US Patent No. 5,843,779, issued December 1, 1998 ("Vandermeeren '779") |
| 1029 | de Jong, et al., "Current state and future directions of neurochemical biomarkers for Alzheimer's disease" Clin. Chem. Lab. Med. 45: 1421– 1434, 1424-25 (2007) |
| 1030 | May 29, 2010 Screenshot of "Alzheimer's Disease" webpage of Quanterix downloaded from "Wayback Machine", https://web.archive.org/web/20100529185326/http://www.quanterix.com/applications/ad.html, accessed January 7, 2025 ("PO Website May 29, 2010") |
| 1031 | Schraen-Maschke et al., "Tau as a biomarker of neurodegenerative diseases", Biomark Med 2(4): 363-384 (2008) ("Schraen-Maschke") |
| 1032 | Blennow et al., CSF markers for incipient Alzheimer's disease", Lancet Neurol 2(10):605-13 (2003) ("Blennow") |
| 1033 | Quanterix Single Molecule Arrays for Digital Detection in Complex Samples, IQT Technology Focus Day, March 25, 2010 presentation ("Quanterix Presentation") |

| Exhibit # | *Description* |
|---|---|
| **1034** | October 22, 2013 Screenshot "simoa Assay Kits" webpage of Quanterix downloaded from "Wayback Machine", https://web.archive.org/web/20131022204103/http://quanterix.com/products/assay-kits, accessed May 27, 2025 (showing Tau Simoa Assay commercially available) ("PO Website Oct 22, 2013") |
| **1035** | Nalefski, *et al.,* "Single-Molecule Detection for Femtomolar Quantification of Proteins in Heterogeneous Immunoassays", Clinical Chemistry 52(11): 2172–2175 (1 November 2006), https://doi.org/10.1373/clinchem.2006.072850 and DOI: 10.1373/clinchem.2006.072850 |
| **1036** | September 12, 2009 Screenshot "Singulex® Assay Menu Erenna® Immunoassay System", Aβ-42 (Amyloid beta protein 42) webpage of Singulex, Inc. downloaded from "Wayback Machine", https://web.archive.org/web/20090912044340/http://www.singulex.com:80/assay_details.html?id=2, accessed April 24, 2025 ("Singulex Website Aug. 12, 2009") |
| **1037** | Gavett BE, *et al.*: "Mild traumatic brain injury: a risk factor for neurodegeneration." Alzheimer's Research & Therapy 2010, 2:18, doi:10.1186/alzrt42 |
| **1038** | Mortimer JA, *et al.*: "Head trauma as a risk factor for Alzheimer's disease: a collaborative re-analysis of case–control studies." EURODEM Risk Factors Research Group. Int J Epidemiol 1991, 20:S28-S35. |
| **1039** | Quanterix July 30, 2013 Press Release "Quanterix Announces Commercial Availability of its Simoa Single Molecule Array Technology", available at, https://www.quanterix.com/wp-content/uploads/2020/12/Simoa_7-30-13_FINAL-Press-Release.pdf, accessed May 28, 2025 ("Quanterix 7/30/13 Press Release") |
| **1040** | Quanterix August 7, 2012 Press Release "Quanterix Issued Key Patent for Simoa™ Technology", available at, https://www.fiercebiotech.com/biotech/quanterix-issued-key-patent-for-simoa%E2%84%A2-technology , accessed May 28, 2025 ("Quanterix 8/17/12 Press Release") |

| Exhibit # | Description |
|---|---|
| **1041** | Quanterix October 16, 2013 Press Release "Quanterix Announces Key Patents Issued for Simoa Platform", available at, https://www.quanterix.com/wp-content/uploads/2020/12/Patents_Release_FINAL.pdf, accessed May 28, 2025 ("Quanterix 10/16/13 Press Release") |
| **1042** | Bogoslovsky et al., "Increases of Plasma Levels of Glial Fibrillary Acidic Protein, Tau, and Amyloid β up to 90 Days after Traumatic Brain Injury", J Neurotrauma 34:66–73 (2017) (citation 28 of Ding) ("Bogoslovsky") |
| **1043** | Declaration of Ingrid Hsieh-Yee |

# I. GROUNDS FOR STANDING (37 C.F.R. § 42.104(a)) AND PROCEDURAL STATEMENT

As required by 37 C.F.R. §42.104(a), Petitioner certifies that U.S. Patent No. 11,275,092 ("the '092 Patent") is available for *inter partes* review ("IPR") and the Petitioner is not estopped from requesting IPR. This Petition is filed pursuant to 37 C.F.R. § 42.106(a).

# II. SUMMARY OF THE ARGUMENT

## A. INTRODUCTION

Pursuant to 35 U.S.C. §§ 311 *et seq*. and 37 C.F.R. §§ 42.1 *et seq*., Fujirebio Diagnostics, Inc. ("FDI" or "Petitioner") hereby petitions for an IPR of the '092 Patent. Petitioner respectfully submits that Claims 1, 6-21 (the "Challenged Claims") are unpatentable under 35 U.S.C. § 103 in view of the prior art references discussed herein. This Petition demonstrates there is a reasonable likelihood that Petitioner will prevail with respect to at least one claim. Accordingly, it is respectfully requested that the Board institute IPR pursuant to 37 C.F.R. § 42.108.

## B. OVERVIEW

The Challenged Claims are invalid as obvious under 35 U.S.C. § 103 over the prior art. The claims are directed to producing a patient bodily fluid sample having an analytically quantified amount of endogenous tau protein. The Challenged Claims recite three well-known, well-understood steps:

- **Step A:** obtaining a sample of blood or a blood component;

- **Step B:** diluting the sample; and

- **Step C:** quantifying the amount of tau protein in the diluted sample using an assay, wherein the assay is sensitive (limit of quantification <0.2 pg/ml) and the tau protein is present in a low concentration (less than about 5 pg/ml).

EX-1003 ¶39.

Step A (obtaining a sample) is required or virtually any blood-based immunoassay and had been performed for decades prior to the purported invention. There is nothing unique with respect to how the blood sample is obtained. EX-1003 ¶40.

Steps B and C (diluting a sample and analyzing it) were also routine in the art. Dr. David Walt and Dr. David Duffy at Tufts University assisted in the publication of numerous articles that taught the claimed steps of "diluting" and "analyzing" a blood sample using ultra-sensitive analytical techniques, such as single molecule assays ("SMA" or "SiMoA"). EX-1010 (diluting sample 1:4 before analyzing with SMA); EX-1011 (discussing Quanterix's SMA approach); EX-1016 (disclosing proof-of-concept for Quanterix's SMA). So too did the several other groups, including Todd *et al.* at Singulex, Inc., Mirkin *et al.* at Northwestern University, Nalefski, *et al.* at U.S. Genomics, and the PO itself. EX-1012, 1990; EX-1013; EX-1014; EX-1035; EX-1015. By April 2011, analytical techniques using SMAs had pushed the detection limit of proteins in bodily fluids into the attomolar range (*i.e.*,

$1 \times 10^{-18}$ mol/L) or sub pg/mL range, and were widely understood to "provide[] a promising approach for measuring extremely low concentrations of proteins." EX-1005, 595; EX-1015, 90; EX-1003 ¶41.

Though these SMA techniques were well-known since the early 2000's, the provisional applications that led to the '092 Patent were not filed until April and August 2011. EX-1001; EX-1002. Any incremental improvements in the '092 Patent as to SMA developed by Drs. Walt and Duffy were prior published, and the '092 Patent simply provides conventional SMA applied to measure endogenous tau protein levels in the blood of patients suspected of suffering from neurological disorders – an indication that was prevalent in the prior art as demonstrated by Grounds 1 and 2 below. EX-1003 ¶42.

## III. RELIEF REQUESTED (37 C.F.R. § 42.22(a))

Petitioner respectfully requests institution of an IPR pursuant to 37 C.F.R. § 42.108 and cancellation of the Challenged Claims.

## IV. REASONS FOR THE REQUESTED RELIEF

As explained in §§ II and VI-VIII of this Petition and in the attached Declaration of Petitioner's Expert, John Todd, PhD, EX-1003, the Challenged Claims would have been obvious over the prior art to a person of ordinary skill in the art ("POSA") at the time of the invention.

## V.     IDENTIFICATION OF CHALLENGES

### A.     Challenged Claims

Claims 1 and 6-21 of the '092 Patent are challenged in this Petition.

### B.     Statutory Grounds for Challenges

The Challenges are set forth in detail below:

| Ground | Claims | Basis | Reference |
|--------|--------|-------|-----------|
| 1 | 1, 6-21 | 35 U.S.C. § 103 | Rissin in view of Todd |
| 2 | 1, 6-21 | 35 U.S.C. § 103 | Rissin in view of Voorheis |

**Ground 1**:

"Rissin" is a printed publication, an article entitled "Single-molecule enzyme-linked immunosorbent assay detects serum proteins at subfemtomolar concentrations", published on May 23, 2010 in Nature Biotechnology, and is submitted with the Supplementary information published with the article (EX-1005).  Rissin qualifies as prior art under at least pre-AIA §102(a) and was submitted in an IDS, but was not cited or applied by the examiner.

"Todd" is a printed publication, an article entitled "How Low Can You Go? next generation immunoassay systems and the revival of protein biomarkers", published on October 7, 2008 in Drug Discovery World (EX-1006).  Todd qualifies as prior art under at least pre-AIA §102(b) and was not before the examiner.

**Ground 2**:

"Voorheis" is U.S. Patent 5,492,812 titled "Diagnostic Method For
Alzheimer's Disease By Screening For Tau-Peptides In The Blood Of A Patient",
issued February 20, 1996, from US application No. 08/159,969, filed November
30, 1993, as a continuation of US application No. 07/738,778, filed August 1, 1991
(EX-1007). The file history published on February 20, 1996 with the grant of
Voorheis. ("Voorheis FH") (EX-1008). Each of Voorheis and Voorheis FH
qualifies as prior art under pre-AIA §102(b). Voorheis was submitted in an IDS,
but was not cited or applied by the examiner. The Voorheis FH was not before the
examiner.

## VI. BACKGROUND

### A. Summary of the '092 Patent

The Challenged Claims relate to a method for producing a patient bodily
fluid sample having an analytically quantified amount of endogenous tau protein
using an assay that is highly sensitive. The '092 Patent acknowledges that tau was
a known biomarker of "patients with neurodegenerative disease and head injuries."
The concentration of tau in the cerebrospinal fluid (CSF) and blood "was known to
increase with hypoxic events", however, because tau "must diffuse across the
blood brain barrier" it may be present in the blood "in extremely low
concentrations that are not reliably measurable by typical conventional

immunoassays." Thus, while not expressly claimed – but how the examiner in original prosecution understood the claims – the inventors sought to use the more sensitive, well-known in the art, SMA to detect tau in the blood. EX-1001, 1:49-2:13.

A SMA interrogates proteins and other target analytes at the level of individual molecules. The '092 Patent does not purport to have invented SMAs or even a new SMA technique. Rather, as the '092 Patent acknowledges, SMAs were known in the art to provide ultra-high sensitivity and several different SMAs had been used to detect protein biomarkers in blood at extremely sensitive levels, including the *attomolar* range (*i.e.*, $1 \times 10^{-18}$ moles/L levels). SMAs' ultra-high resolution was known to be useful for diagnosing disease, understanding the state of tissues, or finding treatments for disease. EX-1001, 16:27-17:41; EX-1003 ¶44.

Instead, at a high level the claimed method generally corresponds to three steps that are indicative of all prior art SMAs:

Step (A) – obtaining a volume of blood, plasma or serum. This step is self-evident.

Step (B) – diluting the volume of bodily fluid. Consistent with prior art SMAs, the concentration of the sample is diluted such that a single molecule of the target protein is isolated in an individual reaction vessel (as the name implies) for detection.

Step (C) – quantifying through the use of an assay a concentration of tau

protein in the volume of bodily fluid, wherein the concentration of tau in the

diluted sample is less than about 5 pg/ml, and a limit of quantification (LoQ) of the

assay is less than about 0.2 pg/mL. Prior art SMAs were known to quantify blood

protein levels at below the claimed concentration and using assays up to 10 times

more sensitive. And tau was a known biomarker for neurological disorders. As

such, the claimed method amounts to nothing more than the obvious use of a

known to be highly sensitive immunoassay, to quantify the concentration of a

known biomarker, known to be present at low levels in blood. All of the inventive

work had already been performed by those who came before, rendering the

Challenged Claims obvious. EX-1003 ¶45.

## B.     Prosecution History

The '092 Patent issued March 15, 2022 from Application No. 16/522,237

("the '237 App.") filed July 25, 2019. The '237 App. was originally filed with 91

claims. By Preliminary Amendment, claims 1-10, 12-19, and 25-91 were

cancelled; new independent claim 92 (issued claim 1) and new dependent claims

93-103 were added, with claims 11 and 20-24 amended. EX-1002, 92-109.

Independent claim 92 was originally directed to "[a] method of producing a

body fluid sample" from "a patient recovering from a brain injury." In a March 16,

2021 Office Action, the claims were rejected as obvious based on Duffy (EX-

1015) in view of a March 15, 2010 PO presentation at the "IQT Technology Focus Day" (the "Quanterix Presentation") (EX-1033) alone, or in view of Wunderlich (EX-1017), or Mortberg (EX-1018).  EX-1002, 493-504.

The examiner found that Duffy taught a SMA that met the limitations of Claim 92, except measuring tau as the specific analyte of interest, and the sample being obtained from a patient "recovering from a brain injury."  Those limitations, however, were disclosed in the Quanterix Presentation, which instructs the use of SMA to detect the concentration of tau in the blood of patients suffering from two neurological conditions:  traumatic brain injury and Alzheimer's disease (AD). Moreover, the examiner relied on Wunderlich and/or Mortberg to disclose a dependent claim limitation (*i.e.*, detecting tau in blood "within 12 hours of the brain injury").  EX-1002, 493-610.

Following an t interview, Applicant submitted a July 16, 2021 Amendment broadening claim 92 (issued claim 1) to recite "producing a bodily fluid sample of *a patient suspected of having a neurological condition*" (from "*a patient recovering from a brain injury*") and adding new claims (*i.e.*, issued claims 12, 13 and 15).  EX-1002, 541-545.

Applicant did not submit any declaration or affidavit evidence, only attorney argument making comparisons to "conventional ELISA" – as opposed to SMA of Duffy or the Quanterix Presentation – and assertions of secondary considerations.

Applicant admitted there were prior art references that measured tau in the blood of patients suspect of having neurological disorders, but ignoring the closest prior art, argued that such techniques were "unreliable." Moreover, PO never disclosed that it had publicly offered SMA kits to test blood for biomarkers of AD before the filing date (as did its competitor, Singulex, Inc.), or that there are only two biomarkers for AD, β-amyloid and tau. EX-1033; slide 22; EX-1030; EX-1036.

Instead, PO argued that following the publication of the invention, there was an alleged "sea-change in the field" that "effectively created or contributed to creating the reasonable expectation of success that was absent at the time Applicant's invention was made…." Applicant argued that a 2021 review article by Ding (EX-1019) evidenced a "dramatic rise in publications with clinically relevant measurements of tau in blood", the "vast majority" of which "use Simoa® techniques described in the present Application." EX-1002, 493-610; EX-1003 ¶46.

PO did not explain how the alleged "rise" in tau-related publications was the result of both what is claimed and novel in the then pending, and now issued, claims (as opposed to being the result of prior art SMA techniques like the Quanterix Presentation or Duffy, PO's marketing of SMA technology, PO's public assertions of a dominating patent position, the publications reported in Ding being by PO or authors affiliated with PO, or improvements in tau antibody specificity).

*See e.g.*, EX-1034 (PO's tau assay kit), EX-1039 (PO announcement of commercial availability of fully automated SiMoA platform), EX-1040 (key SiMoA platform patents press release), EX-1041 (same); EX-1019 (Table 1, citations 27-29, 31, 35, 36, 39, 40, 41, 43, 47, 55, 56, 58, 59, 64 and 65 have authors affiliated with PO or '092 Patent); EX-1042, at 67, 73 (citation 25 for "Simoa is a novel technology" is to "Epub ahead of print" concerning "The Simoa HD-1 Analyzer").  Nonetheless, the examiner allowed the claims, noting incorrectly in his Reasons for Allowance that "Ding table 1 lists Applicant's claimed assay (tau Simoa) used by at least forty-two (42) groups after the effective filing date of 4/12/11."  EX-1002, 654-661.  In reality, Ding describes sixty-six studies (publications), not groups, wherein "ultrasensitive immunoassays" were used to measure tau in plasma.  Ding further states that only 42 of these 66 studies used the Simoa assay.  In regards to the "groups" statement, the authors on many of these Simoa publications were affiliated with the PO.  Ding does not represent an alleged "sea-change" as represented by applicant.  And, in any event, the Challenged Claims are not limited to SMA.  EX-1019, 6-7; EX-1003 ¶47.

## C.    Priority Date of the Challenged Claims

The '092 Patent claims the benefit to two provisional applications, the earliest of which was filed April 12, 2011.  For purposes of this Petition, Petitioner assumes a priority date of April 12, 2011.

### D.    Claim Construction

Petitioner proposes that, only for purposes of this petition, each claim term in the Challenged Claims be given its ordinary and customary meaning, and that no specific construction of any claim term is required because the prior art relied on and as applied in this Petition meets each of the claim terms under any reasonable construction.

### E.    Person of Ordinary Skill in the Art

With respect to the '092 Patent, a POSA in April 2011 would have been familiar with, and have a working knowledge of, molecular biology techniques including immunology techniques and assays, such as enzyme-linked immunosorbent assays (ELISA) and SMAs, and detecting tau in blood by immunoassays for diagnosing neurological conditions.  A POSA would have knowledge of these concepts through a mixture of education, training and work experience such as by having a Bachelor's degree in molecular, cellular, or developmental biology, biochemistry, biomedical sciences, immunology, or neuroscience such as molecular neuroscience, or an equivalent degree, coupled with six years of laboratory experience; or a Master's degree in such fields with

four years of laboratory experience; or a PhD in such fields with at least two years

of laboratory experience.  EX-1003 ¶50.

### F.     State of the Art

This section describes the state of the art of molecular neuroscience that

includes anti-tau antibodies, and assays that use these antibodies, especially for the

detection or diagnosis of neurological diseases (including AD) as of April 2011.

EX-1003 ¶51.  The prior art references, and the discussions of what was known to

a POSA, are exemplary in nature, relied upon by Dr. Todd, properly included to

provide factual support for his opinions, and can be considered by the Board to

show the general state of the art, to identify motivation to combine the teachings of

the primary references, to support reasonable expectation of success, to rebut any

assertions of unpredictability in the art or unexpected results, and to rebut any

assertions that the claims are directed patentable subject matter.

### 1.     The Role of Tau in Alzheimer's Disease and Related Neurological Disorders

AD is a progressive neurodegenerative disorder associated with memory

loss, spatial disorientation, and gradual deterioration of intellectual capacity.  AD

is estimated to effect more than six-million Americans (one in eight), and

necessitates long-term care costing hundreds of billions annually.  AD is

characterized by the formation of abnormal clumps (amyloid plaques) and tangled

bundles of fibers (neurofibrillary, or tau, tangles) in the brain. EX-1020, EX-1003

¶52.

Tau, a structural microtubule-associated protein, is mainly expressed in

neurons and understood to have six isoforms. Nerve cells are responsible for

sending and receiving messages between different parts of the body. As

illustrated, neurons are polarized cells with two types of cell extensions, dendrites

and axons, whose establishment depends on a microtubule cytoskeleton.



Figure 1. Schematic drawing of a neuron with an adjacent astrocyte and capillary. The central pathogenetic processes in AD and their corresponding biochemical markers are depicted. Total concentration of tau protein is a marker of neuronal and axonal degeneration, Aβ₁₋₄₂ concentration is a marker of plaque formation, and concentration of phosphorylated tau is a marker for hyperphosphorylation of tau and formation of tangles.

EX-1020; 515; EX-1032.

Normally, tau functions to promote the assembly of tubulin into

microtubules, which helps stabilize their structure and facilitates the transport of

essential molecules within the neuron. EX-1021. However, in AD and other

neurodegenerative diseases, tau becomes abnormally phosphorylated, causing it to

detach from microtubules and aggregate into tangled fibers called neurofibrillary

tangles (NFTs). These NFTs disrupt the cell's internal transport system, impairing

communication between neurons. Ultimately, plaques and tangles spread

throughout the brain, causing neurons to die. EX-1022, 9916; EX-1003 ¶54. Key

tau discoveries are illustrated below:



**Figure 1** Key discoveries in tau protein research.

EX-1020, 514-515.

By the mid-1980's, tau became recognized as a biomarker – a substance

indicative of disease – for early diagnosis and prognostic prediction of the changes

in brain function and other cognitive disorders, including AD. Galasko describes a

Working Group convened in 1998 by the Alzheimer's Association and the

National Institute on Aging to develop guidelines for identifying biomarkers for

AD.  A key recommendation was that biomarkers should be convenient,

inexpensive and able to be measured sensitively and reliably and, thus, they

logically suggested that blood would be a more convenient source of biomarker

than CSF (which requires a complex and risky spinal tap).  Moreover, because it

was believed that AD pathology starts 20–30 years before its clinical onset, there

was a recognized need to detect elevated tau levels in at risk patients as early as

possible to prevent or slow disease onset.  EX-1025, 342-43; EX-1029, 1424-25;

EX-1003 ¶55.

Thus, early studies explored tau as a biomarker in human CSF, blood, and

blood components (*e.g.*, serum and plasma).  EX-1025, Abstract; EX-1008, 93-94,

122-140, 151-158, 163-167; EX-1017, 559; EX-1018; EX-1023, 1:20-29, 1:57-2:7,

2:33-38, 16:52-17:28; EX-1024; EX-1026; EX-1003 ¶56.

Researchers focused on developing anti-tau antibodies.  These antibodies

were first developed as polyclonal antibodies, with monoclonal antibodies that

detect all isoforms of tau (*i.e.*, "total tau" or "t-tau"), independent of

phosphorylation, developed thereafter.  For example, in 1993, Vandermeeren

taught a sandwich ELISA using a monoclonal antibody directed to human tau in

CSF.  With this technique, the detection limit for tau was less than 5 pg/ml of CSF.

EX-1026, Abstract, 1832-33; EX-1003 ¶57.

In 2000, Hulstaert explored a method for the early detection and quantification of CNS damage by monitoring tau levels in CSF or blood. Hulstaert explains that tau was a known indicator of CNS damage caused by anoxia or ischemia, including during stroke, cerebral infarction, thrombosis, cerebral hemorrhage, and CO poisoning. EX-1027, cls 1, 2, 4; EX-1028, Examples I-V; EX-1003 ¶58.

By 2003 phosphorylated tau ("p-tau") was recognized as a strong candidate biomarker for AD, with total tau being a general biomarker for neuronal damage, and with the existence of numerous antibodies against t-tau and phosphorylated tau:



EX-1032, 606, 607; EX-1003 ¶59.

In 2006, Wunderlich reported elevated tau (including phosphorylated tau) in serum of acute ischemic stroke patients, and experiments that detected 30 pg/ml of tau in blood at 3, 6 and 12 hours after stroke, concluding that tau is a useful predictor of outcome in stroke patients. EX-1017, 559, 563 and Fig. 1b. Mortberg also reported that the presence of tau in blood or CSF is a marker for axonal loss, suggesting a prognostic value for tau in stroke, closed head injury, and mild traumatic brain injury. These uses of tau are very important and expand the use of tau to a number of "neurological conditions" in addition to AD. EX-1018, 19-20. Researchers recognized that TBI may lead to an increased risk of developing neurological disorders, including Ad and Parkinson's disease. EX-1037; EX-1038. As Galasko explained, because "tau can be released from damaged neurons or axons regardless of the cause, any disorder that damages or destroys enough neurons will release tau into CSF." EX-1025, 342; EX-1003 ¶60.

By 2008, it was well known to use assays for p-tau and t-tau during the course of AD, including because as between p-tau181 and p-tau231 – the most studied phospho-epitopes of tau – p-tau181 occurs later in AD than p-tau231:



EX-1031, 364; EX-1003 ¶61. Thus, by 2008, there were selective, sensitive antibodies that could discriminate among the forms of tau proteins – including so that one could discriminate AD from normal aging – allowing the POSA to readily run a more sensitive assay, such as SMA, with an expectation of success. EX-1031, 373; EX-1003 ¶62. Indeed, as the '092 Patent admits, the "six known natural-occurring tau proteins" are "well-known in the art", including "phosphorylated" tau and capture antibodies with affinity for tau were both well-known and commercially available in the art. EX-1001, 8:37-51; 33:34-40.

### 2. SMA and Detecting Tau

Rapid and reproducible methods that implement high-sensitivity and low-level analyte detection are the cornerstone of analytical chemistry. Scientists have

been focused on improving the sensitivity and detection limit of such methods for decades. EX-1016, 6286-6287; EX-1003 ¶63.

Early immunoassay techniques for quantifying low-level analytes including, *inter alia*, ELISA, employed amplification procedures designed to increase the number of reporter molecules producing a signal. While these methods allowed low-level analyte detection, they often involved complex procedures and required a large number of molecules for the aggregate signal to rise above the detection threshold. These disadvantages limited the sensitivity and dynamic range (*i.e.,* the range of concentrations that can be detected) of these techniques. Moreover, the amplification procedures often lead to non-specific binding. This, in turn, amplified the background signal as well as the true signal resulting in non-improved sensitivity. EX-1016, 6286; EX-1003 ¶64.

By the early 2000's, scientists developed new techniques. Rather than amplify the target analyte in a sample – which caused the above disadvantages – these techniques focused on digitizing the signal generated from immunoassays and measuring single molecules. Aided by the development of nanotechnologies (including optical fiber bundles and flow technologies), scientists began using a variety of techniques to separate true signal from background signal (including densely-packed arrayed structures with micrometer-sized elements), aimed at capturing and detecting *individual molecules* of a target analyte. EX-1003 ¶65.

Bourzac describes one of these SMAs. A single optical fiber bundle is made up of thousands of individual glass threads. As illustrated by Bourzac below, by dipping optical fibers in acid, the individual threads can be used to etch a substrate with tens of thousands of microwells, one at the tip of each thread, effectively creating a large array of nanoscale test tubes. Each microwell can then be coated with protein-capturing antibodies. Using these femtoliter-sized reaction chambers (*i.e.,* one-quadrillionth or $1 \times 10^{-15}$ of a liter), the reactor volumes are small enough such that they contain either zero or one analyte molecule. The individual optical threads in contact with each well can be used to carry both excitation and emission light to and from the wells, thereby enabling remote interrogation of the well contents. EX-1011, 1; EX-1003 ¶66.



**Lab on a tip:** Wells carved into the tip of an optical fiber allow researchers to detect single proteins in blood samples. Each well in this image is about 2.5 micrometers in diameter and sits at the tip of an individual thread of an optical fiber.

As excitation light is shone on the microwell, the sandwiched antibody and enzyme undergo a reaction that produces fluorescent light. The light travels back

up the optical fiber, without signal "cross-talk" between fibers. EX-1011, 1; EX-1003 ¶67.

The presence or absence of a fluorescent product in each reaction vessel provides a binary readout ("on" or "off"). At very low target concentrations, the ratio of the number of analyte molecules to the number of wells assumes a "Poisson distribution", where either a single analyte molecule or no analyte binds to each well. The percentage of reaction vessels occupied by enzyme molecules can then be correlated to the bulk concentration by simply counting the number of "on" or "off" reaction vessels. Whereas the detection limit of ELISA was between 1-10 pg/ml of protein in blood (*e.g.*, $10^{-10}$ to $10^{-12}$ g/ml), SMA (sometimes called "Digital ELISA") allowed attomolar level detection – many thousand times more sensitive (*e.g.*, $10^{-16}$ to $10^{-18}$ g/ml). EX-1009, 522; EX-1003 ¶68.

By the mid-2000's, SMAs were well described and recognized as a simple, low-cost approach to single molecule detection that was inherently scalable and had the ability to detect numerous different analytes (including proteins and small molecules). Scientists had developed several different single-molecule assay techniques. In 2007, Todd *et al.*, assessed a SMA technology called Erenna Immunoassay System ("EIS") based upon flow technology to ascertain the limit of detection (LoD) and the dynamic reporting range of a series of ten different biomarkers in blood plasma, and achieved a LoD of 0.01 pg/mL. Todd expressed

the prevailing view of the "utmost importance" of understanding its potential

applications for detecting protein biomarkers for disease diagnosis, monitoring,

and management.  EX-1012, 1993-94; EX-1003 ¶69.

Scientists at Tufts University were also developing SMAs for detection of

disease, neurological conditions and cancer.  Dr. David Walt studied $\beta$-

galactosidase using a 1 mm diameter fiber optic bundle with 24,000 individually

sealed, femtoliter microwell reactors.  Walt applied a Poisson statistical analysis to

obtain the concentration of single molecules of $\beta$-galactosidase.  In particular, Walt

noted that this approach would be "useful for single molecule enzymology and

ultrasensitive bioassays" and concluded that the "future of this technology will

permit studies with multiple different enzymes and will push the limits of ultralow

detection for protein and DNA targets using enzyme-linked detection methods in

conjunction with the high-density femtoliter array."  EX-1009, Abstract, 523; EX-

1011; EX-1003 ¶70.

The work of Todd and Walt was built upon by Duffy.  Duffy taught a

method of detecting protein biomarkers in body fluid samples such as "blood,

serum, plasma, urine, saliva, tissue, organ, or the like", using femtoliter arrays to

analyze single molecules for detection of disease, neurological conditions and

cancer.  In order to increase the dynamic range of the assay, Duffy taught to dilute

the sample by a factor of 10 or more.  EX-1015, 144, 213; EX-1003 ¶71.

The diluted sample was exposed to a substrate with a plurality of capture components (antibodies) immobilized thereon. As analyte molecules associated with the capture components, they bound together to form capture complexes (*i.e.,* antibody-antigen complexes) immobilized on the substrate surface. At least a portion of the capture complex was then dissociated from the substrate, and analyzed using a femtoliter array "such that at least some… reaction vessels contain zero particle-containing complexes and at least some… reaction vessels contain only one or at least one particle-containing complexes." EX-1015, 224-270; EX-1003 ¶72.

The presence and amount of disassociated species can then be detected and quantified, and the analyte concentration is determined by a Poisson distribution analysis of the number or fraction of reaction vessels that contain a dissociated species. Like other single molecule techniques, Duffy's methods were capable of detecting ultra-sensitive levels of analyte at about $50 \times 10^{-15}$. EX-1015, 10, 185, 198; EX-1003 ¶73.

On March 25, 2010, Duffy made a presentation on behalf of the PO titled "Single Molecule Arrays for Digital Detection in Complex Samples" presented at the IQT Technology Focus Day ("the Quanterix Presentation") (EX-1033).

.

EX-1033, slide 1, EX-1002, 493-610; EX-1003 ¶74.

The Quanterix Presentation teaches that SMA is capable of detecting ultra-sensitive levels of proteins (*e.g.*, TNF-α and IL-6 at 0.20 fM, and PSA at 0.10 fM), small molecules (below 10 fM), as well as single cell arrays to detect RNA and DNA, and discusses several "current applications" of SMA, including neurological diseases, such as AD:



EX-1033, slides 9, 11, 15-17, 19; EX-1003 ¶75.

In particular, the Quanterix Presentation describes the use of SMA to detect tau in the blood of patients suffering from AD and other TBI, quoting Dr. Rudolf Tanzi, a neurologist at Massachusetts General Hospital, who explains that an ideal "serum marker for TDI" is "Tau":

> You want a nice serum marker for TBI, you do it through Tau. That is where you may have a use for Tau because the blood brain barrier is damaged. Then you may be able to get some assessment of the degree of injury following a TBI by looking at Tau in the plasma.

EX-1033, slide 29; EX-1003 ¶76.

The Quanterix Presentation reports the results of a "Quanterix t-tau Assay",

based upon SMA technology, that measured t-tau in blood of AD patients and age-

matched controls:



EX-1033, slide 22; EX-1003 ¶77.

The Quanterix Presentation notes that SMA provides an "[a]lternative non-

invasive source for identification of low abundance neuronal specific proteins" as

compared to CSF tests.  It further notes that "[a] rapid blood-based test for TBI

would have significant value" in view of its ability to provide "real-time

assessment of new/worsening neurologic injury", to "predict secondary pathologies

(*e.g.*, elevated JCP, ischemia)", and "detect[] mild injury that cannot be observed

with CT/MRI."  EX-1033, slide 29; EX-1003 ¶78.

Duffy's and the Quanterix Presentation's methods were in diagnostic use.

Quanterix began developing an "Alzheimer's Disease test panel" with its website

announcing Quanterix's ability to use SMA technology to detect the biomarkers

for Alzheimer's "with a simple blood test, even though they are present in the

blood at exceedingly low concentrations, well below the limit of detection

achieved by standard testing methods."  Quanterix explained the benefits of its test,

including "eliminating the need for invasive medical procedures, shortening time

to diagnosis, and reducing the use of expensive imaging modalities."  Quanterix

also taught other useful applications, including as diagnostic test for "other

neurological disorders, including Parkinson's disease, bipolar disorder, stroke and

traumatic brain injury (TBI)."  EX-1030.  At the same time, other competitors in

the field, including Singulex Inc., were already offering commercially available

SMA directed at testing biomarkers for AD.  EX-1036; EX-1003 ¶79.

Accordingly, long before the '092 Patent earliest filing date, the state of the

art was using SMA for calculating concentrations of tau in blood as a biomarker

for numerous neurological conditions, including AD.  EX-1003 ¶80.

## VII.  IDENTIFICATION OF HOW THE CHALLENGED CLAIMS ARE UNPATENTABLE

### A.  Ground I:  Rissin in view of Todd

#### 1.  The Rissin Reference

Like the '092 Patent, Rissin teaches performing a SMA assay (digital ELISA) to measure low concentrations of protein biomarkers in blood and blood serum for clinical diagnosis of healthy and disease states and to monitor disease progression, "us[ing] arrays of femtoliter-sized reaction chambers" that "can isolate and detect single enzyme molecules":



Figure 1  Digital ELISA based on arrays of femtoliter-sized wells. (a,b) Single protein molecules are captured and labeled on beads using standard ELISA reagents (a), and beads with or without a labeled immunoconjugate are loaded into femtoliter-volume well arrays for isolation and detection of single molecules by fluorescence imaging (b). (c) Scanning electron micrograph of a small section of a femtoliter-volume well array after bead loading. Beads (2.7 μm diameter) were loaded into an array of wells with diameters of 4.5 μm and depths of 3.25 μm. (d) Fluorescence image of a small section of the femtoliter-volume well array after signals from single enzymes are generated. Whereas the majority of femtoliter-volume chambers contain a bead from the assay, only a fraction of those beads possess catalytic enzyme activity, indicating a single, bound protein molecule. The concentration of protein in bulk solution is correlated to the percentage of beads that carry a protein molecule.

EX-1005, Fig. 1; EX-1003 ¶81.

Rissin describes disadvantages with conventional analyte detection techniques, including measuring "proteins at concentrations above $10^{-12}$ M", whereas "serum concentrations of the majority of proteins important in… neurological disorders", "rang[e] from $10^{-16}$ to $10^{-12}$ M."  Prior art analyte

detection techniques were not thought to reliably measure protein biomarker
concentrations.  EX-1005, 598; EX-1003 ¶82.

Rissin teaches that SMA solves these problems.  "As [SMAs] provide
superior label sensitivity over conventional assays, substantially less detection
antibody (~1 nM) and enzyme conjugate (1−50 pM) are needed to detect binding
events as compared with conventional assays….  The decreased label
concentration reduces nonspecific binding to the capture surface, resulting in much
lower background signals."  EX-1005, 598; EX-1003 ¶ 83.

Rissin acknowledges that others were developing ultra-sensitive and single
molecule assays.  For example, Rissin discusses that Mirkin "used labels based on
gold nanoparticles and DNA biobarcodes to push the detection of proteins into the
low femtomolar range; and… detect[] 10 fM of PSA in serum."  Rissin also
discusses Todd, who "developed flow-based methods for serially detecting single
fluorescently labeled detection antibodies released from immunocomplexes formed
on solid substrates."  Rissin sought to "exploit the ability of [SMAs] to trap and
detect single enzymes to detect single enzyme–labeled proteins" in order to further
improve upon these ultra-sensitive technologies "using the same reagents as the
gold standard for detecting proteins, namely, the ELISA."  EX-1005 at 595; EX-
1003 ¶84.

According to Rissin: "In the first step… (Fig. 1a), a sandwich antibody complex is formed on microscopic beads (2.7 μm diameter), and the bound complexes are labeled with an enzyme, as in a conventional bead-based ELISA." "When assaying samples containing extremely low concentrations of protein, the ratio of protein molecules (and the resulting enzyme-labeled complex) to beads is small (typically <1:1) and, as such, the percentage of beads that contain a labeled immunocomplex follows a Poisson distribution." At low protein concentrations, "the Poisson distribution indicates that beads carry either a single immunocomplex or none." "At ratios of enzyme to beads greater than ~1:10, the fraction of active beads becomes much higher, and Poisson statistics show that there are a significant number of beads with multiple enzymes." Thus, to ensure protein concentrations in the sample are sufficiently low, a "fourfold dilution factor is typically used to reduce matrix effects in immunoassays." EX-1005, 595-98; EX-1003 ¶85.

Rissin explains SMAs' operation, including its ability to "confin[e] the fluorophores generated by individual enzymes to extremely small volumes (~50 fl), ensuring a high local concentration of fluorescent product molecules." To achieve this confinement, "beads are loaded into an array of femtoliter-sized wells." A "droplet of fluorogenic enzyme substrate", is added causing those beads "possessing a single enzyme–labeled immunocomplex" to fluoresce. "By acquiring time-lapsed fluorescence images of the array… it is possible to

distinguish beads associated with a single enzyme molecule ("on" well) from those

not associated with an enzyme ("off" well)."  EX-1005, 596, Fig. 1; EX-1003 ¶86.

"[P]rotein concentration in the test sample is determined by counting the number

of wells containing both a bead and fluorescent product relative to the total number

of wells containing beads (Fig. 1d)."

"As [SMAs] enable concentration to be determined digitally rather than by

using the total analog signal," Rissin dubbed his approach "digital ELISA."  The

lowest concentration of enzyme conjugate detected by Rissin was 350 zeptomolar

(zM) and the calculated LOD was 220 zM, corresponding to an increase in

sensitivity over prior art ELISA "of a factor of about 68,000."  EX-1005, 596; EX-

1003 ¶87.

### 2.     The Todd Reference

Todd describes the use of a SMA technology developed by Singulex, Inc.

(commercially sold as the "Erenna Immunoassay System" or "EIS") that could be

used to detect tau biomarker in the blood plasma of patients for early detection of

AD.  Like the claimed invention, Singulex's SMA utilizes "paramagnetic

microparticles (MPs) as the solid phase for immune-capture and detection of

analyte from a complex biological sample, providing enhanced specificity,

sensitivity and precision" at "sub-picogram levels."  Todd demonstrates that its

SMA is capable of measuring numerous protein biomarker analytes in human

blood plasma with a LoD of at least 0.01 pg/ml.  EX-1006, 53; EX-1003 ¶88.



**Figure 4**
Erenna immunoassay system LoD compared to the measured range of analyte quantified in healthy human subjects

EX-1006, Fig. 4.

Todd describes the challenges historically faced by translational scientists

when detecting and defining the onset of disease using protein biomarkers.  While

protein biomarkers provide a standardized metric for evaluating disease states,

their application is often limited by the sensitivity of assay used for their detection.

For example, "assay sensitivity is often what determines the lower limit of the

threshold and the diagnostic cut-off value" for disease onset.  "The threshold

system only reveals the tip of the iceberg when it comes to disease states."  Often,

information that "resides beneath the 99th percentile threshold value for a clinically relevant biomarker… could be used to diagnose, stratify, determine risk, or aid in disease prevention." In addition, because the development of a disease state is a continuum rather than "an on/off proposition", disease onset and diagnosis is "difficult to mark" and "a common cause of diagnostic failures." EX-1006, 51-53; EX-1003 ¶89.

Todd specifically highlights AD as "an excellent example" of a disease state having a "prolonged disease onset leading towards diagnostic failure." Todd explains that, because "the only definitive diagnosis of AD is a post-mortem examination of brain tissue… clinical diagnosis of this disease is diagnosed by ruling out other probable causes for the symptoms of AD, which are usually only apparent after significant disease progression has occurred." As a result, "there is no reliable way at this time to clinically define when this complex disease officially starts, and an FDA approved molecular diagnostic for AD is desperately needed." EX-1006, 53; EX-1003 ¶90.

In this way, Todd explains that "protein biomarker programmes in AD and other disease areas can benefit immensely from the application of novel immunoassay technologies with ultra-sensitive detection" such as SMA. Todd emphasizes that "[t]he need for an early diagnosis for AD is especially important as new therapies for AD are developed, which provide better patient outcomes

when administered early in the course of the disease." Todd teaches that the "solution" is "integrating novel technology into next generation immunoassay systems" such as SMA, and specifically identifies "tau proteins" as one of two known protein biomarker candidates for clinical diagnosis of AD. EX-1006, 52-53; EX-1003 ¶91.

### 3. The Motivation to Combine the Teachings of Rissin in view of Todd

As discussed in the State of the Art, the use of SMA to detect ultra-low concentrations of tau biomarker in the blood of patients suspected of having a neurological disorder was already known in the art. EX-1033, slides 9, 11, 15-17, 19; EX-1003 ¶92. A POSA would have been motivated to use the SMA procedure of Rissin to quantify endogenous tau in the blood of patients suspected of having a neurological disorder as taught by Todd to arrive at the inventions claimed by the Challenged Claims for several reasons. EX-1003 ¶92.

Rissin and Todd, being in the same field of endeavor as the '092 Patent, are analogous art. Both teach SMAs to quantify ultra-low concentrations of analytes in patients' blood for detecting and diagnosing neurological diseases. Rissin cites to the work of Todd 2007 (EX-1012) as "a promising approach for measuring extremely low concentrations of proteins" using "the isolation and detection of single protein molecules." Rissin notes that Todd 2007 has "developed flow-based

methods for serially detecting single fluorescently labeled detection antibodies that have been released from immunocomplexes formed on solid substrates." EX-1005, 595; EX-1003 ¶93.

Both Todd and Rissin speak to measuring tau blood and serum concentrations for the detection and diagnosis of AD. Specifically, Todd teaches that the use of SMAs provide a "solution" that would enable the ultra-sensitive detection of tau as a biomarker for the detection and diagnosis of AD. Todd explains the numerous benefits provided by the ultra-low diagnostic sensitivity and strategic applications of SMAs, including allowing for earlier detection of disease, more defined disease diagnosis criteria, and improving data relevant to critical new drug development decisions. Todd explains that the "ultimate diagnostic challenge is to detect the onset of disease as early as possible" which "correlate[s] with better patient outcomes." By enabling highly sensitive biomarker detection, including detection of tau protein biomarkers, SMA technology is able to establish baseline levels in healthy subjects, track therapeutic effects of the new therapy, aid in the early detection of adverse events, and provide data to support preclinical efficacy and safety studies which enhances drug development. EX-1006, 56; EX-1003 ¶94.

Rissin, too, recognized the application of SMAs to the detection and diagnosis of AD. Rissin notes that "serum concentrations of the majority of proteins important in… neurological disorders… are thought to range from $10^{-16}$ to $10^{-12}$ M" and, in

support, cites to two articles, EX-1025, EX-1029, discussing tau protein as a blood biomarker for AD. Rissin recognized the improved "diagnostic benefits" of SMAs, including their ability to detect and establish diagnostic threshold values for key biomarkers using a LoD that far exceeds the highest sensitivity of prior-art assays, presents a clear application for SMAs. Rissin, thus, directs the POSA to use Rissin's SMA technology to quantify ultra-low concentrations of tau in blood as a biomarker for neurological disorders such as AD. EX-1005, 595; EX-1003 ¶95.

A POSA understood that while the SMAs of both Rissin and Todd were highly sensitive and had known diagnostic benefits, Rissin's SMA provided a more streamlined process that reduced the number of steps while still "detect[ing] proteins in serum at subfemtomolar concentrations". While both SMAs utilize antibodies disposed on a plurality of capture objects (*i.e.*, beads) to form capture complexes with analyte molecules, the Todd SMA includes the additional steps of releasing a portion of the capture complexes, and determining the concentration of the analyte using a portion of the released complexes. EX-1005, 595-599; EX-1006, 53; EX-1012 (describing the Erenna Immunoassay system developed by Singulex and discussed in Todd); EX-1003 ¶96. In contrast, building on the earlier SMA technologies, Rissin sought to "simplify[] the logistics of the assay", including by eliminating the additional release steps present in the Todd SMA. EX-1005, 598-599.

A POSA recognized that the additional release steps taught by the Todd SMA were cumbersome, more complex, more time consuming and required additional reagents compared to Rissin. Moreover, a POSA recognized that the additional steps of Todd increased expense and further introduced additional and unnecessary opportunities for user error. Thus, a POSA recognized the benefit provided by the teaching of Rissin which eliminated these additional release steps and their associated complexity, cost, and error. EX-1003 ¶97.

A POSA would have been confident that using Rissin's simplified SMA to quantify tau would have been successful because it was simply using a known tau antibody with a known technology (a simplified SMA) for its intended purpose: quantifying low-concentration protein analytes. Indeed, Rissin demonstrates its success at quantifying low-concentration protein analytes using two of the same blood proteins that were studied in Todd, *i.e.,* PSA and TNF-α. Rissin reported a similar LoD for these proteins as Todd, which a POSA understood were far more sensitive than the detection limits claimed in the Challenged Claims. *Compare* EX-1006, 56 (disclosing LoD of 0.20 pg/ml for TNF-α, and 0.05 pg/ml for PSA) *with* EX-1005, 597-98 (disclosing LoD of 2.5 fg/ml for TNF-α, and 1.5 fg/ml for PSA).

### 4. Detailed Application of Rissin in view of Todd

#### a. <u>Claim 1</u>

##### i. *A method of producing a bodily fluid sample of a patient suspected of having a neurological*

> *condition containing an analytically quantified amount of endogenous tau protein, said method comprising:*

To the extent the preamble is a limitation, Rissin discloses a method for performing simplified SMA to quantify blood protein concentrations for clinical diagnosis of neurological disease, citing two articles, EX-1025, EX-1029, discussing tau protein as a blood biomarker for AD. EX-1005, 595. Moreover, Todd teaches performing SMA for the detection and diagnosis of AD and expressly identifies tau proteins as one of two "hopeful candidates" to serve as an FDA approved biomarker for clinical diagnosis of AD. EX-1006, 53. A POSA would have been motivated to modify the teachings Rissin with the teachings of Todd in order to quantify concentrations of tau protein in blood for clinical diagnosis of neurological disease for the reasons discussed in the Motivation to Combine Section. This modification results in a *method of producing a bodily fluid sample of a patient suspected of having a neurological condition containing an analytically quantified amount of endogenous tau protein*, consistent with the discussion in the State of the Art section demonstrating that a POSA understood tau was a known indicator of TBI from a hypoxic or ischemic event, including cardiac arrest, stroke or thrombosis. EX-1027, cls 1, 2, 4; EX-1018 at 19-20; EX-1003 ¶99.

> ### ii.    *(A) obtaining a volume of bodily fluid comprising blood, or a blood component selected from plasma and serum,*

A POSA reading Rissin understood that it includes the step of obtaining a volume of body fluid.  Rissin teaches "detecting very low concentrations of proteins in blood using digital ELISA" including by measuring "serum samples from patients who had undergone radical prostatectomy" [*a volume of bodily fluid comprising blood, or a blood component selected from plasma and serum*].  EX-1005, 1-2.  A POSA understood that, in order to perform such a blood-based assay, a sample of blood must first be "obtained."  EX-1003 ¶100.

> ### iii.    *(B) diluting the volume of bodily fluid, and*

Rissin discloses this limitation.  Rissin discloses that the whole-serum samples collected for use in the SMA arrays "were diluted 1:4 in buffer and measured using the digital ELISA" [*diluting the volume of bodily fluid*].  EX-1005, 598; Fig. 3a (teaching "25% serum").  Rissin teaches that a "fourfold dilution factor is typically used to reduce matrix effects in immunoassays" and so that the resulting enzyme-labeled complex will "follow[] a Poisson distribution" wherein "beads carry either a single immunocomplex or none."  Dilution is an established important method used by those skilled in the art.  EX-1005, 597; 598; Fig. 3 (showing "final concentration of spiked protein in the *diluted* sample").  This, in turn, allows for single-molecule counting of labeled protein molecules such that

the protein concentration in the original test sample can be determined.  EX-1005, 596; EX-1003 ¶101.

> iv. *(C) quantifying through the use of an analytical protein concentration measurement assay a concentration of tau protein in the volume of bodily fluid to produce the bodily fluid sample containing the analytically quantified amount of endogenous tau protein;*

Rissin in view of Todd discloses this limitation.  Rissin makes "use of arrays of femtoliter-sized reaction chambers" called "single-molecule arrays" (SMAs) that "can isolate and detect single enzyme molecules" [*quantifying through the use of an analytical protein concentration measurement assay*].  EX-1005, Fig. 1; EX-1003 ¶102.  Specifically, Rissin's Fig. 1 illustrates Rissin's *analytical protein concentration measurement assay*:



**Figure 1** Digital ELISA based on arrays of femtoliter-sized wells. (**a,b**) Single protein molecules are captured and labeled on beads using standard ELISA reagents (**a**), and beads with or without a labeled immunoconjugate are loaded into femtoliter-volume well arrays for isolation and detection of single molecules by fluorescence imaging (**b**). (**c**) Scanning electron micrograph of a small section of a femtoliter-volume well array after bead loading. Beads (2.7 µm diameter) were loaded into an array of wells with diameters of 4.5 µm and depths of 3.25 µm. (**d**) Fluorescence image of a small section of the femtoliter-volume well array after signals from single enzymes are generated. Whereas the majority of femtoliter-volume chambers contain a bead from the assay, only a fraction of those beads possess catalytic enzyme activity, indicating a single, bound protein molecule. The concentration of protein in bulk solution is correlated to the percentage of beads that carry a protein molecule.

Rissin discloses that "[i]n the first step of this [SMA] (Fig. 1a), a sandwich antibody complex is formed on microscopic beads (2.7 μm diameter), and the bound complexes are labeled with an enzyme, as in a conventional bead-based ELISA." SMAs "permit the detection of very low concentrations of enzyme labels by confining the fluorophores generated by individual enzymes to extremely small volumes (~50 fl)…." To achieve this confinement, "beads are loaded into an array of femtoliter-sized wells." A "droplet of fluorogenic enzyme substrate", is added causing those beads "possessing a single enzyme–labeled immunocomplex" to fluoresce. "By acquiring time-lapsed fluorescence images of the array… it is possible to distinguish beads associated with a single enzyme molecule ("on" well) from those not associated with an enzyme ("off" well)." EX-1005, 596, Fig. 1; EX-1003 ¶103.



EX-1005, 595; FIG. 1.

"Imaging the arrays allows simultaneous detection of tens to tens of

thousands of single immunocomplexes. The protein concentration in the test

sample is determined by counting the number of wells containing both a bead and

fluorescent product relative to the total number of wells containing beads (Fig.

1d)" [*a concentration of protein in the volume of bodily fluid to produce the bodily

fluid sample containing the analytically quantified amount of endogenous protein*].

EX-1005, 596. While Rissin does not expressly state that the protein is tau, Rissin

cites to articles demonstrating that tau is known to be present in ultra-low

concentrations in the blood of patients diagnosed with AD (e.g., citations 8 and 9)

and, thus, directs the POSA to use Rissin's SMA to quantify blood tau levels as a

biomarker for neurological disorders. EX-1005, 595. Moreover, Todd teaches

performing SMA for the detection and diagnosis of AD and expressly identifies tau

proteins as one of two "hopeful candidates" to serve as an FDA approved

biomarker for clinical diagnosis of AD. EX-1006, 53. A POSA understood that

Rissin's teaching equally applied to tau and would have been motivated to modify

the teaching of Rissin with the teaching of Todd to quantify *a concentration of tau*

*protein in the volume of bodily fluid* for the reasons discussed in the Motivation to

Combine Section. EX-1003 ¶104.

> ***v.*** ***wherein the analytically quantified concentration***
> ***of endogenous tau protein contained in the bodily***
> ***fluid sample is less than about 5 pg/ml, and a limit***
> ***of quantification of the analytical protein***
> ***concentration measurement assay used in step (C)***
> ***for quantifying the concentration of tau protein is***
> ***less than about 0.2 pg/mL.***

Rissin discloses this limitation. The "lowest concentration of enzyme

conjugate detected" (LoQ) by Rissin was 350 zeptomolar (zM) and the calculated

limit of detection (LoD) was 220 zM, corresponding to an increase in sensitivity

over prior art measurements using a typical ELISA-plate reader "of a factor of

about 68,000." EX-1005, 596; EX-1003 ¶105. While Rissin does not expressly

teach tau, as described in the Motivation to Combine Section, Rissin does teach

that an SMA provides sensitivities of 0.006 and 0.01 pg/mL using two of the same

blood proteins studied in Todd, PSA and TNF-alpha, respectively, which are less

than the claimed 0.2 pg/mL. EX-1005, 597-98. Moreover, Figure 2 of Rissin

demonstrates a LoQ of the assay of less than 3.5 aM (with a coefficient of variance

of 10%) when detecting the analyte streptavidin-β-galactosidase ("SBG"). A

POSA understood that Rissin's teaching equally applied to tau and would have

been motivated to modify the teaching of Rissin with the teaching of Todd to

achieve analytically quantified concentration of endogenous tau less than about 5

pg/ml, and a limit of quantification of less than about 0.2 pg/mL for the reasons

discussed in the Motivation to Combine Section

### b.    Claim 12

#### i.    *The method of claim 1, wherein the analytical protein concentration measurement assay used in step (C) comprises:*

##### (a)    *i. suspending a plurality of capture objects that each include a binding surface having affinity for tau protein molecules in the diluted volume of bodily fluid,*

Rissin in view of Todd discloses this limitation. As shown in annotated

Figure 1 below, Rissin discloses "[i]n the first step of this single-molecule

immunoassay (Fig. 1a), a sandwich antibody complex [*a binding surface having

affinity for protein molecules*] is formed on microscopic beads (2.7 μm diameter)

[*a plurality of capture objects*], and the bound complexes are labeled with an

enzyme, as in a conventional bead-based ELISA." "Test solutions (100 μl)

containing the protein of interest were incubated with suspensions of 200,000

magnetic beads… then separated and washed… re-suspended and incubated with

solutions containing detection antibody… then separated and washed… [and] then

re-suspended in 10 µl of PBS and loaded" [*suspending a plurality of capture*

*objects*].  EX-1005, 596-97.



EX-1005, 595; FIG. 1.

Rissin discloses a plurality of suspended beads [*capture objects*] having an

affinity for the target protein (the illustrated antigen).  While Rissin does not

expressly disclose a capture antibody with an affinity for a tau, Rissin directs the

POSA to use Rissin's SMA technology to quantify blood tau levels as a biomarker

for neurological disorders.

Todd discloses a bead-based SMA in which a target protein (*e.g.*, tau) is immobilized on a plurality of "paramagnetic microparticles" (*i.e.*, a "capture objects") having affinity for target protein and suspended in a volume of a patient biological sample, such as blood serum or plasma. EX-1006, 53. Moreover, Todd teaches performing SMA for the detection and diagnosis of AD and expressly identifies tau proteins as one of two "hopeful candidates" to serve as an FDA approved biomarker for clinical diagnosis of AD. EX-1006, 53. As discussed in the State of the Art Section and in the specification of the '092 Patent, capture antibodies with affinity for tau (anti-tau antibodies) were both well-known and commercially available in the art. EX-1001, 8:37-51; 33:34-40 (disclosing "commercial[ly] available antibody purchased from Covance").

A POSA understood that Rissin teaches a SMA capable of detecting proteins at subfemtomolar concentrations, and would have been motivated to use a capture antibody having an affinity for tau as disclosed in Todd for the reasons discussed in the Motivation to Combine Section. EX-1003 ¶109.

> **(b)    ii. immobilizing at least a portion of the tau protein molecules with respect to at least some of the plurality of capture objects suspended in the diluted volume of bodily fluid such that at least some of the capture objects associate with at least one tau protein molecule from the volume of bodily fluid,**

Rissin as modified by Todd discloses this limitation. As demonstrated for limitation 12(i) above, in the first step of Rissin "(**Fig. 1a**), a sandwich antibody complex is formed on microscopic beads (2.7 μm diameter), and the bound complexes are labeled with an enzyme, as in a conventional bead-based ELISA." Those "beads are loaded into an array of femtoliter-sized wells for isolation and detection of single molecules by fluorescence imaging (b)." "Whereas the majority of femtoliter-volume chambers contain a bead from the assay, only a fraction of those beads possess catalytic enzyme activity, indicating a single, bound protein molecule" [*immobilizing at least a portion of the tau protein molecules with respect to at least some of the plurality of capture objects suspended in the diluted volume of bodily fluid such that at least some of the capture objects associate with at least one tau protein molecule from the volume of bodily fluid*]. EX-1005, 596-97; EX-1003 ¶110.



EX-1005, 595; FIG. 1.

For example, if 50 aM of protein in 0.1 ml (3,000 molecules) is captured and labeled on 200,000 beads, then 1.5% of the beads will carry one protein molecule and 98.5% will not carry any protein molecules (**Fig. 1b**). EX-1005, 595.

While Rissin does not expressly disclose tau, Rissin directs the POSA to use Rissin's SMA technology to quantify blood tau levels as a biomarker for neurological disorders. Moreover, Todd teaches performing a bead-based SMA for the detection and diagnosis of AD and expressly identifies tau proteins as one of two "hopeful candidates" to serve as an FDA approved biomarker for clinical diagnosis of AD. EX-1006, 53. A POSA would understand that Rissin teaches SMA capable of detecting proteins at subfemtomolar concentrations, and would be

motivated to use a capture antibody to immobilize at least a portion of tau as

disclosed in Todd for the reasons discussed in the Motivation to Combine Section.

EX-1003 ¶112.

> *(c)* *iii. interrogating at least some of the capture objects associated with at least one tau molecule from the volume of bodily of fluid; and*
>
> *iv. determining a measure of tau protein molecule concentration in the volume of bodily fluid based at least in part on the interrogating step performed in step iii.*

  Rissin, as modified by Todd to use a capture antibody having affinity for tau

protein as discussed above, discloses this limitation.  As illustrated in annotated

FIG. 1 below, Rissin discloses a streamlined SMA in which the concentration of

target analyte is determined directly by interrogating the relative proportion of

capture complexes in the array.



EX-1005, 595; FIG. 1.

Using time-lapsed fluorescence images, Rissin "detects single protein

molecules" on the captured complex itself (the same objects exposed to an analyte-

containing solution and immobilized with analyte molecules or particles) in order

to distinguish "beads associated with a single enzyme molecule ("on" well) from

those not associated with an enzyme ("off" well)" [*interrogating at least some of*

*the capture objects associated with at least one tau molecule from the volume of*

*bodily of fluid*]. Finally, "[t]he protein concentration in the test sample is

determined by counting the number of wells containing both a bead and

fluorescent product relative to the total number of wells containing beads (Fig.

1d)" [*determining a measure of tau protein molecule concentration in the volume*

*of bodily fluid based at least in part on the interrogating step performed in step*

*iii*].  EX-1005, 595-599 and FIGs. 1, 2; Supp. FIGs 1, 2; EX-1003 ¶114.

> ## ii.  <u>Claim 13</u> - *The method of claim 12, wherein the plurality of capture objects comprises a plurality of beads.*

Both Rissin in view of Todd teach that the capture objects comprise a plurality of beads and, thus, disclose this limitation for the same reasons discussed for Claim 12.  EX-1003 ¶115.

> ## c.  <u>Claim 6</u> – *The method of claim 1, wherein each of the tau protein molecules quantified in step (C) is selected from the group consisting of tau 23 (352, 0N3R), tau 2.4 (383, 0N4R), tau 37 (381, 1N3R), tau 34 (412, 1N4R), tau 39 (410, 2N3R), and tau 40 (441, 2N4R).*

Rissin as modified by Todd discloses this limitation.  Claim 6 recites a specific subset of isoforms that make up total tau, including tau 23 (352, 0N3R), tau 2.4 (383, 0N4R), tau 37 (381, 1N3R), tau 34 (412, 1N4R), tau 39 (410, 2N3R), and tau 40 (441, 2N4R).  As shown above, Todd expressly teaches the detection of "tau proteins" in a human blood samples, which a POSA understood to include the specific subset of isoforms that make up total tau recited in claim 6, including phosphorylated tau (claim 7).  EX-1006, 53; EX-1003 ¶116.  Moreover, as discussed in the State of the Art Section and in the specification of the '092 Patent, the "six known natural-occurring tau proteins" are "well-known in the art", including "phosphorylated" tau.  EX-1001, 8:37-51.

As such, a POSA understood that Rissin as modified by Todd would include

quantification of each of the identified the isoforms of tau recited in claim 6. EX-

1003 ¶117.

> **d.      Claim 7 – *The method of claim 6, wherein at least a portion of the tau protein molecules are phosphorylated.***

Rissin as modified by Todd discloses this limitation for the same reasons

discussed for claim 6.  EX-1006, 53; EX-1001, 8:37-51.  Moreover, as set forth in

the State of the Art, a POSA understood that under normal physiological

conditions, tau functions to promote the assembly and stabilization of neuron

structure.  However, in AD and other neurodegenerative diseases, tau becomes

abnormally phosphorylated, causing it to detach and aggregate into tangled fibers

called neurofibrillary tangles.  A POSA understood that phosphorylated tau was a

blood biomarker for neurodegenerative diseases, including TBI.  EX-1022, 9916;

EX-1003 ¶ 118.

As such, a POSA understood that tau serum marker discussed in Todd would

include phosphorylated tau.  EX-1003 ¶119.

> **e.      Claims 8-11 – *The method of claim 1, wherein the volume of bodily fluid comprises blood (claim 8), plasma (claim 9), serum (claim 10) or not cerebrospinal fluid (claim 11).***

Rissin teaches a SMA that "detects low-abundance proteins in blood" [claim

8] and "serum proteins at subfemtomolar concentrations" [claim 10].  EX-1005,

595-599.  While Rissin does not expressly disclose the detection of such proteins

in blood "plasma", a POSA understood that Rissin's disclosure of "blood" would

include all of its constituent components, including blood plasma [claim 9], and

would not include cerebrospinal fluid [claim 11]. Moreover, Rissin cites to articles

concerning the "plasma proteome" for support (citation 19), showing that Rissin's

disclosure of "blood" clearly directed the POSA to all constituent components of

blood. A POSA would have understood Rissin to teach a method of producing a

bodily fluid comprising blood [claim 8], plasma [claim 9], serum [claim 10] or not

cerebrospinal fluid [claim 11]. EX-1005, 595-599; EX-1003 ¶120.

> **f.** **Claim 14** – *The method of claim 1, wherein the limit of detection for the analytical protein concentration measurement assay is less than about 0.02 pg/mL.*

Rissin teaches SMA having a LoD of less than about 0.02 pg/ml. In

particular, Rissin teaches a "LoD of ~50 aM (1.5 fg/ml)" when detecting PSA (*e.g.*,

Prostate-Specific Antigen) in 25% serum, "which equates to an LoD in whole

serum of ~200 aM (6 fg/ml). The lowest concentration tested and detected was

250 aM in 25% serum, corresponding to 1 fM in whole serum." EX-1005, 597;

EX-1003 ¶121.

> **g.** **Claim 15** – *The method of claim 1, wherein the patient suspected of having a neurological condition is recovering from a brain injury.*

Claim 15 purports to limit the "neurological condition" recited in the

preamble of claim 1 to that of a "brain injury". As Claim 15 does not alter the

steps to be performed in the claimed method, to the extent it is considered a

limitation, it is nonetheless disclosed for the same reasons discussed for the

preamble of claim 1 and as further understood from the State of the Art. EX-1027,

cls 1, 2, 4; EX-1018, 19-20; EX-1003 ¶122.

Consistent with the discussion in the State of the Art Section (including the

Quanterix Presentation presented by PO), a POSA understood that brain injuries

are linked to causing neurological disorders, such as AD, and that tau was a known

indicator of TBI from a hypoxic or ischemic event, including cardiac arrest, stroke

or thrombosis. EX-1027, cls 1, 2, 4; EX-1018 at 19-20; EX-1033, slides 28-29 (tau

is "a nice serum marker for TBI"); EX-1003 ¶123. Thus, for the reasons set forth

for claim 1, claim 15 would have been obvious over Rissin in view of the State of

the Art. EX-1003 ¶123.

### h. <u>Claims 17-21</u> – *The method of claim 15, wherein the brain injury results from a hypoxic event (claim 17), caused by cardiac arrest (claim 18), stroke (claim 19), an ischemic event (claim 20), or thrombosis (claim 21)*

Claims 17-21 purport to limit the "neurological condition" recited in the

preamble of claims 1 and 15 to that of a "brain injury" resulting from a "hypoxic

event" [claim 17] or ischemic event [claim 20], such as cardiac arrest [claim 18],

stroke [claim 19], or thrombosis [claim 21]. Like Claim 15, the recited limitations

of claims 17-21 do not alter the steps to be performed in the claimed method.

Moreover, a POSA understood that brain injury can result from any type of hypoxic or ischemic event, including the specific events of cardiac arrest, stroke or thrombosis, and that tau is an effective biomarker for brain injury in the blood. To the extent these specific indications are considered limitations, however, they are disclosed for the same reasons discussed as to the preamble of claim 1 as understood from the State of the Art. EX-1027, cls 1, 2, 4; EX-1017, 559, 563, and Fig. 1b; EX-1018, 19-20; EX-1003 ¶124.

> i. <u>Claim 16</u> - *The method of claim 15, wherein the volume of bodily fluid has been collected from the patient within 12 hours of the brain injury.*

Rissin as modified by Todd discloses this limitation. As set forth in the State of the Art, a POSA understood the prior art taught that elevated tau could be detected in blood of acute ischemic stroke patients at levels of 30 pg/ml at 3, 6 and 12 hours after stroke, and that tau was a predictor of outcome in stroke patients. EX-1017, 559, 563, and Fig. 1b. Given the increase sensitivity of SMAs, it would have been obvious to a POSA at the time of the invention to test tau blood levels at intervals immediately following a brain injury, including within 12 hours of such an event, and a POSA would have had a reasonable expectation of success in doing so. Moreover, given the known prognostic benefits of early disease detection, a POSA would have been motivated to begin testing tau levels at intervals

immediately following a brain injury, including within 12 hours of such an event.

EX-1003 ¶125.

**B.      Challenge 2: Claims 1-21 of the '092 Patent are invalid as obvious over Rissin in view of Voorheis**

**1.      Voorheis**

Voorheis is directed to methods and kits for diagnosing AD and other neurological disorders by screening for tau in the blood of a patient.  The invention is based, in part, on the discovery that "proteolytic fragments of… tau-proteins are released from the neurofibrillary tangles associated with the disease and can be detected in body fluids outside the brain."  Voorheis notes that it was "well documented" that "the number and size of these tangles within an affected neuron as well as the total number of tangles and the total amount of constituent tau-protein in an affected brain correlates with the progression and severity of the disease."  EX-1007, 4:10-15, 5:19-23; 6:57-67; EX-1003 ¶126.

Voorheis discussed the inability of prior art methods to readily and reliably diagnose AD, and the need for sensitive diagnostic tests to screen body fluids of individuals for the presence of tau biomarkers.  Prior art methods focused on evaluating the patient's intellectual ability: "[u]sually a patient must be evaluated on a number of occasions over some period of time in order to document the deterioration in intellectual ability and other signs and symptoms before a diagnosis can be attempted with reasonable confidence."  "The necessity of

repeated evaluation… before a firm diagnosis [could] be made was costly,

generates anxiety and… frustrating to patients and their families." Furthermore,

the inability to rapidly diagnose the disease "greatly hampered" the development of

a therapeutic strategy, "particularly in the early stages where even a simple arrest

of the progress of the disease would leave the patient with significant intellectual

capacity and a reasonable quality of life." Thus, Voorheis recognized the need for

early detection and diagnosis of AD, and developed a blood-based diagnostic assay

using tau as a method for doing so. EX-1007, 3:4-28; EX-1003 ¶127.

"In practicing the invention, a sample of blood is removed from the patient

by venesection…." The sample is then "diluted in an appropriately buffered

medium". In one mode of the invention, tau is "used as antigens in immunoassays

for the detection of those individuals suffering from Alzheimer's." These

immunoassay systems include "any known in the art, including but not limited to:

radioimmunoassays, [ELISA]" and "[p]articularly preferred… is the sandwich or

double antibody assay, of which a number of variations exist." EX-1007, 13:35-

60, 14:5-31, 16:1-6; EX-1003 ¶128.

Voorheis recognized that tau could broadly include "any one of the proteins

that comprise a single constituent part of the tau-complex of proteins." Because

"concentrations [of tau] greatly exceed[] that found in normal humans that are not

victims of Alzheimer's", the "detection and quantitation" of tau "is useful in

confirming a clinical diagnosis of Alzheimer's… and in following the course of the disease." Tau concentration "may be calculated in absolute terms, or may be done in comparison with a standard… containing a known normal level of antigen." EX-1007, 5:19-56, 7:1-18, 14:60-65; EX-1003 ¶129.

## 2. The Motivation to Combine Rissin in view of Voorheis

A POSA would have been motivated to combine the teachings of Rissin with the teachings of Voorheis in order to quantify endogenous tau in the blood of patients suspected of having a neurological disorder as claimed by the '092 Patent for several reasons. EX-1003 ¶130.

Rissin and Voorheis are analogous art as they are in the same field of endeavor as the '092 Patent. Both references are directed at detecting and quantifying low concentrations of analytes in the blood of patients for purposes of detection and diagnosis of neurological diseases. EX-1003 ¶131.

A POSA understood that a simple, easy to use and ultra-sensitive technique to detect trace amounts of analyte in blood would have been beneficial for early detection and diagnosis of neurological disorders. Rissin states that the "isolation and detection of single protein molecules [using SMA] provides a promising approach for measuring extremely low concentrations of proteins… using the same reagents as the gold standard for detecting proteins, namely, the ELISA" but now "at subfemtomolar concentrations." Rissin notes that "serum concentrations of the

majority of proteins important in… neurological disorders… are thought to range

from $10^{-16}$ to $10^{-12}$ M" and, in support, cites to two articles, EX-1025, EX-1029,

discussing tau protein as a blood biomarker for AD. Thus, a POSA reading Rissin

understood that tau was both present at low concentrations in blood, and was a viable

candidate for quantification using SMA. EX-1005, 595; EX-1003 ¶132.

A POSA also understood that tau was recognized as a biomarker in human

CSF, blood and blood components for early diagnosis and prognostic prediction of

the changes in brain function and other cognitive disorders. Voorheis developed

methods and kits for diagnosing neurological disorders, including AD, by screening

for tau in human blood. A POSA understood that the earlier tau can be detected, the

sooner a clinician can diagnosis, and begin treatment of, a neurological condition.

Voorheis emphasized the need for sensitive diagnostic tests to screen body fluids for

the presence of tau biomarkers, "particularly in the early stages where even a simple

arrest of the progress of the disease would leave the patient with significant

intellectual capacity and a reasonable quality of life." EX-1007, 3:23-28; EX-1003

¶133.

Armed with this knowledge of tau and SMA, a POSA as of the priority date

would have been motivated to test the blood of a patient suspected of having a

neurological disorder to detect and quantify the presence of endogenous tau using

ultra-sensitive SMA, and would have a reasonable expectation of success in doing so.  EX-1003 ¶134.

**First**, a POSA understood AD, a progressive neurodegenerative disorder that effects more than 6 million Americans, costs hundreds of billions of dollars annually in long-term care, is the most common cause of dementia in older adults, and is the seventh leading cause of death in the US.  Voorheis recognized market pressure to solve the problem of early AD diagnosis, and taught assaying blood for tau to address the problem. Tau in blood as taught to be detected by Voorheis to diagnose AD could be readily and reliably quantified using Rissin's SMA assay. EX-1003 ¶135.

**Second**, given that SMA assays were simple, convenient, and inexpensive to conduct and provided ultra-high sub-femtomolar analyte sensitivity, selecting Rissin's SMA assay that was both more sensitive than conventional ELISA and easy to use was a matter of common sense, especially when seeking to detect analytes known to be present in very low concentrations in blood such as tau.  This is particularly true when combined with the fact that a POSA recognized that tau concentration correlates with disease progression and, therefore, the sooner tau could be detected, the sooner the condition could be clinically treated.  EX-1003 ¶136.

As such, the published prior art provided all the data a POSA would need to

try – with a reasonable expectation of success – a method of quantifying

endogenous tau in blood of patients suspected of having a neurological disorder as

taught by Voorheis, using the SMA taught by Rissin, within the scope of the '092

Patent – using the "digital ELISA" (SMA) of Rissin in place of ELISA of

Voorheis.

### 3. Detailed Application of Rissin in view of Voorheis

#### a. Claim 1

> **i. *A method of producing a bodily fluid sample of a patient suspected of having a neurological condition containing an analytically quantified amount of endogenous tau protein, said method comprising:***

To the extent the preamble is a limitation, Rissin discloses a method for

performing simplified SMA to quantify concentrations of protein in blood for

clinical diagnosis of neurological disease. EX-1005, 596. Rissin does not

expressly state that the protein could be tau, Rissin's citation to articles

demonstrating that tau is known to be present in ultra-low concentrations in the

blood of patients diagnosed with AD (e.g., citations 8 and 9) directs the POSA to

use Rissin's SMA technology to quantify blood tau levels as a biomarker for

neurological disorders. EX-1005, 595. Moreover, Voorheis teaches that tau could

be measured in blood and blood plasma and used as a diagnostic marker for

neurological disorders, including AD.  EX-1007, Abstract.  A POSA would have
been motivated to modify the teachings Rissin with the teachings of Voorheis in
order to quantify protein concentrations in blood for clinical diagnosis of
neurological disease for the reasons discussed in the Motivation to Combine
Section.  This modification results in a *method of producing a bodily fluid sample
of a patient suspected of having a neurological condition containing an
analytically quantified amount of endogenous tau protein*, consistent with the State
of the Art that a POSA understood tau was a known indicator of TBI resulting
from a hypoxic or ischemic event, including cardiac arrest, stroke or thrombosis.
EX-1027, cls 1, 2, 4; EX-1018 at 19-20; EX-1003 ¶138.

> ii.     ***(A) obtaining a volume of bodily fluid comprising
> blood, or a blood component selected from plasma
> and serum,***

With references to the discussion of Rissin in Ground 1 above, a POSA
reading Rissin understood that it includes the step of obtaining a volume of body
fluid comprising blood, or a blood component selected from plasma and serum.
EX-1005, 1-2; EX-1003 ¶139.

Voorheis discloses that "[i]n practicing the invention, a sample of blood is
removed from the patient by venesection", which a POSA understood included
blood components including plasma and serum [*obtaining a volume of bodily fluid
comprising blood*].  EX-1007, 13:55-60; EX-1003 ¶140.

### iii.     (B) diluting the volume of bodily fluid, and

With references to the discussion of Rissin in Ground 1 above, Rissin

discloses this limitation.  Rissin discloses that whole-serum samples collected for

use in SMA arrays "were diluted 1:4 in buffer and measured using the digital

ELISA specific for PSA (Fig. 3a)" [*diluting the volume of bodily fluid*]**.**  EX-1005,

596-598; Fig. 3a (teaching "25% serum"); EX-1003 ¶141.

### iv.     (C) quantifying through the use of an analytical protein concentration measurement assay a concentration of tau protein in the volume of bodily fluid to produce the bodily fluid sample containing the analytically quantified amount of endogenous tau protein;

Rissin in view of Voorheis discloses this limitation.  As discussed in Ground

1 above, Rissin makes use of SMAs that "can isolate and detect single enzyme

molecules" [*quantifying through the use of an analytical protein concentration*

*measurement assay*] and teaches that the "protein concentration in the test sample

is determined by counting the number of wells containing both a bead and

fluorescent product relative to the total number of wells containing beads (Fig.

1d)" [*a concentration of protein in the volume of bodily fluid to produce the bodily*

*fluid sample containing the analytically quantified amount of endogenous protein*].

EX-1005, 596, Fig. 1; EX-1003 ¶142.

While Rissin does not expressly disclose tau, Rissin directs the POSA to use Rissin's SMA technology to quantify blood tau levels as a biomarker for neurological disorders. A POSA understood that Rissin's teaching equally applied to tau and would have been motivated to modify the teaching of Rissin with the teaching of Voorheis to quantify *a concentration of tau protein in the volume of bodily fluid* for the reasons discussed in the Motivation to Combine Section.

> *v.* *wherein the analytically quantified concentration of endogenous tau protein contained in the bodily fluid sample is less than about 5 pg/ml, and a limit of quantification of the analytical protein concentration measurement assay used in step (C) for quantifying the concentration of tau protein is less than about 0.2 pg/mL.*

As discussed in Ground 1 above, Rissin discloses this limitation. EX-1005, 596 (disclosing a calculated LOD of 220 zM); EX-1003 ¶144. While Rissin does not expressly teach tau, as described in the Motivation to Combine Section, Rissin does teach that an SMA provides sensitivities of 0.006 and 0.01 pg/mL for two proteins PSA and TNF-alpha, in serum, respectively, which are less than the claimed 0.2 pg/mL. Moreover, Figure 2 of Rissin demonstrates a LoQ of the assay of less than 3.5 aM (with a coefficient of variance of 10%) when detecting the analyte streptavidin-β-galactosidase ("SBG"). A POSA understood that Rissin's teaching equally applied to tau and would have been motivated to modify the

teaching of Rissin with the teaching of Voorheis to achieve analytically quantified

concentration of endogenous tau less than about 5 pg/ml, and a limit of

quantification of less than about 0.2 pg/mL for the reasons discussed in the

Motivation to Combine Section.

> ### b. <u>Claim 12</u>
>
> > #### i. *The method of claim 1, wherein the analytical protein concentration measurement assay used in step (C) comprises:*

Claim 12 is disclosed by Rissin as modified by Voorheis and a POSA would

be motivated to use the simplified SMA assay of Rissin to quantity the concentration

of tau disclosed in Voorheis for the reasons discussed in Motivation to Combine

Section.  EX-1003 ¶145.

> > #### (a) *i. suspending a plurality of capture objects that each include a binding surface having affinity for tau protein molecules in the diluted volume of bodily fluid,*

As discussed in Ground 1 above, Rissin discloses this limitation.  Rissin

discloses a sandwich antibody complex [*a binding surface having affinity for*

*protein molecules*] formed on microscopic beads [*a plurality of capture objects*]

"…and incubated with solutions containing detection antibody… then separated

and washed… [and] then re-suspended in 10 μl of PBS and loaded" [*suspending a*

*plurality of capture objects*].  Thus, Rissin discloses plurality of suspended beads

[*capture objects*] having an affinity for the target protein (the illustrated antigen),

but does not expressly disclose a capture antibody with an affinity for tau.

However, Voorheis teaches the use of "a number of antibodies [that are]

described in the literature as 'anti-tau'" including "commercial antibody described

as 'anti-tau'", as well as numerous "procedures known in the art" that can be "used

for the production of antibodies to epitopes of the tau-protein." EX-1007, 6:10-35;

12:35-13:31. A POSA understood that Rissin teaches a SMA capable of detecting

proteins at subfemtomolar concentrations, and would have been motivated to use a

capture antibody having an affinity for tau as disclosed in Voorheis for the reasons

discussed in the Motivation to Combine Section. EX-1003 ¶147.

> **(b)** **ii. immobilizing at least a portion of the tau protein molecules with respect to at least some of the plurality of capture objects suspended in the diluted volume of bodily fluid such that at least some of the capture objects associate with at least one tau protein molecule from the volume of bodily fluid,**

Rissin as modified by Voorheis discloses this limitation for the same reasons

discussed in connection with Claim 12(b) in Ground 1. EX-1003 ¶148.

> **(c)** **iii. interrogating at least some of the capture objects associated with at least one tau molecule from the volume of bodily of fluid; and**

Rissin as modified by Voorheis discloses this limitation for the same reasons

discussed in connection with Claim 12(c) in Ground 1. EX-1003 ¶149.

> **(d)** **iv. determining a measure of tau protein molecule concentration in the volume of bodily fluid based at least in part on the interrogating step performed in step iii.**

Rissin as modified by Voorheis discloses this limitation for the same reasons

discussed in connection with Claim 12(d) in Ground 1. EX-1003 ¶150.

> **ii.** **Claim 13** *- The method of claim 12, wherein the plurality of capture objects comprises a plurality of beads.*

Rissin discloses this limitation for the same reasons discussed for Claim 12.

EX-1003 ¶151.

> **c.** **Claim 6** *– The method of claim 1, wherein each of the tau protein molecules quantified in step (C) is selected from the group consisting of tau 23 (352, 0N3R), tau 2.4 (383, 0N4R), tau 37 (381, 1N3R), tau 34 (412, 1N4R), tau 39 (410, 2N3R), and tau 40 (441, 2N4R).*

Rissin as modified by Voorheis discloses this limitation. Claim 6 recites a

specific subset of isoforms that make up total tau, including tau 23 (352, 0N3R),

tau 2.4 (383, 0N4R), tau 37 (381, 1N3R), tau 34 (412, 1N4R), tau 39 (410, 2N3R),

and tau 40 (441, 2N4R). Voorheis teaches that tau proteins broadly include "any

one of the proteins that comprise a single constituent part of the tau-complex of

proteins" which a POSA understood includes measurement of the isoforms of tau

recited in claim 6, including phosphorylated tau (claim 7). EX-1007, 5:54-56; EX-1003 ¶152.

> d. <u>Claim 7</u> – *The method of claim 6, wherein at least a portion of the tau protein molecules are phosphorylated.*

Rissin as modified by Voorheis disclose this limitation for the same reasons discussed for claim 6. EX-1003 ¶153. Voorheis teaches that tau proteins broadly include "any one of the proteins that comprise a single constituent part of the tau-complex of proteins" and describes that "inappropriate phosphorylation" of tau is associated with neurological diseases, including AD. EX-1007, 2:1-25.

Moreover, as set forth in the State of the Art, a POSA understood that under normal physiological conditions, tau functions to promote the assembly and stabilization of neuron structure. However, in AD and other neurodegenerative diseases, tau becomes abnormally phosphorylated, causing it to detach and aggregate into tangled fibers called neurofibrillary tangles. A POSA understood that phosphorylated tau was a blood biomarker for neurodegenerative diseases. EX-1022, 9916; EX-1003 ¶154.

A POSA understood that Rissin teaches a SMA capable of detecting proteins at subfemtomolar concentrations, and would have been motivated to use Rissin's SMA to detect phosphorylated tau as taught by Voorheis for the reasons discussed in the Motivation to Combine Section. EX-1003 ¶155.

     e.     <u>**Claims 8-11**</u> **– *The method of claim 1, wherein the
volume of bodily fluid comprises blood (claim 8), plasma (claim 9),
serum (claim 10) or not cerebrospinal fluid (claim 11).***

With reference to Claims 8-11 in Ground 1 above, Rissin teaches a SMA
that "detects low-abundance proteins in blood [claim 8], plasma [claim 9], serum
[claim 10] or not cerebrospinal fluid [claim 11]. EX-1005, 595-599; EX-1003
¶156.

Voorheis' diagnostic assays are based on the principle that cleaved
"segments of tau-proteins that can find their way into body fluids outside the brain
and whose detection and quantitation are important for diagnostic purposes."
Voorheis discloses the detection of tau in "on samples of blood, spinal fluid or
other bodily fluid". EX-1007, 13:50-55. More specifically, Voorheis teaches
evaluating the amount of antigen present in "blood" (EX-1007, 13:50-55),
"plasma" (EX-1007, 13:56-62) and "serum" (EX-1007, 14:66-15:25).

     f.     <u>**Claim 14**</u> **– *The method of claim 1, wherein the limit of
detection for the analytical protein concentration measurement assay is
less than about 0.02 pg/mL.***

With reference to claim 14 in Ground 1 above, Rissin teaches a SMA
wherein the LOD for the analytical protein concentration measurement assay is
"~50 aM (1.5 fg/ml)", which is less than about 0.02 pg/mL. EX-1005, 597; EX-
1003 ¶158.

> **g.** **Claim 15** – *The method of claim 1, wherein the patient suspected of having a neurological condition is recovering from a brain injury.*

With reference to claim 15 in Ground 1 above, limiting the "neurological condition" recited in the preamble of claim 1 to that of a "brain injury" does not alter the steps to be performed in the claimed method. To the extent it is considered a limitation, however, it is nonetheless disclosed for the same reasons discussed in the preamble of claim 1 and as further described in the State of the Art. EX-1027, cls 1, 2, 4; EX-1018, 19-20; EX-1003 ¶159.

Consistent with the discussion in the State of the Art (including the Quanterix Presentation presented by Patent Owner), a POSA understood that brain injuries are linked to causing neurological disorders, such as AD, and that tau was a known indicator of TBI from a hypoxic or ischemic event, including cardiac arrest, stroke or thrombosis. EX-1027, cls 1, 2, 4; EX-1018 at 19-20; EX-1033, slides 28-29 (tau is "a nice serum marker for TBI"); EX-1003 ¶160. Thus, for the reasons set forth for claim 1, claim 15 would have been obvious over Rissin in view of the State of the Art. EX-1003 ¶160.

In addition, Voorheis is directed to the diagnosis, subtyping and monitoring of AD, which a POSA understood is a type of brain injury. EX-1007 1:10-25; EX-1003 ¶161.

> **h.  Claims 17-21 – *The method of claim 15, wherein the brain injury results from a hypoxic event (claim 17), caused by cardiac arrest (claim 18), stroke (claim 19), an ischemic event (claim 20), or thrombosis (claim 21).***

With reference to claims 17-21 in Ground 1 above, limiting the "neurological condition" recited in the preamble of claims 1 and 15 to that of a "brain injury" resulting from a "hypoxic event" [claim 17] or ischemic event [claim 20], such as cardiac arrest [claim 18], stroke [claim 19], or thrombosis [claim 21] do not alter the steps to be performed in the claimed method.  Moreover, a POSA understood that brain injury can result from any type of hypoxic or ischemic event, including the specific events recited in claims 17-21, and that tau is an effective biomarker for brain injury in the blood.  To the extent these specific indications are considered limitations, however, they are disclosed for the same reasons discussed in the preamble of claim 1 as further described in the State of the Art.  EX-1027, cls 1, 2, 4; EX-1017, 559, 563, and Fig. 1b; EX-1018, 19-20; EX-1003 ¶162.

> **i.  Claim 16 - *The method of claim 15, wherein the volume of bodily fluid has been collected from the patient within 12 hours of the brain injury.***

Rissin in view of Voorheis renders this limitation obvious.  Rissin teaches a diagnostic SMA with increased sensitivity and describes the known prognostic benefits of "earlier diagnosis and treatment of disease."  Similarly, Voorheis emphasized the need for sensitive diagnostic tests to screen body fluids for the

presence of tau, "particularly in the early stages where even a simple arrest of the progress of the disease would leave the patient with significant intellectual capacity and a reasonable quality of life." EX-1007, 3:23-28; EX-1003 ¶163.

As set forth in the State of the Art, a POSA understood from the prior art that elevated tau could be detected in blood of acute ischemic stroke patients at levels of 30 pg/ml at 3, 6 and 12 hours after stroke, and that tau was a predictor of outcome in stroke patients. EX-1017, 559, 563, and Fig. 1b. Thus, in view of the increase sensitivity of SMAs and the known prognostic benefits of early disease detection, it would have been obvious to a POSA at the time of the invention to quantify tau blood concentration levels at intervals immediately following a brain injury, including within 12 hours of such an event, and a POSA would have been motivated to do so. EX-1003 ¶164.

## VIII. MANDATORY NOTICES UNDER 37 C.F.R. § 42.8

### A.     Real Party-in-Interest (37 C.F.R. § 42.8(b)(1))

The real parties-in-interest in this Petition are Fujirebio Diagnostics, Inc., Fujirebio Holdings, Inc., and H.U. Group Holdings, Inc.

### B.     Related Matters (37 C.F.R. § 42.8(b)(2))

#### 1.     Judicial Matters

As of the filing date of this Petition and to the best knowledge of the Petitioner, the '092 Patent is not involved any litigation.

## 2.    Administrative Matters

As of the filing date of this Petition and to the best knowledge of Petitioner,

the '092 Patent has not previously been subject to an *inter partes* review, reissue or

reexamination.

## 3.    Related Patents

Petitioners are aware of the following patents and patent applications related

to the '092 Patent:

Provisional applications Nos. 61/524,693 and 61/474.315, filed August 17,

2011 and April 12, 2011, respectively.

PCT/US2012/033343, filed April 12, 2012 ("the PCT").

US application No. 14/111,326, now abandoned; filed as the US National

Stage Entry of the PCT.

US application No. 15/269,142, now US 10,393,759, filed September 19,

2016, as a continuation of US application No. 14/111,326.

US application No. 16/522,237, now US 11,275,092, filed July 25, 2019, as

a continuation of US application No. 15/269,142.

US applications Nos. 17/674,968 and 17/589,912, each pending, filed

respectively February 18 and 1, 2022, each as a continuation of US application No.

16/522,237.

### C. Lead/Back-up Counsel (37 C.F.R. § 42.8(b)(3)):

**Lead Counsel (**FDI)**:** Patrick D. McPherson, USPTO Reg. No. 46,255

DUANE MORRIS LLP, 901 New York Ave. NW, Suite 7000, Washington,

D.C. 20001

P: 202-776-5214; F: 202-776-7801; email PDMcPherson@duanemorris.com

**Back-Up Counsel: (**FDI): Thomas J. Kowalski, USPTO Reg. No. 32,147

DUANE MORRIS LLP, 22 Vanderbilt, 335 Madison Avenue, 23rd Floor

NY, NY 10017

P: 212-692-1025; F: 212-202-7805; email TJKowalski@duanemorris.com

Christopher S. Kroon, USPTO Reg. No. 54,241

DUANE MORRIS LLP, 100 High Street, Suite 2400 Boston, MA 02110

P: 857-488-4276; F: 857-401-3008; email CSKroon@duanemorris.com

### D. Notice of Service Information (37 C.F.R. § 42.8(b)(4)):

Please direct all correspondence to lead and back-up counsel at the above

addresses. Petitioners consent to electronic service at the email addresses above.

## IX. CONCLUSION

For the reasons set forth above, Petitioner has established a reasonable

likelihood of prevailing with respect to all Challenged Claims of the '092 Patent

and requests the Board institute *inter partes* review and then cancel the Challenged

Claims as unpatentable.

Respectfully submitted,

DUANE MORRIS LLP

BY:   /Patrick D. McPherson/
Patrick D. McPherson
USPTO Reg. No. 46,255
Duane Morris LLP
505 9th Street NW, Suite 1000
Washington, D.C. 20004
*Lead Counsel*

.

Dated:  May 28, 2025

## <u>CERTIFICATION OF SERVICE ON PATENT OWNER</u>

Pursuant to 37 C.F.R. §§ 42.6(e), 42.8(b)(4) and 42.105, the undersigned

certifies that on the 28 of May 2025, a complete and entire copy of this Petition for

*Inter Partes* Review of U.S. Patent No. 11,275, 092 and all supporting exhibits

were served via Federal Express, postage prepaid, to the Patent Owner by serving

the correspondence address of record for the '092 Patent and the assignee of

record:

> 23628 – Wolf Greenfield & Sacks, P.C.
> 600 Atlantic Avenue
> Boston, MA 02210-2206

>     /Patrick D. McPherson/
> Patrick D. McPherson, Reg. No. 46,255
> 505 9th Street, N.W., Suite 1000
> Washington, D.C. 20004
> P: (202) 776-7800
> F: (202) 776-7801
> PDMcPherson@duanemorris.com

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24 *et seq*., the undersigned certifies that this document complies with the type-volume limitations. Excluding the Table of Contents, Table of Authorities, Mandatory Notices, Certificates of Service and Word Count, and Appendix (or List) of Exhibits, this document contains 13997 words as calculated by the "Word Count" feature of Microsoft Word 365, the word processing program used to create it.

Dated: May 28, 2025

By: /Patrick D. McPherson/
Patrick D. McPherson
Reg. No. 46,255
Duane Morris LLP
505 9th Street, N.W., Suite 1000
Washington D.C., 20004
P: (202) 776-7800
F: (202) 776-7801
PDMcPherson@duanemorris.com

# EXHIBIT B

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

FUJIREBIO DIAGNOSTICS, INC.,
Petitioner,

v.

QUANTERIX CORP.,
Patent Owner.

———————————

IPR2025-01060
Patent 11,275,092

Title:  Methods of Determining a Treatment Protocol for and/or a
Prognosis of a Patient's Recovery from Brain Injury

———————————

## PATENT OWNER'S BRIEF IN SUPPORT OF DISCRETIONARY DENIAL

***Mail Stop "PATENT BOARD"***
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................1

II. BACKGROUND .................................................................2

    A. Petitioner Filed an IPR Petition and Declaratory Judgment Action and Patent Owner Counterclaimed for Infringement ..............2

    B. The '092 Patent Issued Over Art that Disclosed Ultrasensitive Assay Methods and that Identified Tau Protein as a Potential Blood-Based Biomarker Target ...........................................2

        1. The Examiner's Obviousness Rejections Relied on Patent Owner's Prior Art Assay Method and a Suggestion to Apply Such Methods to Detect Tau Protein in Blood ...............3

        2. The Examiner Withdrew the Obviousness Rejections and Allowed the Claims After Considering Patent Owner's Rebuttal Evidence ...................................................5

    C. The Petition's Obviousness Grounds Mirror Those Raised and Overcome During Prosecution .............................................8

    D. The Petition's Primary Reference—Rissin—Has Long Served as an Obviousness Reference in Prosecution of Related Applications Involving the Same Examiner ......................................10

III. ARGUMENT ...................................................................13

    A. Discretionary Denial Is Warranted Because the Petition Raises the Same or Substantially the Same Prior Art and Arguments the Examiner Previously Considered ..................................13

        1. Legal Standard for Discretionary Denial Under § 325(d) .......13

        2. *Advanced Bionics* Step 1 Is Met Because the Petition Raises the Same or Similar Prior Art and Arguments ............15

            a. The Examiner Considered Rissin and Voorheis............15

            b. Rissin Is Cumulative of and Immaterially Different from Duffy ...................................................17

            c. Todd and Voorheis Are Cumulative of the Multiple "Tau References" the Examiner Considered ...................................................19

d.     The Petition's Grounds Are Based on Cumulative Art and Duplicative Arguments the Examiner Already Considered ........................................................21

3.     *Advanced Bionics* Step 2 Is Met Because the Petition Fails to Show Examiner Error....................................24

4.     The Examiner Did Not Err in a Manner Material to Patentability ...............................................................25

B.    Discretionary Denial Is Warranted to Avoid Duplicative Efforts and the Risk of Conflicting Decisions in Parallel Litigation .............30

IV.    CONCLUSION............................................................................31

# TABLE OF AUTHORITIES

**Page**

**Cases**

*ADVA Optical Networking, Inc. v. RAD Data Commc'ns Ltd.*,
    IPR2016-01848, Paper 6 (PTAB Mar. 9, 2017) ..................................29

*Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*,
    IPR2019-01469, Paper 6 (PTAB Feb. 13, 2020) .........................*passim*

*Becton, Dickinson & Co. v. B. Braun Melsungen AG*,
    IPR2017-01586, Paper 8 (PTAB Dec. 15, 2017) .................................14

*Boragen, Inc. v. Syngenta Participations AG*,
    IPR2020-00124, Paper 16 (PTAB May 5, 2020) ...............................29

*DataDome S.A. v. Arkose Labs Holdings, Inc.*,
    IPR2025-00693, Paper 13 (PTAB Aug. 14, 2025)..............................31

*Ecto World, LLC & SV3 LLC v. RAI Strategic Holdings, Inc.*,
    IPR2024-01280, Paper 13 (PTAB May 19, 2025) (Director
    Stewart) ......................................................................................15, 25

*Eyenovia, Inc. v. Sydnexis*,
    IPR2022-00963, Paper 7 (PTAB Nov. 8, 2022)..................................29

*Google LLC v. Valtrus Innovations Ltd.*,
    IPR2022-01197, Paper 18 (PTAB June 13, 2023) .............................16

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)..........................................................................4

*Microsoft Corp. v. KoninKlijke Philips N.V.*,
    IPR2018-00279, Paper 11 (PTAB June 8, 2018) ..............................16

*Robert Bosch Tool Corp. v. SD3, LLC*,
    IPR2016-01754, Paper 15 (PTAB March 22, 2017) .........................28

*Skechers U.S.A., Inc. v. Nike, Inc.*,
    IPR2025-00141, Paper 20 (PTAB June 3, 2025) ..............................29

# TABLE OF AUTHORITIES
(continued)

**Statutes**

35 U.S.C.
   § 314(a) ........................................................................................................24
   § 325(d) .................................................................................................*passim*

**Other**

Interim Director Discretionary Process (Mar. 26, 2025),
   https://www.uspto.gov/patents/ptab/interim-director-discretionary-
   process............................................................................................................30

**EXHIBIT LIST**

| Exhibit No. | Description |
|:---:|:---|
| **2001** | U.S. Patent Application No. 15/269,142, Office Action Rejection dated January 29, 2015 |
| **2002** | U.S. Patent Application No. 15/269,142, Office Action Rejection dated December 31, 2018 |

# I. INTRODUCTION

Patent Owner respectfully requests that the Director exercise discretion to deny institution of IPR2025-01060. Discretionary denial is warranted under 35 U.S.C. § 325(d) because the Petition raises art that was already considered or cumulative of art already submitted, and presents arguments substantially similar to those already presented during prosecution of challenged U.S. Patent No. 11,275,092 (the "'092 patent").

During prosecution, the Examiner carefully considered, and allowed the claims over, prior art disclosing Patent Owner's ultra-sensitive, single-molecule protein assay (coined Simoa®) together with art suggesting a need to detect a protein in blood—tau—that is associated with brain injuries and other neurological conditions including Alzheimer's Disease. Both concepts—existence of the assay, and general suggestions to search for tau in blood—appear in prior art references that the Examiner cited as a basis for claim rejections. Although the Examiner allowed the claims over these disclosures, the Petitioner now asks the Patent Office to address the same arguments already presented and overcome during prosecution. The Director should reject Petitioner's request to reconsider its findings of patentability over the same or highly similar prior art and arguments and deny the

1

Petition under § 325(d). The Petitioner has not met (and cannot meet) its burden to show that the Office erred in a manner material to its finding of patentability.

Discretionary denial is further justified by the Petitioner's decision not to file a stipulation that would eliminate the risks of duplicative efforts or conflicting decisions between this proceeding and parallel district court litigation.

## II. BACKGROUND

### A. Petitioner Filed an IPR Petition and Declaratory Judgment Action and Patent Owner Counterclaimed for Infringement

On May 28, 2025, Petitioner filed its Petition, along with a lawsuit in the U.S. District Court for the District of Delaware, requesting a declaratory judgment of non-infringement of the '092 patent. (*Fujirebio Diagnostics, Inc. v. Quanterix Corp.*, No. 1:25-cv-00659 (D. Del.), Dkt. No. 1.) Patent Owner filed a counterclaim alleging infringement of the '092 patent on June 23, 2025. (*Id.*, Dkt. No. 12.)

### B. The '092 Patent Issued Over Art that Disclosed Ultrasensitive Assay Methods and that Identified Tau Protein as a Potential Blood-Based Biomarker Target

The '092 patent claims methods of producing bodily fluid samples for quantification of tau protein that is present in exceedingly low concentrations in a patient's blood sample. (*See, e.g.*, '092 patent, claim 1; Petition at 1; *see also* Ex. 1002 at 555.) The '092 patent issued after the Examiner and Patent Owner

resolved obviousness rejections raised in the only office action made during prosecution.

### 1. The Examiner's Obviousness Rejections Relied on Patent Owner's Prior Art Assay Method and a Suggestion to Apply Such Methods to Detect Tau Protein in Blood

The Examiner relied on the combination of "Duffy" (Ex. 1015), and "Quanterix 2010a" (Ex. 1033), as the primary basis of rejection for pending claims 11, 20-24, and 92-102. (Ex. 1002 at 496.) Both Duffy and Quanterix 2010a originate from and describe or relate to Patent Owner's ultra-sensitive protein assay, and Duffy is cited in the '092 patent specification among a long list of Patent Owner's disclosures related to that assay. (Ex. 1001, '092 patent, 16:48-53.) The Examiner also rejected these same claims in further view of either "Wunderlich" (Ex. 1017) or "Mortberg" (Ex. 1018), and rejected pending claim 103 based on Duffy in view of Quanterix 2010a and Wunderlich. (Ex. 1002 at 500-02.)

In the rejection, the Examiner asserted that Duffy teaches an ultra-sensitive assay for measuring proteins in blood, which alone discloses each claim limitation except that "the protein being detected is tau" and obtaining a sample "from a patient recovering from brain injury." (Ex. 1002 at 496-97.) Even then, the Examiner concluded that "[n]evertheless, one of ordinary skill in the art at the time of the

3

invention would have found it obvious that the method of Duffy could be used to" detect and quantify tau as recited by the claims "in a blood/serum/plasma sample of a patient recovering from a brain injury," as required by then-pending independent claim 92. (Ex. 1002 at 497.) The Examiner reasoned that a skilled artisan would have anticipated success in applying the Duffy assay in the same way to quantify tau. (*Id.* (discussing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420-21 (2007)).)

The Examiner further asserted that even if Duffy alone did not render obvious the claim limitations that "the protein being detected is tau" and obtaining a sample "from a patient recovering from brain injury," the combination of Duffy and Quanterix 2010a did so. (Ex. 1002 at 497.) According to the Examiner, Quanterix 2010a teaches not only "the same assay as Duffy," but also "explicitly teaches the assay can detect tau in a blood sample and suggests doing so in a subject recovering from a brain injury." (Ex. 1002 at 498.)

The Examiner also rejected pending claims 11, 20-24, and 92-102 based on the combination of Duffy and Quanterix 2010a in further view of either Wunderlich or Mortberg. (Ex. 1002 at 500-01 (in further view of Wunderlich), 501-02 (in further view of Mortberg).) The Examiner found both Wunderlich and Mortberg teach quantifying tau following brain injury (including injuries resulting from the specific

events recited in the pending claims, e.g., hypoxic and ischemic events), and therefore fill that potential gap in Quanterix 2010a. (*E.g.*, Ex. 1002 at 501 ("Wunderlich teaches that approximately 30 pg/mL of tau are detected in blood . . . after a stroke . . . ."); *id.* ("Mortberg teaches measuring tau in plasma after cardiac arrest . . . .").)

The Examiner additionally rejected pending claim 103, which recited collecting the patient sample within 12 hours of a brain injury, based on the combination of Duffy, Quanterix 2010a, and Mortberg. (Ex. 1002 at 501.) The Examiner observed that Quanterix 2010a provided "the teachings to make obvious measuring tau in the blood of a subject with a brain injury[,] . . . Wunderlich provides a reasonable expectation of detecting tau in said blood within 12 hours of a brain injury." (*Id.*)

### 2. The Examiner Withdrew the Obviousness Rejections and Allowed the Claims After Considering Patent Owner's Rebuttal Evidence

The Examiner allowed the '092 patent claims after holding an interview with Patent Owner's representatives and reviewing Patent Owner's rebuttal evidence and claim amendments.

The Examiner and Patent Owner's representatives discussed the obviousness rejection over Duffy and Quanterix 2010a during an interview attended by David Duffy—the named inventor on Duffy and the presenter of the Quanterix 2010a slides, who then served as Patent Owner's Chief Technology Officer. (Ex. 1002 at 554.) Among other issues, Mr. Duffy explained why a skilled artisan would not have been motivated to pursue the claimed tau protein assay method in light of the conventional wisdom in the art, and how it was only after the underlying patent application published that the field experienced a "sea-change" in the approach to measuring tau in blood samples. (*Id.* at 555, 627.) This was evidenced by an article—Ding, Ex. 1019—that catalogued a dramatic, post-publication uptick in the use of Patent Owner's ultra-sensitive assay (Simoa® assays), and other sensitive assays, to detect tau in blood. (*Id.* at 556, 627.)

Patent Owner also addressed the obviousness rejections in written remarks, emphasizing the lack of a reasonable expectation of success in reliably producing an analytically quantified sample from blood containing tau at the levels claimed and using the level of sensitivity claimed. (*Id.* at 555, 558.) More specifically, Patent Owner explained that at the time of the invention, there was no clear impetus in the field to use ultra-sensitive assay methods to detect tau, and that conventional assay

6

methods had been used and generally accepted. (*Id.* at 555-56.) Patent Owner pointed out that those conventional techniques were used by Mortberg and Wunderlich, among others. (*Id.* at 555-57, 559.) And Patent Owner explained that Quanterix 2010a reported tau measurements using conventional techniques—not Patent Owner's ultra-sensitive assay—and only in hindsight was it recognized that those results lacked reliability and overestimated tau concentration. (*Id.* at 557, 559.) Patent Owner then reiterated that it was only after publication of the underlying application that the field adopted a reasonable expectation of success detecting tau in blood and moved away from the gold-standard method of quantifying tau in cerebrospinal fluid. (*Id.* at 559-61.) That adoption was accompanied by praise for— and the commercial success of—Patent Owner's ultra-sensitive tau assay. (*Id.* at 561-62.)

After considering Patent Owner's arguments, the Examiner allowed the claims. In particular, the Examiner acknowledged that the alleged prima facie case presented in the non-final office action could not stand given that no group had used Patent Owner's ultra-sensitive Simoa® assay to detect tau until after the effective filing date. (*Id.* at 659.) As succinctly put by the Examiner:

In this case, no group prior to the effective filing date had done more than perhaps suggest using Simoa to detect tau (see Quanterix document previously discussed), while dozens of groups utilized Simoa to detect tau after the date of Applicant's contribution. It is on this fact that the Examiner finds the argument persuasive and concludes that the rebuttal evidence is sufficient to overcome the obviousness rejection.

(*Id.* at 660.)

## C. The Petition's Obviousness Grounds Mirror Those Raised and Overcome During Prosecution

The Petitioner presents two Grounds of obviousness, both of which use the same base reference, Rissin (Ex. 1005):

| Ground | Basis | Claims | Reference(s) |
|--------|-------|--------|--------------|
| 1 | § 103 | 1, 6-21 | Rissin in view of Todd |
| 2 | § 103 | 1, 6-21 | Rissin in view of Voorheis |

According to Petitioner, Rissin "teaches performing a SMA [single molecule assay] (digital ELISA) to measure low concentrations of protein biomarkers in blood and blood serum" by "'us[ing] single arrays of femtoliter-sized reaction chambers' that 'can isolate and detect single enzyme molecules.'" (Petition at 28.) According to Petitioner, Rissin discloses all elements of the challenged claims except targeting tau. (*See, e.g.*, *id.* at 38, 61-62.)

According to Petitioner, Todd "describes the use of a SMA technology . . . that could be used to detect tau biomarker in the blood plasma of patients for early detection of [Alzheimer's Disease]." (Petition at 31.) The Petitioner also relies on Todd as identifying Alzheimer's Disease as an area where ultra-sensitive assay techniques might be used, and pointing to tau as a known biomarker candidate for clinical diagnosis of Alzheimer's Disease. (*Id.* at 33-34.)

According to Petitioner, Voorheis "is directed to methods and kits for diagnosing [Alzheimer's Disease] and other neurological disorders by screening for tau in the blood of a patient." (Petition at 56.) Petitioner also describes Voorheis as "recogniz[ing] the need for early detection and diagnosis of [Alzheimer's Disease]," and as having "developed a blood-based diagnostic assay using tau as a method for doing so" that involves diluting a blood sample and performing an immunoassay. (*Id.* at 57.)

For Ground 1 combining Rissin and Todd, Petitioner asserts that "[a] POSA would have been motivated to use the SMA procedure of Rissin to quantify endogenous tau in the blood of patients suspected of having a neurological disorder as taught by Todd to arrive at the inventions claimed by the Challenged Claims for several reasons," including a shared field of endeavor and their common disclosure

of use of SMAs to quantify ultra-low concentration of analytes in blood. (Petition at 34.) In other words, Petitioner argues that a skilled artisan would have been motivated to apply the ultra-sensitive assay technique of Rissin to detect tau protein as suggested by Todd, which itself suggests use of ultrasensitive assays for detection of biomarkers relevant to diagnosis of Alzheimer's disease. (*Id.* at 38-44.)

For Ground 2 combining Rissin and Voorheis, Petitioner asserts that "[a] POSA would have been motivated to combine the teachings of Rissin with the teachings of Voorheis in order to quantify endogenous tau in the blood of patients suspected of having a neurological disorder as claimed by the '092 patent," because a POSA would know an ultra-sensitive technique to detect trace amounts of analyte in blood, like in Rissin, would be beneficial for early Alzheimer's Disease diagnosis, and in particular tau, as described in Voorheis. (Petition at 58-60.)

### D. The Petition's Primary Reference—Rissin—Has Long Served as an Obviousness Reference in Prosecution of Related Applications Involving the Same Examiner

The Petitioner's resort to Rissin as a primary reference, rather than the Duffy reference cited by the Examiner, is a distinction without a difference. The contents of Rissin and Duffy are very similar, which is no surprise. The authors of Rissin worked for Patent Owner Quanterix and Rissin's author list includes every one of

the named inventors of the Duffy reference (i.e., David Duffy, Evan Ferrell, Jeff Randall, David Rissin, and David Walt). (*Compare* Ex. 1005, *with* Ex. 1015.) Furthermore, and of greater significance to the question of discretionary denial, the same Examiner that evaluated and allowed the '092 patent's claims had long considered and relied on Rissin during examination of '092 parent applications.

To illustrate, during prosecution of the earliest patent application in the '092 patent's family, U.S. Patent Application No. 14/111,326[1], the same Examiner rejected the pending claims over the combination of Rissin, which describes Patent Owner's "assay which detects serum proteins at subfemtomolar concentrations (title)," with Hulstaert (WO 2000/14546), which claimed "a method for early detection or quantification of CNS damage in an individual by determining (i.e., detecting) the level of tau in said individual and comparing it to the level of tau in control healthy individuals (claim 1)." (Ex. 2001 at 15.) The Examiner's obviousness rationale was that a skilled artisan "would have been motivated to use the technique of Rissin in the method of Hulstaert," to arrive at the claimed invention

---

[1] The '092 patent is a continuation of, and claims priority to, the '326 application.

because of the motivation to measure tau, per Hulstaert, "with the greatest sensitivity available as this is the general nature of scientific experimentation." (*Id.* at 15.) In other words, the Examiner's argument was that it would have been obvious to apply Patent Owner's ultra-sensitive assay to tau because tau was a known biomarker for brain injury.

During prosecution of the next-filed application in the family, U.S. Patent Application No. 15/269,142[2], the same Examiner rejected the then-pending claims under § 101, referencing Rissin as describing a known sensitive assay to detect proteins, along with Quanterix 2010a, which the Examiner characterized as teaching the use of Patent Owner's assay to detect tau. (Ex. 2002 at 6-8.)

Thus, whether as described in Duffy or Rissin, the same Examiner was intimately aware of the prior art status of Patent Owner Quanterix's ultra-sensitive assay methods for measuring proteins in blood, and had cited Rissin and Duffy interchangeably for essentially the same teachings throughout his examination of applications in the '092 patent family.

---

[2] The '092 patent is a continuation of, and claims priority to, the '142 application.

## III.  ARGUMENT

### A.  Discretionary Denial Is Warranted Because the Petition Raises the Same or Substantially the Same Prior Art and Arguments the Examiner Previously Considered

#### 1.  Legal Standard for Discretionary Denial Under § 325(d)

The Board applies a two-part framework to analyze discretionary denial under § 325(d): "(1) whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office; and (2) if either condition of [the] first part of the framework is satisfied, whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims." *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) ("*Advanced Bionics*") (precedential).

"If a condition in the first part of the framework is satisfied and the petitioner fails to make a showing of material error, the Director generally will exercise discretion not to institute *inter partes* review." *Id.* at 8–9. "[T]his framework reflects a commitment to defer to previous Office evaluations of the evidence of record unless material error is shown." *Id.* at 9.

In the first step of the *Advanced Bionics* framework, the Board may consider

*Becton, Dickinson* factors (a), (b) and (d), which are:

a)    the similarities and material differences between the asserted art and the prior art involved during examination;

b)    the cumulative nature of the asserted art and the prior art evaluated during examination; and

d)    the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art.

*Advanced Bionics*, Paper 6 at 10; *see also Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17-18 (PTAB Dec. 15, 2017) ("*Becton, Dickinson*") (precedential).  "Previously presented art includes art made of record by the Examiner, and art provided to the Office by an applicant, such as on an Information Disclosure Statement (IDS), in the prosecution history of the challenged patent."  *Advanced Bionics*, Paper 6 at 7–8.

In the second step of the *Advanced Bionics* framework, the Board may consider *Becton, Dickinson* factors (c), (e), and (f), which are:

c)    the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;

e)    whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and

f)    the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the prior art or arguments.

*Id.* at 10.

## 2. *Advanced Bionics* Step 1 Is Met Because the Petition Raises the Same or Similar Prior Art and Arguments

The Petition raises art already considered (Rissin and Voorheis), that is cumulative of art already considered, and presents substantially the same obviousness arguments as those that were already overcome during prosecution. Step 1 of the *Advanced Bionics* framework is thus met.

### a. The Examiner Considered Rissin and Voorheis

Two of the three references that the Petition raises, Rissin and Voorheis, were submitted by the Patent Owner on an IDS that the Examiner electronically signed. The Examiner signed the individual IDS pages where Rissin and Voorheis appear, noting "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /AMW/," without crossing off Rissin or Voorheis.  (Ex. 1002 at 512, 534.)

Because a reference presented to the Patent Office in an IDS citation alone is deemed previously presented to and considered by the Office, *Advanced Bionics* step 1 is met as to Rissin and Voorheis.  *Ecto World, LLC & SV3 LLC v. RAI Strategic Holdings, Inc.*, IPR2024-01280, Paper 13 at 4 (PTAB May 19, 2025) ("*Ecto World*")

(precedential) (Acting Director Stewart) ("Challenging the claims using the same prior art that was previously presented on an IDS is sufficient to satisfy the first part of the *Advanced Bionics* framework." (citations omitted)); *Advanced Bionics*, Paper 6 at 7-8 (stating that previously presented art includes art cited in an IDS); *see also Google LLC v. Valtrus Innovations Ltd.*, IPR2022-01197, Paper 18 at 15 (PTAB June 13, 2023) ("[P]roviding a document to the Office in an Information Disclosure Statement is sufficient to satisfy prong one of the *Advanced Bionics* analysis."); *Microsoft Corp. v. KoninKlijke Philips N.V.*, IPR2018-00279, Paper 11 at 12, 14-15 (PTAB June 8, 2018) ("The bottom of each page of the signed Information Disclosure Statement reads, 'ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH....' Willey is not lined through. Thus, we find that Willey was previously presented to, and considered by, the Office." (citations omitted)).

In addition, the same Examiner repeatedly cited Rissin in claim rejections during prosecution of parent patent applications, underscoring that the Examiner was fully aware of Rissin's teachings during examination of the '092 patent. (Ex. 2001 at 15; Ex. 2002 at 6-8.)

### b. Rissin Is Cumulative of and Immaterially Different from Duffy

Petitioner's primary obviousness reference, Rissin, is cumulative of Duffy, the primary obviousness reference raised in prosecution. Both describe Patent Owner Quanterix's ultra-sensitive assay for detection and measurement of proteins.

Rissin describes Patent Owner Quanterix's "single-molecule enzyme-linked immunosorbent assay (digital ELISA)" and discloses the method's ability to measure certain proteins in serum at subfemtomolar concentrations. (Ex. 1005 at 1; Petition at 28.) Rissin describes this digital assay as using "arrays of femtoliter-sized reaction chambers" "that can isolate and detect single enzyme molecules." (Ex. 1005 at 1, 6; Petition at 28.) The assay operates by forming a sandwich antibody complex on microscopic beads, after which bound antibodies are labeled with enzymes. The sample is then introduced to the labeled complex, whereby the labeled antibodies capture the target proteins of interest. (Ex. 1005 at 1, 6; Petition at 30.) These complexes are then put into femtoliter-volume wells for isolation and detection of single molecules. (Ex. 1005 at 1, 2, 6.) Rissin's Figure 1 depicts this set up. (Ex. 1005 at 2; Petition at 28.) Rissin discloses assay results for detecting two proteins, PSA and TNF-α, and generally states a belief that the "digital ELISA

has the potential to facilitate earlier diagnosis and treatment of disease." (Ex. 1005 at 3, 5; *see also* Petition at 37.)

Duffy, titled "Ultra-Sensitive Detection of Molecules on Single Molecule Arrays," also describes Patent Owner Quanterix's ultra-sensitive assay technology for detecting analyte molecules or particles in a fluid sample like blood, and determining their concentration, including in subfemtomolar ranges. (Ex. 1015 at 1, 29, 43, 51, 57 (tbl. 1).) Like Rissin, Duffy describes capturing the target molecule in a complex that can include beads associated with capture antibodies and a detectable label. (*See, e.g.*, Ex. 1015 at 57 (Example 11).) Duffy also makes use of arrays comprising a plurality of reaction vessels to isolate and detect the analyte molecule. (*See id.*) Duffy also describes application of the ultra-sensitive assay to the detection of PSA and TNF-α, just like Rissin. (Ex. 1015 at 57-58 (Examples 11-12).)

As is evident from the above, Rissin is cumulative of and not materially different from Duffy, and Rissin's content largely mirrors Duffy's teachings of Examples 11 and 12, which use Patent Owner's ultra-sensitive assay to detect TNF-α and PSA, respectively. And what is more, just as the Examiner asserted Duffy disclosed all limitations of pending independent claim 92 but tau protein, (Ex. 1002

18

at 496-74; Petition at 8), Petitioner asserts Rissin discloses that same exact scope for that same claim, which issued as claim 1, (Petition at 37-44, 61-65 (identifying Rissin for all limitations of claim 1 except tau)), and the same Examiner took essentially the same position while examining the '092 patent's parent applications, (Ex. 2001 at 15; Ex. 2002 at 6-8). Simply put, Rissin and Duffy are substantially similar, and Rissin is cumulative of Duffy.

### c. Todd and Voorheis Are Cumulative of the Multiple "Tau References" the Examiner Considered

Todd and Voorheis serve a singular purpose in the Petition: addressing the claim limitations that require detection of tau in a blood sample, which Rissin does not disclose. (*See, e.g.*, Petition at 34, 38, 42-43, 58, 61-62, 63-65.) As demonstrated below, Todd and Voorheis are duplicative of multiple references already considered by the Examiner, including Quanterix 2010a, Mortberg, and Wunderlich, that disclosed attempts to detect and quantify tau in blood samples.

Todd describes a "biomarker movement" in drug discovery and disease diagnosis, and the need to develop advanced protein detection systems. (Ex. 1006 at 1-2; Petition at 32.) Among other applications, Todd asserts that protein biomarker programs in Alzheimer's disease might benefit from immunoassay

technologies with ultra-sensitive detection, and identifies "beta-amyloid and tau proteins" as potentially "hopeful candidates" as clinical markers for Alzheimer's diagnoses. (Ex. 1006 at 3; Petition at 33-34.) Todd further reports on "next generation immunoassay systems," including "Single Molecule counting (SMC)-based systems" by Singulex that are capable of "quantifying biomarkers at the sub-picogram level." (Ex. 1006 at 3; Petition at 31.)

Voorheis discloses that fragments of tau protein can be detected outside the brain and describes the use of conventional immunoassay techniques to detect tau protein fragments in patient blood samples for purposes of diagnosing Alzheimer's Disease. (Ex. 1007 at 1, 6, 10.)

Todd's identification of tau protein as a hopeful candidate for an Alzheimer's Disease biomarker coupled with the disclosure of ultra-sensitive assay techniques, and Voorheis's disclosure that the presence of tau protein fragments in blood could be exploited to diagnose Alzheimer's Disease, offer the same information that Quanterix 2010a, Mortberg, and Wunderlich provided during prosecution of the '092 patent. The Examiner relied on those three references for motivation to detect tau protein in blood, as each suggested or reported doing so, at least with

conventional assay techniques.  (Ex. 1002 at 498, 501, 502.)  Todd and Voorheis are thus cumulative of and substantially similar to those three references.

### d. The Petition's Grounds Are Based on Cumulative Art and Duplicative Arguments the Examiner Already Considered

Petitioner's arguments based on Rissin together with Todd or Voorheis are cumulative of, and overlap with, the Examiner's reliance on Duffy and Quanterix 2010a alone or in further view of Wunderlich or Mortberg.

Both of Petitioner's proposed Grounds rely on combining the single molecule assay taught by Rissin, which omits quantifying tau, with references (Todd and Voorheis) that identify tau as a target analyte.  (*See, e.g.*, Petition at 34-38, 58-62.) In each instance, Petitioner argues that a POSA would have "been motivated to modify the teachings Rissin [sic] with the teachings of [Todd/Voorheis] in order to quantify protein concentration in blood for clinical diagnosis of neurological disease for the reasons discussed in the Motivation to Combine Section." (*Id.* at 38, 62.)

Petitioner's proposed Grounds are duplicative of those the Examiner previously considered.  Indeed, as the Petition acknowledged, "[t]he Examiner found that Duffy taught a [single-molecule assay] that met the limitations of [then-pending claim 1], except measuring tau as the specific analyte of interest, and the sample

being obtained from a patient 'recovering from a brain injury'"; however, the Examiner found "[t]hose limitations . . . disclosed in [Quanterix 2010a]." (Petition at 8; *see also* Ex. 1002 at 497 ("Duffy teaches . . . [q]uantifying through the use of an analytical protein concentration measurement assay a concentration of protein . . . "); *id.* at 498 (Quanterix 2010a "explicitly teaches the assay can detect tau in a blood sample.").) The Examiner also explicitly considered the state of the art and a skilled artisan's anticipated success based on Duffy alone and in combination with Quanterix 2010a. (*E.g.,* Ex. 1002 at 497-98.) The Petition follows the Examiner's rejections like a roadmap.

Moreover, the Petition emphasizes that Rissin cites two articles discussing tau protein as a blood biomarker for Alzheimer's Disease, further exposing the cumulative nature of Petitioner's arguments, since the Examiner decidedly knew of Rissin, having used it as a basis of rejection in examining two parent applications. (Petition at 35-36; Ex. 2001 at 15; Ex. 2002 at 6-8.)

Petitioner's other arguments fare no better and are similarly cumulative over the arguments that the Examiner considered. For example, dependent claim 16 recites collecting a patient sample within 12 hours of a brain injury. Petitioner argues that this would have been obvious based on Rissin in view of the "State of the Art"

and either Voorheis, which generally teaches diagnostic testing, or Todd, which teaches that tau can be detected at 3-, 6-, and 12-hour intervals after a stroke. (Petition at 55, 71-72.) But these arguments are cumulative of the Examiner's assertion that Wunderlich "teaches that . . . tau [is] detected in blood at 3, 6, and 12 hours after a stroke." (Ex. 1002 at 501.) The Examiner asserted that "Quanterix 2010a provides the teachings to make obvious measuring tau in the blood of a subject with a brain injury while Wunderlich provides a reasonable expectation of detecting tau in said blood within 12 hours of a brain injury, making such a method of 'producing a body fluid sample' obvious." (*Id.*) This is the exact argument Petitioner advances.

Similarly, Petitioner argues dependent claims 17-21, which recite collecting a patient sample following different types of brain injuries, are obvious over Rissin in view of the "State of the Art" and either Voorheis or Todd, based on general knowledge regarding quantifying tau protein for diagnosis of neurological disease. (Petition at 38, 52-55, 61-62, 71.) But again, these arguments are cumulative of those considered by the Examiner, who considered collecting patient samples following the different types of brain injuries recited by these claims to be obvious over (1) Duffy in combination with Quanterix 2010a based on a skilled artisan's

"reasonable expectation of success," and (2) Duffy in combination with Quanterix 2010a and Wunderlich or Mortberg, which taught detecting tau following the types of brain injuries recited by the claims. (Ex. 1002 at 498, 501-02.) Thus, all of Petitioner's Grounds and arguments are cumulative of and substantially similar to those already considered by the Examiner.

For all the above reasons, *Advanced Bionics* step 1 is met as to the entirety of the Petitioner's asserted art and Grounds.[3]

### 3. *Advanced Bionics* Step 2 Is Met Because the Petition Fails to Show Examiner Error

Where, as here, *Advanced Bionics* step 1 is met, "the Director generally will exercise discretion not to institute *inter partes* review" unless the petitioner makes a showing of material error. *Advanced Bionics*, Paper 6 at 8-9. Petitioner has not

---

[3] Given that the Petitioner's Grounds advance arguments essentially copied from prosecution that are supported by cumulative art and fail to refute the factual findings that were the basis for allowance, denial under 35 U.S.C. § 314(a) is alternatively warranted because the "strength of the patentability challenge" is exceedingly weak.

met—and cannot make—the required showing, so the Director should exercise discretion not to institute *inter partes* review.

### 4. The Examiner Did Not Err in a Manner Material to Patentability

Under *Advanced Bionics* step 2, "if the Examiner applied the asserted prior art or substantially the same prior art during examination, then a petitioner must demonstrate that, for example, the previously presented art teaches the limitations of the challenged claims, and that no reasonable examiner could have found otherwise." *Ecto World*, Paper 13 at 5-6.

As the analysis above applying *Advanced Bionics* step 1 illustrates, Rissin and Voorheis were considered by the Examiner, and both of Petitioner's proposed Grounds are cumulative of the prior art cited by the Examiner. Accordingly, Petitioner must demonstrate that no reasonable examiner could have allowed the claims of the '092 patent, or else its Petition should be denied institution. *Id.* (reciting standard and clarifying that "a petitioner must provide an analysis [under part two of *Advanced Bionics*] even when the asserted prior art is on an IDS, but the Examiner did not apply the reference").

Neither the Petition nor its accompanying expert declaration directly

addresses whether the Examiner materially erred, or attempts to explain why no reasonable examiner could have concluded that the Patent Owner's rebuttal evidence overcame the Examiner's obviousness rejections.

The gist of Petitioner's criticism of the Examiner is that he accepted the Patent Owner's evidence of non-obviousness without considering other evidence that might have contributed to the uptick in usage of highly sensitive assays to measure tau in blood, apart from the publication of the underlying application. (Petition at 9-10.) The Petitioner's argument falls far short of meeting its burden of proof, and all of the evidence Petitioner cites is cumulative of the information the Examiner considered. The Petition cites three Exhibits (Exs. 1039, 1040, 1041) relating to Patent Owner Quanterix's Simoa® technology and patents which are expressly cited on the face of the '092 patent. (*See* Ex. 1001 at 2 (listing Ex. 1040 (U.S. Pat. No. 8,236,574)); *id.* (listing three patents related to Patent Owner's Simoa® technology issued during 2013, one of which was assigned to Patent Owner (U.S. Pat. No. 8,415,171) and others assigned to Tufts University (U.S. Pat. Nos. 8,460,878, 8,460,879, and 8,492,098), which are described in Ex. 1041); *id.* at 4 (listing Ex. 1039).) The remaining two exhibits that Petitioner relies upon reflect nothing more than what the Examiner already knew from the Ding reference—i.e., that Patent

Owner's Simoa® assay, including as described in Rissin,[4] was marketed and used to detect tau in blood after the '092 patent's priority date.  (*See* Ex. 1034 (Patent Owner's website page from 2013 describing its Simoa® technology and tau assay kit); Ex. 1042 (Journal article published in 2017 describing blood-based detection of tau using Patent Owner's Simoa® platform).)  *Advanced Bionics* step 2 is met because the Petitioner cannot show material error by merely pointing to the same evidence that the Examiner already considered, and then second-guessing the result.

Petitioner also halfheartedly attacks the Ding article.  (Petition at 9-10.)  But those arguments are cumulative too, because the Examiner expressly considered Ding, including Ding's list of publications concerning the use of highly sensitive assays to detect tau in blood.  (*See* Ex. 1002 at 556 (summary of 6/20/2021 Examiner interview during which Ding was discussed); *id.* at 567, 575-88 (6/29/2021 email from Patent Owner to Examiner attaching Ding); *id.* at 659 (notice of allowance discussing Ding).)  There is no evidence to support Petitioner's insinuation that the

---

[4] Ding cites Rissin as describing the Simoa technology that had been used to detect tau in the studies included in its meta-analysis.  (*See* Ex. 1019 at 1-2 & n.13.)

articles analyzed by Ding were published for any purpose other than to report the results of notable scientific studies, and Petitioner's observation that 17 publications out of 66 listed an author with some connection to Patent Owner Quanterix does nothing to undermine the correctness of the Examiner's conclusions.  In summary, the Petition offers no evidence or argument to refute the Examiner's conclusion of non-obviousness based on Ding's findings that no group had used highly sensitive assays to detect tau in blood before the effective filing date of the '092 patent, and at least 42 groups did so afterwards.  (*See* Ex. 1002 at 659.)

The only other quibble offered by the Petitioner with respect to the Examiner's allowance of the '092 patent is that he incorrectly wrote in his Reasons for Allowance that "Ding table 1 lists Applicant's claimed assay (tau Simoa) used by at least forty-two groups <u>after</u> the effective filing date of 4/12/11," and that, "in reality," the correct term was "studies (publications), not groups."  (Ex. 1003, ¶ 47 (emphasis added); *see also* Petition at 10.)  Petitioner's picayune word choice critique is not evidence of an error, much less a "material" error.  *Robert Bosch Tool Corp. v. SD3, LLC*, IPR2016-01754, Paper 15 at 19-20 (PTAB March 22, 2017) (denying institution under § 325(d) after giving "little probative weight" to expert declaration that "provide[d] insufficient probative facts and evidence beyond what was already

considered by the Examiner during prosecution").

The Board has consistently exercised its discretion to deny institution in cases with similar facts, where a Petitioner's argument is essentially that the evidence submitted to the Examiner is incorrect and the Petitioner has submitted an expert declaration to controvert the evidence that the Examiner relied on in allowing the claims. *See Boragen, Inc. v. Syngenta Participations AG*, IPR2020-00124, Paper 16 at 29-30 (PTAB May 5, 2020) (finding no material error by the Examiner in crediting applicants' arguments that there was no reasonable expectation of success based on the cited evidence); *ADVA Optical Networking, Inc. v. RAD Data Commc'ns Ltd.*, IPR2016-01848, Paper 6 at 19-20 (PTAB Mar. 9, 2017) (denying institution and finding that Petitioner's arguments were substantially the same as the art and arguments which were considered by the Examiner); *Skechers U.S.A., Inc. v. Nike, Inc.*, IPR2025-00141, Paper 20 at 20-21 (PTAB June 3, 2025) ("For example, even if we were to disagree with the Examiner's findings, that does not necessarily mean that those findings are unreasonable."); *Eyenovia, Inc. v. Sydnexis*, IPR2022-00963, Paper 7 at 21 (PTAB Nov. 8, 2022) (finding no material error where Examiner accepted "Patent Owner's argument that a POSA would not have had sufficient motivation" to use compound in claimed way).

At best, Petitioner asks the Board to second-guess a reasonable judgment made by the Examiner during the prosecution of the '092 patent. Petitioner's arguments and evidence thus fall far short of its burden of proving that no reasonable examiner could have allowed the claims of the '092 patent to issue. Accordingly, the Petition should be denied under § 325(d).

## B. Discretionary Denial Is Warranted to Avoid Duplicative Efforts and the Risk of Conflicting Decisions in Parallel Litigation

Petitioner simultaneously filed its Petition and a lawsuit seeking a declaratory judgment of non-infringement in the District of Delaware. (*Fujirebio Diagnostics*, No. 1:25-cv-00659, Dkt. No. 1.) Patent Owner responded with counterclaims of infringement. (*Id.*, Dkt. No. 12.) Petitioner has not offered a stipulation to address concerns of duplicative efforts and potentially conflicting decisions.[5] Petitioner's

---

[5] According to the Interim Director Discretionary Process webpage, "If a petitioner chooses to file a stipulation, such as a *Sotera* stipulation, they should file it as soon as practicable, so that the patent owner may address the impact of the stipulation in its discretionary denial brief." (*See* Section I.(D)., Interim Director Discretionary

decision not to offer a stipulation weighs in favor of discretionary denial, even though no trial date has been set in the district court action. *See DataDome S.A. v. Arkose Labs Holdings, Inc.*, IPR2025-00693, Paper 13 at 3 (PTAB Aug. 14, 2025) (denying institution where trial date in parallel litigation had not yet been set and Petitioner had not filed a *Sotera* stipulation).

## IV. CONCLUSION

For these reasons, the Director should exercise discretion and deny institution of the Petition.

Dated: August 20, 2025

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Avenue N.W.<br>Suite 700<br>Washington, D.C. 20004<br>Tel: (720) 566-4000<br>Fax: (720) 566-4099</td><td>By:  /Orion Armon/<br>Orion Armon<br>Reg. No. 65,421<br>Counsel for Patent Owner</td></tr>
</table>

---

Process (Mar. 26, 2025), https://www.uspto.gov/patents/ptab/interim-director-discretionary-process.)

# CERTIFICATE OF COMPLIANCE WITH WORD COUNT

Pursuant to 37 C.F.R. § 42.24(d), I certify that this Patent Owner's Brief in Support of Discretionary Denial complies with the type-volume limits of 37 C.F.R. § 42.24(b)(3) and the PTAB's March 26, 2025 Memorandum re Interim Processes for PTAB Workload Management because it contains 6,224 words, according to the word-processing system used to prepare this Brief, excluding the parts of this Brief that are exempted by 37 C.F.R. § 42.24(a) (including the table of contents, a table of authorities, mandatory notices, a certificate of service or this certificate word count, appendix of exhibits, and claim listings).

DATED:  August 20, 2025

Cooley LLP
ATTN: Patent Group
1299 Pennsylvania Ave., N.W.
Suite 700
Washington, D.C. 20004
Tel: (720) 566-4000
Fax: (720) 566-4099

/Orion Armon/
Orion Armon
Reg. No. 65,421
Counsel for Patent Owner

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. §§ 42.6(e) and 42.105(b), the undersigned certifies that

a true and correct copy of the foregoing **PATENT OWNER'S BRIEF IN**

**SUPPORT OF DISCRETIONARY DENIAL AND EXHIBITS 2001 AND 2002**

were served on August 20, 2025, via email to counsel for Petitioners at the following:

Patrick D. McPherson
DUANE MORRIS LLP
901 New York Ave. NW, Suite 7000
Washington, D.C. 20001
Email: PDMcPherson@duanemorris.com

Thomas J. Kowalski
DUANE MORRIS LLP
22 Vanderbilt, 335 Madison Ave., 23rd Floor
New York, NY 10017
Email: TJKowalski@duanemorris.com

Christopher S. Kroon
DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110
Email: CSKroon@duanemorris.com

/Orion Armon/
Orion Armon
Reg. No. 65,421
Tel: (720) 566-4000
Counsel for Patent Owner

# EXHIBIT C

## REMARKS

Applicant respectfully requests reconsideration. Claims 11, 20-24 and 92-103 were previously pending in this application. Claims 11, 20-24, 92-93, 95, and 103 have been amended. New claims 104-106 have been added and are supported by the specification at, for example, p. 26 line 31 to p. 27 line 17, p. 30 line 6 to p. 31 line 4, and p. 47 line 32 to p. 48 line 25. No new matter has been added.

Claims 11, 20-24 and 92-106 are now pending in this application with claim 92 being the sole independent claim.

### Interview Summary

The Applicant's Representatives, Michael J. Pomianek, Ph.D., Reg. No.: 46,190 and Andrew G. Maher, Ph.D., Reg. No.: 79,399 ("the Representatives"), thank Examiner Weidner for the courtesy of a telephone interview conducted with the Representatives on June 30, 2021. Also participating in the telephone interview was David C. Duffy, Ph.D. Dr. Duffy is the Chief Technology Officer of the Applicant, Quanterix Corporation ("Quanterix"). Before the interview, Representative Pomianek emailed an Agenda to Examiner Weidner, which is attached hereto with supporting materials described below as Appendix 1. The Agenda included (a) proposed claim amendments for discussion (attached as Appendix A to Appendix 1); (b) a copy of Ding, et al. (2021). "Ultrasensitive assays for detection of plasma tau and phosphorylated tau 181 in Alzheimer's disease: a systematic review and meta-analysis." Translational neurodegeneration, 10(1), 1-14 ("Ding" attached as Appendix B to Appendix 1); and (c) a copy of Teunissen, et al. (2020). "Plasma p-tau217: from 'new kid' to most promising candidate for Alzheimer's disease blood test." Brain, 143(11), 3170-3172 ("Teunissen"; attached as Appendix C to Appendix 1).

During the interview, the Representatives, Examiner Weidner, and Dr. Duffy discussed the rejection of independent claim 92 under 35 U.S.C. 103 over US20100075407 ("Duffy '407") in view of Quanterix 2010 IQT Technology Focus Day ("Quanterix 2010a"). Dr. Duffy is the first named inventor of Duffy '407 and was the presenter of the Quanterix 2010a slides. The Representatives described the context of the claimed method and the frame of mind of a person of ordinary skill in the art at and around the time of the invention and at the time of the earliest

effective filing date (April 11, 2011). The Representatives explained that claim 92, which is directed to preparing a sample from which to measure a level of tau that is derived from a bodily fluid comprising blood (or a blood component selected from plasma and serum) that was contraindicated, as samples derived from cerebrospinal fluid (CSF) were conventionally believed to be required, and that recites limitations related to an analytically quantified amount of tau (less than about 5 pg/mL) and a level of quantification (less than about 0.2 pg/mL) that a person of ordinary skill at that time would not have believed to be necessary, useful or appropriate for patients suspected of having a neurological condition (e.g., as a successful tool for treatment/diagnosis). The Representatives noted while there were a handful of experimental attempts in the prior art purporting to measure tau in blood (at higher levels generally lacking reliability and with high control levels making it questioning whether, in at least the controls, tau was actually being measured), the publication of the assays and data disclosed in Applicant's Application resulted in a clear line of demarcation and sea-change in the field that effectively created or contributed to creating the reasonable expectation of success that was absent at the time Applicant's invention was made and first filed for patent protection.

Dr. Duffy further described the nature and extent of the sea-change in the neurobiomarker industry following the publication of the subject matter of the present Application in 2012, providing specific examples – a development with now heightened significance in view of the recent, widely publicized, FDA approval of Biogen's Alzheimer's drug Aduhelm™, highlighting the importance of considering rapid, easy-to-administer, and accurate blood tests for neurological biomarkers as part of a patient treatment plan this and future novel therapeutics. Dr. Duffy further supported his points by referencing Teunissen, one example of recent commentary on the promise of plasma tau assays for Alzheimer's disease blood tests, as underscoring the dramatic rise in importance of tau blood tests following this sea-change. Dr. Duffy explained that conventional wisdom at the time was that tau was not reliably present in blood, either generally due to the blood-brain barrier or at least at levels that were consistent and meaningfully correlated to any neurological disorder. Furthermore, to the extent the skilled person had attempted to measure tau in blood or was aware of such attempts, conventional ELISA assays useful for measurement of tau in CSF were believed to be sufficient—which was reinforced by the relatively high, possibly

artifactual measurements published from early studies attempting to measure tau in blood using such conventional ELISA assays. Dr. Duffy described the few examples of which he was aware of investigators trying to measure tau in blood using conventional ELISA approaches. As an example, Dr. Duffy pointed to the very large error bars and signal response buried in noise in Mortberg "Assessment of the Cerebral Ischemic/Reperfusion Injury after Cardiac Arrest" *Acta Universitatis Upsaliensis Uppsala.* 2010 ("Mortberg"), and how it was evident to him why the field did not view such data as sufficiently reliable or repeatable to be adopted by the field or drive investigations to deviate from measurement of tau in CSF using industry accepted ELISA techniques.

By contrast, to illustrate the impact on the field of the results disclosed in the present Application, Dr. Duffy referred to Ding, which is a recent meta-analysis review article on ultrasensitive plasma tau assays. Despite multiple ultrasensitive measurement techniques being known for years prior to the filing of the present Application, the timeline evident in Ding (see Table 1 and Table 2) shows that it was not until abruptly after the publication of the subject matter of the present Application in 2012 ("post publication period") that, a vast majority of studies (by numerous different research groups) began measuring tau in blood with high sensitivity assays. Moreover, not surprisingly, most of the earliest post publication studies were performed using the Simoa® method described in various embodiments and working examples in the present Application. Dr. Duffy noted that the dramatic rise in publications with clinically relevant measurements of tau in blood only after publication of the techniques and results disclosed in this Application, and the high prevalence of use of Simoa® assays in Ding is clear and objective support for the contention that industry did not "catch on" (i.e., have a reasonable expectation of success of measuring tau in blood with sufficient accuracy and reproducibility to be useful as an indicator of neurological function or injury) until, and in response to, the teaching of the present Application.

The Representatives emphasized that Ding supports the legal conclusion of non-obviousness of the claimed method. Along these lines, the Representatives noted that, following the breaking of the dam by the invention disclosed in the present Application, competitors have begun filing patent applications directed to ultrasensitive measurement of tau and phosphorylated tau in blood using commercial embodiments of Quanterix's Simoa® tau assay technology by collaborating with Quanterix customers, some of which the Examiner is presently examining.

Dr. Duffy then discussed how the measurements of tau in blood on slide 22 of Quanterix 2010a cited in the Office Action are actually in line with the above description of the state of the art at the time. Significantly, the early-stage experimental results depicted in the slide were produced using a conventional ELISA comparable to that used in Mortberg rather than any ultrasensitive technique such as Simoa®. Dr. Duffy explained that the ~60-80 pg/mL levels of tau in age matched disease free individuals depicted on slide 22 were subsequently determined by the inventors of this Application to be inaccurate and likely the result of non-specific binding artifact, with true tau levels in such samples (measured by the techniques as reported in the present Application) being in some cases in excess of an order magnitude lower. Indeed, Dr. Duffy indicated that for at least the disease-free patients in slide 22, the conventional ELISA was likely measuring background noise rather than true signal indicative of analytically quantifiable tau levels in blood, and that other measurements in the prior art (e.g., Mortberg and Wunderlich et al. *Clinical Neurology and Neurosurgery* 108 (2006) 558-563 ("Wunderlich")) that similarly showed much high levels of tau in blood than in claim 92 may reflect the same artifact.

Examiner Weidner, while noting that further search and/or consideration would be needed, indicated that the explanation of the context of the claimed invention, and the Ding reference in particular, demonstrated potentially compelling secondary considerations consistent with non-obviousness, such that the obviousness rejection in the Office Action may not be supportable and will be reconsidered.

Finally, the Representatives and Examiner Weidner discussed proposed new claim 105, which recites specific steps of a preferred embodiment of the quantification step of claim 92 involving suspending a plurality of capture objects that each include a binding surface having affinity for tau protein molecules in the diluted volume of bodily fluid and then interrogating at least some of those capture objects. The Representatives noted neither Duffy '407 nor Quanterix 2010a disclosed or suggested the combination of steps recited in claim 105, which can provide improvements in the performance of high sensitivity assays (e.g., those of Duffy '407) when measuring the tau in blood/blood-derived samples.

Further remarks responsive to the bases of the rejections are presented immediately below.

### Rejections Under 35 U.S.C §103

Claims 11, 20-24, and 92-102 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over U.S. Patent Application Publication 2010-0075407 ("Duffy '407") in view of Quanterix 2010a IQT Technology Focus Day ("Quanterix 2010a"; cited on IDS 1/13/20 p. 16).

As discussed during the interview, it would not have been obvious to a person of ordinary skill at the time of the invention and earliest effective filing date of the Application to have prepared a sample obtained from patient suspected of having a neurological condition containing an analytically quantified amount of endogenous tau protein from blood (or a component of blood) of less than about 5 pg/mL using an analytical protein concentration measurement assay having a level of quantification of less than about 0.2 pg/mL, as claimed in independent claim 92. The non-obviousness of this combination of features is supported at least by the fact that a person of ordinary skill at the time would have lacked a reasonable expectation of success for reliably producing a clinically useful analytically quantified sample from blood possessing the tau levels claimed measured at the level of sensitivity claimed, for reasons articulated above in the Interview Summary.

As explained by Dr. Duffy during the interview, before the earliest effective filing date of this Application, there were some attempts at quantifying tau in blood, but with high baseline values and/or lack of reproducibility or clear differentiation of levels in test versus control samples, which at best created doubt as to a reasonable expectation of success in using such measurements as a research or diagnostic tool, and provided no indication of a need if attempting to quantify tau in blood samples to measure at the levels and sensitivities recited in the method as claimed. There was skepticism and doubt as to whether such a measurement would be useful for patients suspected of having a neurological condition and no reason for believing that high-sensitivity assays providing the claimed limit of quantification was needed or advantageous. In Öst et al. (2006). "Initial CSF total tau correlates with 1-year outcome in patients with traumatic brain injury." *Neurology*, 67(9), 1600-1604 ("Öst"; attached as Appendix 2), the investigators, using conventional ELISA, found a correlation of total tau in CSF (at levels of hundreds to thousands of pg/ml of sample) to patient outcome following traumatic brain injury, but explicitly stated that "[t]otal tau was <u>not detected in serum</u> throughout the study." Öst at Abstract, emphasis added. In Liliang et al., (2010). "τ proteins

in serum predict outcome after severe traumatic brain injury." *Journal of Surgical Research*, 160(2), 302-307 ("Liliang"; attached as Appendix 3), the investigators reported that their measurements of tau protein levels in serum collected from patients following traumatic brain injury having poor outcomes (436.2 ± 473.6 pg/mL) and good outcomes (51.6 ± 81.5 pg/mL) "suggest that in addition to GCS; serum $\tau$ protein levels may serve as indicators for the prediction of outcome following serve TBI. However; it should be viewed with caution because of the small sample size and wide standard deviations." Liliang at p. 302; emphasis added. In Wunderlich (published in 2006), a conventional ELISA is used to measure tau protein in serum, and the measured values of tau are all at least 30 pg/mL with only a handful of measurements from acute stroke patients exceeding the 60 pg/mL detection limit of the assay. Wunderlich at p. 560 right column and Fig. 1. In Mortberg, measurements of tau levels in plasma from patients following cardiac arrest using conventional Luminex colorimetric assays show tau values for both good outcome and bad outcome patients approaching and exceeding 50 pg/mL with wide error bars as indicated by the box and whisker plots in Figure 18. Mortberg at p. 48. And in Quanterix 2010a, as discussed during the interview, measurement of total tau in blood using a conventional ELISA (not a Simoa® assay) showed levels of ~60-80 pg/mL even in age-matched disease free patients. Quanterix 2010a at slide 22. As discussed during the interview, Dr. Duffy believes the results in slide 22 of Quanterix 2010a had an artificially inflated baseline value due to background signal calibration mismatch when measured values are near LOD, which would lead to non-AD patients showing values of ~60-80 pg/mL when in fact true values, as were subsequently determined via the presently claimed assay, are typically 0.1-1 pg/mL in serum and 1-10 pg/mL in plasma.

As explained by Dr. Duffy, the Quanterix 2010a slide 22 result is believed to be a common artifact that may also be reflected in the similar results/levels published by other investigators in the references described above. As Dr. Duffy noted during the interview, these publications showing either no tau in blood or widely varying values either buried in noise/error bars or at levels far higher than claimed collectively demonstrate that the conventional wisdom was that measurement of tau in blood was not useful or sufficiently reliable for research/clinical purposes, or at least there was substantial skepticism (i.e., a lack of a reasonable expectation of success) prior to publication of the results reported in this Application. As discussed during the interview, the claimed invention

upon publication and commercial dissemination is believed to have created a reasonable expectation of success resulting in the paradigm shift in the field of tau assays away from CSF to blood/serum/plasma as a medium and towards a new understanding of what are "normal" and symptomatic levels of circulating tau in such samples.

Despite published reports purportedly quantifying tau in blood (examples of which are discussed above), and the general existence of multiple highly sensitive assay techniques being known for years prior to the effective filing date of this Application (more than a decade), the state of knowledge and reasonable expectation of skilled artisans can be inferred by the lack of reports demonstrating analytical quantification of tau in blood at the levels and sensitivity claimed here before this application published. The Ding meta-analysis and review article discussed during the interview as summarized above illustrates this dramatically. The meta-analysis included reports of measurements of plasma tau using the highly sensitive techniques of Simoa®, ImmunoMagnetic Reduction (IMR, around since at least 2006 according to reference 14 in Ding), enhanced immunoassay using multi-arrayed fiber optics conjugated with rolling circle amplification (a-EIMAF), and Meso Scale Discovery (MSD, around since at least 2000 according to referenced 16 in Ding). Tables 1 and 2 in Ding show plasma tau and p-tau reports from various research groups. Notably, and as discussed during the interview, a vast majority of the reports in Tables 1 and 2 of Ding use Simoa® techniques described in the present Application, and all reports came after the publication of International Publication WO2012/142301 on October 18, 2012 from International Application No. PCT/US2012/033343, from which the present Application claims priority. The figure below illustrates the timeline using the frequency of publication dates of the references used in Tables 1 and 2 in Ding starting at the year 2000 (the year of the publication of MSD). Publication of the claimed invention represents a clear line of demarcation in the field evidencing that it was the subject matter of this Application that established a reasonable expectation of success.



Ding Table 1 and Table 2 References by Year

As discussed during the interview, tau blood assays at the level of quantification and producing samples with quantified tau at the claimed levels have achieved a marked rise in prominence in the medical community since the publication of the subject matter of the present Application, with the Teunissen reference as one example praising ultrasensitive tau measurement in blood as a tool for Alzheimer's diagnosis. Another example of media reports praising tau measurement blood and acknowledging the notoriety of Quanterix's commercial embodiments of the claimed invention is in the April 19, 2021 article Cairns, E. "A new market beckons for Alzheimer's blood tests" *Evaluate Advantage*, 2021 ("Cairns"; attached as Appendix 4). This article notes that Quanterix's product is comparable in correlation for Alzheimer's pathology to CSF and PET scan testing that require either a spinal tap or length imaging procedures, and quotes Quanterix CEO Kevin Hrusovsky as saying that "the test is 'selling off the charts' at the moment." Cairns at p. 2. The praise for ultrasensitive tau measurements in blood in the medical and the sales

success of the commercial embodiment of the claimed invention both underscore the non-obviousness of claim 92.

For at least the reasons outlined above, the combination of Duffy '407 and Quanterix 2010a does not render claim 92 obvious, and independent claim 92 is patentable over the combination of Duffy '407 and Quanterix 2010a.[1] The remaining claims that stand rejected on this ground depend from claim 92, and are therefore also patentable over Duffy '407 and Quanterix 2010a for at least the reasons outlined above. In addition, it is not conceded that Duffy '407 or Quanterix 2010a, alone or in combination, teach or render obvious any of the features recited in claims 11, 20-24, and 93-102, as asserted by the Patent Office. It is also not conceded that it would have been obvious to combine Duffy '407 and Quanterix 2010a in the manner suggested by the Patent Office.

Claims 11, 20-24, and 92-103 are rejected under pre-A IA 35 U.S.C. 103(a) as being unpatentable over Duffy '407 in view of Quanterix 2010a and further in view of Wunderlich.

Wunderlich fails to cure the deficiencies of Duffy '407 and Quanterix 2010a noted above with respect to independent claim 92. Accordingly, claim 92 and its dependents are also patentable over Duffy '407, Quanterix 2010a, and Wunderlich. In addition, it is not conceded that Wunderlich teaches the combination of features recited in claims 11, 20-24, and 92-103, and it is not conceded that it would have been obvious to combine Duffy '407, Quanterix 2010a, and Wunderlich in the manner suggested in the Office Action.

Withdrawal of the rejection is respectfully requested.

Claims 11, 20-24, and 92-102 are rejected under pre-A IA 35 U.S.C. 103(a) as being unpatentable over Duffy in view of Quanterix 2010a and further in view of Mortberg.

Mortberg fails to cure the deficiencies of Duffy '407 and Quanterix 2010a noted above with respect to independent claim 92. Accordingly, claim 92 and its dependents are also patentable over Duffy '407, Quanterix 2010a, and Mortberg. In addition, it is not conceded that Mortberg teaches the combination of features recited in claims 11, 20-24, and 92-103, and it is not conceded that it

---

[1] It is also not conceded that Quanterix 2010a, which is a slideshow presented to a closed group of InQTel members is a "printed publication" qualifying it as prior art with respect to the claimed invention.

would have been obvious to combine Duffy '407, Quanterix 2010a, and Mortberg in the manner suggested in the Office Action.

Withdrawal of the rejection is respectfully requested.


Double-Patenting

Claims 11, 20-24, and 92-103 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 11, 24-30, 100-102, 104, 107-114, 132-133, and 135 of copending Application No. 14/111,331 (reference application) in view of Quanterix 2010a.

Without acceding to the correctness of the rejection, Applicant is filing a terminal disclaimer.

Withdrawal of the rejection is respectfully requested.


Claim 11, 20-24, and 92-103 are rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-25 of U.S. Patent No. 10,393,759.

Without acceding to the correctness of the rejection, Applicant is filing a terminal disclaimer.

Withdrawal of the rejection is respectfully requested.


New Claims

New dependent claims 104-106 have been added. Claims 104-106 patentably distinguish the cited references relied of record at least because of their dependency on independent claim 92. whose patentability has been demonstrated above. Claim 105 recites steps of i. suspending a plurality of capture objects that each include a binding surface having affinity for tau protein molecules in the diluted volume of bodily fluid, ii. immobilizing at least a portion of the tau protein molecules with respect to at least some of the plurality of capture objects suspended in the diluted volume of bodily fluid such that at least some of the capture objects associate with at least one tau protein molecule from the volume of bodily fluid, iii. interrogating at least some of the capture objects associated with at least one tau molecule from the volume of bodily of fluid; and iv. determining a measure of tau protein molecule concentration in the volume of bodily fluid based at

least in part on the interrogating step performed in step iii. Neither Duffy '407 nor Quanterix 2010a teach, at least, this combination of features.

As discussed during the interview, suspending capture objects in the diluted volume of bodily fluid can allow for improved analyte-binding efficiency by distributing the beads throughout the volume bodily fluid to increase the rate of freely diffusing analytes encountering the capture objects (e.g., as compared to diffusion to fixed locations on planar substrate surfaces). The claimed steps also can provide the benefit of facilitating collection of the capture objects suspended in the bodily fluid (e.g. during magnetic-assisted processing) for more effective handling and, in some instances, partitioning.

Further, determining a measure of tau protein molecule concentration at least in part by interrogating the same capture objects that were suspended in the volume of bodily fluid, as recited in new claim 105, stands in contrast to the methods disclosed in Duffy '407 and Quanterix 2010a. The cited portions of Duffy '407 are directed to immobilizing a plurality of analyte molecules or particles (e.g., to a first substrate) to form a plurality of complexes, releasing at least a portion of some of the plurality of complexes, determining at least a portion of the plurality of complexes released, and determining a measure of the concentration of the analyte molecules are particles in a fluid sample. Quanterix 2010a at slide 13 shows a similar process (e.g., enzyme release followed by enzyme capture). Such a releasing/dissociation step in Duffy '407 and Quanterix 2010a therefore requires that any objects interrogated (e.g., the second substrate) to determine at least a portion of the plurality of complexes released are not the same objects exposed to an analyte-containing solution and immobilized with analyte molecules or particles. For at least these reasons, claim 105 further distinguishes Duffy '407 and Quanterix 2010a.

General Comments on Dependent Claims

Each of the dependent claims depends from a base claim believed to be in condition for allowance, and Applicant believes that it is unnecessary at this time to argue the allowability of each of the dependent claims individually. Applicant does not, however, ratify, adopt, or concede the correctness of the interpretation of the dependent claims as set forth in the Office Action, nor does Applicant concur that the basis for the rejection of any of the dependent claims is proper.

Therefore, Applicant reserves the right to specifically address the patentability of the dependent claims, if deemed necessary.

## CONCLUSION

A Notice of Allowance is respectfully requested. The Examiner is requested to call the undersigned at the telephone number listed below if this communication does not place the case in condition for allowance.

If this response is not considered timely filed and if a request for an extension of time is otherwise absent, Applicant requests any necessary extension of time.  If there is a fee occasioned by this response, including an extension fee, the Director is authorized to charge any deficiency or credit any overpayment in the fees filed, asserted to be filed or which should have been filed herewith to our Deposit Account No. 23/2825, under Docket No. Q0052.70018US03.

Dated:  July 16, 2021                              Respectfully submitted,

By: /Michael J. Pomianek/
Michael J. Pomianek
Registration No.: 46,190
Andrew G. Maher, PhD
Registration No.: 79,399
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, Massachusetts  02210-2206
617.646.8000

# EXHIBIT D



# Single-molecule enzyme-linked immunosorbent assay detects serum proteins at subfemtomolar concentrations

David M Rissin[1,3], Cheuk W Kan[1,3], Todd G Campbell[1], Stuart C Howes[1], David R Fournier[1], Linan Song[1], Tomasz Piech[1], Purvish P Patel[1], Lei Chang[1], Andrew J Rivnak[1], Evan P Ferrell[1], Jeffrey D Randall[1], Gail K Provuncher[1], David R Walt[2] & David C Duffy[1]

© 2010 Nature America, Inc. All rights reserved.

**The ability to detect single protein molecules[1,2] in blood could accelerate the discovery and use of more sensitive diagnostic biomarkers. To detect low-abundance proteins in blood, we captured them on microscopic beads decorated with specific antibodies and then labeled the immunocomplexes (one or zero labeled target protein molecules per bead) with an enzymatic reporter capable of generating a fluorescent product. After isolating the beads in 50-fl reaction chambers designed to hold only a single bead, we used fluorescence imaging to detect single protein molecules. Our single-molecule enzyme-linked immunosorbent assay (digital ELISA) approach detected as few as ~10–20 enzyme-labeled complexes in 100 µl of sample (~$10^{-19}$ M) and routinely allowed detection of clinically relevant proteins in serum at concentrations (<$10^{-15}$ M) much lower than conventional ELISA[3–5]. Digital ELISA detected prostate-specific antigen (PSA) in sera from patients who had undergone radical prostatectomy at concentrations as low as 14 fg/ml (0.4 fM).**

The clinical use of protein biomarkers to differentiate between healthy and disease states, and to monitor disease progression, requires the measurement of low concentrations of proteins in complex samples. Current immunoassays typically measure proteins at concentrations above $10^{-12}$ M[6]. The serum concentrations of the majority of proteins important in cancer[7], neurological disorders[8,9] and the early stages of infection[10], however, are thought to range from $10^{-16}$ to $10^{-12}$ M. For instance, a 1-mm³ tumor composed of a million cells that each secrete 5,000 proteins into 5 liters of circulating blood translates to a concentration of ~$2 \times 10^{-15}$ M (or 2 fM). Moreover, serum from individuals recently infected with HIV contains 10–3,000 virions per ml, resulting in estimated concentrations of the p24 capsid antigen ranging from $50 \times 10^{-18}$ M (50 aM) to $15 \times 10^{-15}$ M (15 fM)[10]. Attempts to develop methods capable of measuring these concentrations of proteins have focused on the replication of nucleic acid labels on proteins[11,12], or on measuring the bulk, ensemble properties of labeled protein molecules[13–16]. The work of Mirkin et al.[12,17] and others[18] using labels based on gold nanoparticles and DNA biobarcodes has pushed the detection of proteins into the low femtomolar range; a recent report

using this technology demonstrated the detection of 10 fM of PSA in serum[17]. Nonetheless, the sensitivities achieved by methods for detecting proteins still lag behind those for nucleic acids, such as PCR, limiting the number of gene products that have been detected in blood[6,19]. The isolation and detection of single protein molecules provides a promising approach for measuring extremely low concentrations of proteins[1,2]. For example, Todd et al.[2] have developed flow-based methods for serially detecting single fluorescently labeled detection antibodies that have been released from immunocomplexes formed on solid substrates. Here we report an approach for detecting thousands of single protein molecules simultaneously using the same reagents as the gold standard for detecting proteins, namely, the ELISA. This method has been used to detect proteins in serum at subfemtomolar concentrations.

Our approach makes use of arrays of femtoliter-sized reaction chambers (Fig. 1)—which we term single-molecule arrays (SiMoAs)—that can isolate and detect single enzymes. This approach builds from the work of Walt et al.[20–23], who used these arrays to study the kinetics[21] and inhibition[20] of single enzymes. Our objective was to exploit the ability of SiMoAs to trap and detect single enzymes to detect single enzyme–labeled proteins. In the first step of this single-molecule immunoassay (Fig. 1a), a sandwich antibody complex is formed on microscopic beads (2.7 µm diameter), and the bound complexes are labeled with an enzyme, as in a conventional bead-based ELISA. When assaying samples containing extremely low concentrations of protein, the ratio of protein molecules (and the resulting enzyme-labeled complex) to beads is small (typically <1:1) and, as such, the percentage of beads that contain a labeled immunocomplex follows a Poisson distribution. At low concentrations of protein, the Poisson distribution indicates that beads carry either a single immunocomplex or none. For example, if 50 aM of a protein in 0.1 ml (3,000 molecules) is captured and labeled on 200,000 beads, then 1.5% of the beads will carry one protein molecule and 98.5% will not carry any protein molecules (Fig. 1b)[22]. It is not possible to detect these low numbers of enzyme labels using standard detection technology (for example, a plate reader), because the fluorophores generated by each enzyme diffuse into a large assay volume (typically 0.1–1 ml), and it takes hundreds of thousands of enzyme labels to generate a

[1]Quanterix Corporation, Cambridge, Massachusetts, USA. [2]Department of Chemistry, Tufts University, Medford, Massachusetts, USA. [3]These authors contributed equally to this work. Correspondence should be addressed to D.C.D. (dduffy@quanterix.com).

Received 1 February; accepted 29 April; published online 23 May 2010; doi:10.1038/nbt.1641

595


Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000001

© 2010 Nature America, Inc. All rights reserved.

**Figure 1** Digital ELISA based on arrays of femtoliter-sized wells. (**a,b**) Single protein molecules are captured and labeled on beads using standard ELISA reagents (**a**), and beads with or without a labeled immunoconjugate are loaded into femtoliter-volume well arrays for isolation and detection of single molecules by fluorescence imaging (**b**). (**c**) Scanning electron micrograph of a small section of a femtoliter-volume well array after bead loading. Beads (2.7 μm diameter) were loaded into an array of wells with diameters of 4.5 μm and depths of 3.25 μm. (**d**) Fluorescence image of a small section of the femtoliter-volume well array after signals from single enzymes are generated. Whereas the majority of femtoliter-volume chambers contain a bead from the assay, only a fraction of those beads possess catalytic enzyme activity, indicating a single, bound protein molecule. The concentration of protein in bulk solution is correlated to the percentage of beads that carry a protein molecule.



fluorescence signal above background. In contrast, SiMoAs permit the detection of very low concentrations of enzyme labels by confining the fluorophores generated by individual enzymes to extremely small volumes (~50 fl), ensuring a high local concentration of fluorescent product molecules. To achieve this confinement in our assay, beads are loaded into an array of femtoliter-sized wells; we used 2-mm-wide arrays with ~50,000 wells, each with a diameter of 4.5 μm and a depth of 3.25 μm (**Fig. 1c**). After sealing the loaded arrays against a rubber gasket in the presence of a droplet of fluorogenic enzyme substrate, each bead is isolated in a femtoliter-volume reaction chamber. Beads possessing a single enzyme–labeled immunocomplex generate a high concentration of fluorescent product that is restricted to the 50-fl reaction chamber (**Fig. 1d**). By acquiring time-lapsed fluorescence images of the array using standard microscope optics, it is possible to distinguish beads associated with a single enzyme molecule ("on" well) from those not associated with an enzyme ("off" well); **Supplementary Figure 1** shows histograms of fluorescence from "on" and "off" wells. Imaging the arrays allows simultaneous detection of tens to tens of thousands of single immunocomplexes. The protein concentration in the test sample is determined by counting the number of wells containing both a bead and fluorescent product relative to the total number of wells containing beads (**Fig. 1d**). As SiMoAs enable concentration to be determined digitally rather than by using the total analog signal, we call our approach to detecting single immunocomplexes digital ELISA.

We first assessed the intrinsic sensitivity of this strategy by creating populations of beads with well-characterized enzyme-to-bead ratios. We mixed 400,000 biotin-modified beads with a range of concentrations of the enzyme conjugate streptavidin-β-galactosidase (SβG). For convenience, biotinylated beads were provided by hybridizing biotinylated DNA with beads functionalized with complementary DNA. (We note that this experiment should not be construed as a sensitive DNA assay; the sensitivity of such an assay is limited by nonspecific interactions between the enzyme conjugate and surface-bound DNA as shown in **Supplementary Fig. 2**.) These beads were detected in two different ways. First, we assayed an ensemble of beads in 100 μl using a fluorescence plate reader after 1 h incubation with 100 μM resorufin-β-D-galactopyranoside (RGP), a fluorogenic substrate for β-galactosidase. The detection limit for enzyme on the plate reader was 15 fM of SβG (**Fig. 2**). Second, we loaded the beads into femtoliter-volume well arrays and, after sealing a solution of RGP

into the wells of the array, allowed the signal from single enzymes to accumulate in the reaction chambers for 2.5 min, acquiring fluorescent images every 30 s. At the end of the experiment we used an image of the array that was acquired in white light to identify wells that contained beads (bead-containing wells scatter light differently than empty wells). The fluorescent images were used to determine which of those beads had an associated bound enzyme (from increasing intensity in time-lapsed fluorescent images). **Figure 2** shows a log-log plot of the percentage of beads that contained an enzyme as a function of bulk SβG concentration. The lowest concentration of enzyme conjugate detected was 350 zeptomolar (zM) and the calculated limit of detection (LOD)—determined by extrapolating the enzyme concentration at a signal equal to background plus 3 s.d. of the background signal—was 220 zM. The sensitivity of SiMoAs to intrinsic label was, therefore, ~10–20 enzymes in 100 μl, corresponding to an increase in sensitivity over ensemble measurements using a typical ELISA-plate reader of a factor of about 68,000. For comparison, chemiluminescent detection of alkaline phosphatase[4], a highly sensitive enzyme reporter system widely used in clinical diagnostics, has an LOD of about 30 aM (see <http://www.turnerbiosystems.com/doc/appnotes/S_0096.php>). The high sensitivity that arises from the thermodynamic and kinetic efficiency of the capture and detection processes in our approach are discussed below and detailed in **Supplementary Table 1**.

The linear dynamic range of digital detection of enzyme labels by SiMoAs is determined by the ability to distinguish "on" and "off" wells. At ratios of enzyme to beads of less than ~1:10, Poisson statistics show that the only statistically significant populations of beads are those carrying either one enzyme or no enzyme. Single enzymes can be detected provided that sufficient beads are interrogated and the number of active beads rises above the Poisson noise of counting active beads. At ratios of enzyme to beads greater than ~1:10, the fraction of active beads becomes much higher, and Poisson statistics show that there are a significant number of beads with multiple enzymes. To quantify the number of detected enzymes and maintain linearity in the subpopulations of beads with multiple enzymes, we use Poisson statistics to convert the number of active beads to the number of detected enzymes (see **Supplementary Table 1**). As the percentage of active beads approaches 50% (ratios of enzyme to beads greater than ~1:1.5), however, distinguishing "on" and "off" wells using image analysis software becomes challenging, and we reach a practical upper limit of the digital dynamic range. For example, the

Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000002

**Figure 2** Digitization of enzyme-linked complexes greatly increases sensitivity compared with bulk, ensemble measurements. (**a**) Log-log plot of signal output (% active beads for single-molecule array (SiMoA) or relative fluorescence units (r.f.u.) for plate reader) as a function of the concentration of streptavidin-β-galactosidase (SβG) captured on biotinylated beads. SβG concentrations for the ensemble readout ranged from 3 fM to 300 fM, with a detection limit of $15 \times 10^{-15}$ M (15 fM; green broken line). For the SiMoA assay, SβG concentrations ranged from 350 zM to 7 fM, demonstrating a linear response of



<table>
<tr><td></td><td colspan="4"><b>b</b></td></tr>
<tr><td>[SβG] (aM)</td><td>Average number of active beads</td><td>Average fraction of active beads</td><td>Measurement CV</td><td>Poisson Noise CV</td></tr>
<tr><td>0</td><td>1</td><td>0.0016%</td><td>87%</td><td>122%</td></tr>
<tr><td>0.35</td><td>3</td><td>0.0086%</td><td>75%</td><td>55%</td></tr>
<tr><td>0.7</td><td>5</td><td>0.0099%</td><td>63%</td><td>46%</td></tr>
<tr><td>3.5</td><td>22</td><td>0.0413%</td><td>10%</td><td>21%</td></tr>
<tr><td>7</td><td>38</td><td>0.0713%</td><td>15%</td><td>7%</td></tr>
<tr><td>35</td><td>237</td><td>0.4461%</td><td>1%</td><td>7%</td></tr>
<tr><td>70</td><td>385</td><td>0.8183%</td><td>5%</td><td>5%</td></tr>
<tr><td>350</td><td>1787</td><td>3.3802%</td><td>2%</td><td>2%</td></tr>
<tr><td>700</td><td>4036</td><td>7.5865%</td><td>5%</td><td>2%</td></tr>
<tr><td>3500</td><td>15634</td><td>30.6479%</td><td>3%</td><td>1%</td></tr>
<tr><td>7000</td><td>24836</td><td>44.5296%</td><td>1%</td><td>1%</td></tr>
</table>

~10,000-fold, with a calculated detection limit of $220 \times 10^{-21}$ M (220 zM; red broken line). Error bars are based on the s.d. over three replicates for both technologies. LODs were determined by extrapolating the concentration from the signal equal to background signal plus 3 s.d. of the background signal. (**b**) The imprecision from SiMoAs is determined by the Poisson noise of counting single events. The intrinsic variation (Poisson noise) of counting single active beads is given by $\sqrt{n}$. Comparing the Poisson noise–associated coefficient of variation (%CV = $\sqrt{n}/n$) with the SiMoA %CV over three measurements confirmed that the imprecision of the assay is determined by counting error.

signal at 7 fM (~45% active) in **Figure 2** deviates from linearity. As a result, the digital, linear dynamic range demonstrated here using 50,000 wells spanned approximately four orders of magnitude (from 3.5 fM down to 350 zM). Provided that appropriate enzyme concentrations are used (see below), this dynamic range is sufficient for many clinical applications.

We have developed digital ELISAs for two clinically relevant proteins—PSA and tumor necrosis factor-α (TNF-α)—to determine the sensitivity of the approach for detecting proteins in blood. The critical parameters in developing these assays were the concentrations of the beads and the two labeling reagents (detection antibody and enzyme conjugate). The choice of bead concentration depends on several competing factors. First, a sufficient number of beads must be present to capture most of the target analyte from thermodynamic and kinetic perspectives. Thermodynamically, 200,000 beads in 100 μl, each of which has ~80,000 antibodies[25] bound to it, equates to an antibody concentration of about 0.3 nM. The antibody-protein equilibrium at that concentration permits a high capture efficiency (>70%) (D.M.R., E.P.F., D.C.D., unpublished work). Kinetically, for 200,000 beads dispersed in 100 μl, the average distance between beads is about 80 μm. Proteins the size of TNF-α and PSA (17.3 and 30 kDa, respectively) will diffuse 80 μm in <1 min, suggesting that capture of the protein molecules will not be limited kinetically over a 2-h incubation. Second, a sufficient number of beads must be present to be loaded onto the arrays to limit Poisson noise. Loading 200,000 beads into 50,000-well arrays typically results in 20,000–30,000 beads being trapped in femtoliter-sized wells. For a typical background of

1% active beads (see below), this loading results in a background signal of 200–300 active beads detected, corresponding to an acceptable coefficient of variation (CV) from Poisson noise of 6–7%. Third, excessive bead concentrations can lead to both increases in nonspecific binding that reduces signal-to-background and low ratios of analyte to beads that can result in high CVs from Poisson noise. The balance of these factors means that 200,000 to 1,000,000 beads per 100 μl of test sample is optimal for digital ELISA. The concentrations of detection antibody and enzyme conjugate were also minimized to yield the acceptable background signal (1%) and Poisson noise (**Supplementary Discussion**).

**Figure 3** shows data from digital ELISAs for PSA and TNF-α. The human forms of the proteins were spiked into 25% bovine serum to final concentrations representative of clinical test samples. A fourfold dilution factor is typically used to reduce matrix effects in immunoassays[4]. Using digital ELISA to detect PSA in 25% serum, we obtained an LOD of ~50 aM (1.5 fg/ml), which equates to an LOD in whole serum of ~200 aM (6 fg/ml). The lowest concentration tested and detected was 250 aM in 25% serum, corresponding to 1 fM in whole serum. As LOD is determined by extrapolating the concentration at background plus 3 s.d. of the background, LODs for different runs are dependent on the CV of the background. We obtained subfemtomolar LODs of PSA in whole serum over several experiments with typical background variances. For comparison, a leading commercial PSA assay (ADVIA Centaur, Siemens) reports an LOD of 3 pM (0.1 ng/ml) in human serum, and ultrasensitive assays have been reported with LODs in the range





**Figure 3** Subfemtomolar detection of proteins in serum using digital ELISA. (**a,b**) Changes in the percentage of active beads with changes in analyte concentration for human prostate-specific antigen (PSA) spiked into 25% serum (**a**) and human tumor necrosis factor-α (TNF-α) spiked into 25% serum (**b**). The concentrations plotted on the x axes refer to the final concentration of spiked protein in the diluted sample. The plots on the left-hand side show the assay response over the concentration range tested in log-log space. The plots on the right-hand side show the assay response in the femtomolar range in linear-linear space to illustrate the limit of detection (LODs) and linearity of response. LODs were determined by extrapolating the concentration from the signal equal to background signal plus 3 s.d. of the background signal. Broken lines, signal at the LOD. Error bars, s.d. over three replicates.

© 2010 Nature America, Inc. All rights reserved.

Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000003

**Figure 4** Digital detection of prostate-specific antigen (PSA) in serum samples of patients who had undergone radical prostatectomy. Concentrations of PSA in serum samples from radical prostatectomy patients (●), healthy control samples (■) and Bio-Rad PSA control samples (▲) determined using digital ELISA. Radical prostatectomy patient samples (SeraCare Life Sciences) all had undetectable PSA levels as measured by a leading clinical diagnostic assay (ADVIA Centaur); the green broken line represents the detection limit of the ADVIA Centaur PSA assay (100 pg/ml or 3 pM). All 30 patient samples were above the detection limit of the PSA digital ELISA, shown by the red



| Patient ID | [PSA] (pg/mL) | Dose CV | Patient ID | [PSA] (pg/mL) | Dose CV | Patient ID | [PSA] (pg/mL) | Dose CV |
|---|---|---|---|---|---|---|---|---|
| S600 | 9.39 | 6% | S590 | 0.22 | 22% | S580 | 0.30 | 41% |
| S599 | 0.75 | 10% | S589 | 0.85 | 17% | S579 | 1.22 | 15% |
| S598 | 2.71 | 12% | S588 | 2.33 | 3% | S578 | 0.090 | 91% |
| S597 | 1.79 | 12% | S587 | 1.06 | 13% | S577 | 1.92 | 6% |
| S596 | 2.46 | 17% | S586 | 1.29 | 22% | S576 | 0.014 | 286% |
| S595 | 0.32 | 21% | S585 | 0.49 | 84% | S575 | 0.79 | 63% |
| S594 | 1.63 | 15% | S584 | 0.056 | 136% | S574 | 1.62 | 20% |
| S593 | 1.15 | 12% | S583 | 1.33 | 26% | S573 | 0.22 | 32% |
| S592 | 3.46 | 9% | S582 | 4.76 | 9% | S572 | 1.04 | 20% |
| S591 | 0.21 | 25% | S581 | 1.57 | 31% | S571 | 0.24 | 21% |

broken line (0.006 pg/ml or ~200 aM), with the lowest patient PSA concentrations measured at 0.014 pg/ml (~400 aM) using digital ELISA. Patient samples with the lowest PSA levels approached the LOD of the assay, resulting in a large imprecision in the concentration determined (high dose %CV). The digital ELISA was validated for specificity to PSA using control standards (Bio-Rad) and serum from healthy individuals (ProMedDx) that had been assayed using the ADVIA Centaur PSA assay (**Supplementary Table 3**).

© 2010 Nature America, Inc. All rights reserved.

of 10–30 fM[17,26]. The detection limit determined from the TNF-α digital ELISA was ~150 aM (2.5 fg/ml), corresponding to ~600 aM (10 fg/ml) in whole serum; the highest sensitivity commercially available ELISA for TNF-α has an LOD of 21 fM (0.34 pg/ml) in serum (**Supplementary Fig. 3**). The zero concentration spike of target protein for both assays provides a useful negative control for these experiments: 25% serum contains millimolar concentrations of a wide variety of proteins, and very low concentrations of target protein can be detected above these high-protein backgrounds. We also developed a proof-of-principle digital assay for DNA to show that low concentrations of nucleic acids can be detected without replication of the target (**Supplementary Fig. 2**).

The ability of digital ELISA to measure much lower concentrations of proteins than conventional ELISA derives from two effects: (i) the high sensitivity of SiMoAs to enzyme label and (ii) the low background signals that can be achieved by digitizing the detection of proteins. The sensitivity of any immunoassay is determined by the sensitivity of the detection technology to the label, the antibody affinity, the assay background and the variance (%CV) of the background measurement[27]. The subattomolar sensitivity of SiMoAs to enzyme labels (**Fig. 2**) enables digital ELISA to detect subfemtomolar concentrations of labeled proteins. That said, for antibodies of given affinity, the sensitivity of the immunoassay will be determined by the assay background, and the high label sensitivity of SiMoAs helps reduce this background. Control experiments have shown that backgrounds in digital ELISA arise from nonspecific binding of detection antibody and enzyme conjugate to the capture bead surface (**Supplementary Table 2**). As SiMoAs provide superior label sensitivity over conventional assays, substantially less detection antibody (~1 nM) and enzyme conjugate (1–50 pM) are needed to detect binding events as compared with conventional assays (labeling reagent concentrations ~10 nM). The decreased label concentration reduces nonspecific binding to the capture surface, resulting in much lower background signals. For example, in the TNF-α and PSA digital ELISAs, the levels of nonspecific binding were equivalent to the signal produced by 1.8 fM and 1.2 fM of target protein, respectively (**Fig. 3**). The highest sensitivity commercial TNF-α assay has a level of nonspecific binding equivalent to 85 fM of TNF-α (**Supplementary Fig. 3**), which is 50 times more than we observe using digital ELISA. The ability to reduce backgrounds in digital ELISA by lowering the concentration of labeling reagents enables more sensitive immunoassays than are possible using conventional assays.

To demonstrate the possible diagnostic value of detecting very low concentrations of proteins in blood using digital ELISA, we measured PSA in serum samples from patients who had undergone radical prostatectomy. Levels of serum PSA are used both to screen for prostate cancer and to monitor recurrence of the disease in patients who have undergone radical prostatectomy[28]. After radical prostatectomy the vast majority of PSA is eliminated, and concentrations fall below the detection limit of standard commercial assays (3 pM or 0.1 ng/ml). Although regular monitoring of these patients for increases in PSA concentrations can detect recurrence of prostate cancer, several years may pass after surgery for biochemical recurrence to be detected by current immunoanalyzers. The ability to accurately quantify PSA levels in patients who have undergone prostatectomy at very low concentrations (<300 fM or 10 pg/ml) should provide early indication of recurrence if PSA levels increase[17,29]. **Figure 4** shows PSA concentrations measured using digital ELISA in the serum of 30 patients (age 60–89) who had undergone radical prostatectomy and whose blood was collected at least 6 weeks after surgery. The PSA concentrations in the sera of all 30 patients were below the detection limit of commercial assays. Whole-serum samples were diluted 1:4 in buffer and measured using the digital ELISA specific for PSA (**Fig. 3a**). PSA was successfully detected in all 30 patients using digital ELISA, with concentrations ranging from 14 fg/ml to 9.4 pg/ml, with an average of 1.5 pg/ml. Further clinical studies are required to establish the diagnostic benefit of measuring PSA at femtogram per milliliter amounts in patients following radical prostatectomy.

By isolating and detecting single immunocomplexes in arrays of femtoliter-volume wells, digital ELISA enables clinically important proteins in serum to be measured at subfemtomolar concentrations. We believe that the improvement in sensitivity shown by digital ELISA over previously reported approaches will translate into diagnostic benefits. For example, PSA concentrations in 9 of the 30 radical prostatectomy samples assayed in this work fell below the LOD of the previously highest sensitivity PSA assay based on nanoparticle labels[17]. An attractive feature of this approach is the ability to directly use reagents developed for standard ELISA for substantially more sensitive assays. We continue to improve the SiMoA technology in two key areas. First, based on the sensitivity to enzyme label (**Fig. 2**), it seems that the sensitivity of protein detection could be increased at least 100-fold if nonspecific interactions that cause background signals could be minimized. The ability to isolate and interrogate single molecules on individual beads provides avenues for distinguishing antibody-antigen

Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000004

binding events from nonspecifically bound complexes. Second, we are simplifying the logistics of the assays. Even in its present form, however, we believe that digital ELISA has the potential to facilitate earlier diagnosis and treatment of disease.

## METHODS

Methods and any associated references are available in the online version of the paper at http://www.nature.com/naturebiotechnology/.

*Note: Supplementary information is available on the Nature Biotechnology website.*

**ACKNOWLEDGMENTS**

The project described was supported by Award Number R43CA133987 from the National Cancer Institute.

**AUTHOR CONTRIBUTIONS**

D.M.R., C.W.K., D.R.F., D.R.W. and D.C.D. conceived the approach. D.R.F. built the imaging system. D.M.R., C.W.K., T.G.C., S.C.H., L.S., P.P.P., A.J.R., E.P.F., J.D.R. and G.K.P. conducted the experiments. T.P. wrote the image analysis software. L.C. prepared reagents. D.M.R. and D.C.D. wrote the manuscript. All authors were involved in designing experiments, reviewing and discussing data, and commenting on the manuscript.

**COMPETING FINANCIAL INTERESTS**

The authors declare competing financial interests: details accompany the full-text HTML version of the paper at http://www.nature.com/naturebiotechnology/.

Published online at http://www.nature.com/naturebiotechnology/.
Reprints and permissions information is available online at http://npg.nature.com/reprintsandpermissions/.

© 2010 Nature America, Inc. All rights reserved.



1. Tessler, L.A., Reifenberger, J.G. & Mitra, R.D. Protein quantification in complex mixtures by solid phase single-molecule counting. *Anal. Chem.* **81**, 7141–7148 (2009).
2. Todd, J. *et al.* Ultrasensitive flow-based immunoassays using single-molecule counting. *Clin. Chem.* **53**, 1990–1995 (2007).
3. Gosling, J.P.A. Decade of development in immunoassay methodology. *Clin. Chem.* **36**, 1408–1427 (1990).
4. Wild, D. *The Immunoassay Handbook 3rd Edn.* (Elsevier, 2005).
5. Zhang, H.Q., Zhao, Q., Li, X.F. & Le, X.C. Ultrasensitive assays for proteins. *Analyst (Lond.)* **132**, 724–737 (2007).
6. Giljohann, D.A. & Mirkin, C.A. Drivers of biodiagnostic development. *Nature* **462**, 461–464 (2009).
7. Srinivas, P.R., Kramer, B.S. & Srivastava, S. Trends in biomarker research for cancer detection. *Lancet Oncol.* **2**, 698–704 (2001).
8. Galasko, D. Biomarkers for Alzheimer's disease—clinical needs and application. *J. Alzheimers Dis.* **8**, 339–346 (2005).
9. de Jong, D., Kremer, B.P.H., Olde Rikkert, M.G.M. & Verbeek, M.M. Current state and future directions of neurochemical biomarkers for Alzheimer's disease. *Clin. Chem. Lab. Med.* **45**, 1421–1434 (2007).
10. Barletta, J.M., Edelman, D.C. & Constantine, N.T. Lowering the detection limits of HIV-1 viral load using real-time immuno-PCR for HIV-1 p24 antigen. *Am. J. Clin. Pathol.* **122**, 20–27 (2004).
11. Adler, M., Wacker, R. & Niemeyer, C.M. Sensitivity by combination: immuno-PCR and related technologies. *Analyst (Lond.)* **133**, 702–718 (2008).
12. Nam, J.M., Thaxton, C.S. & Mirkin, C.A. Nanoparticle-based bio-bar codes for the ultrasensitive detection of proteins. *Science* **301**, 1884–1886 (2003).
13. Armani, A.M., Kulkarni, R.P., Fraser, S.E., Flagan, R.C. & Vahala, K.J. Label-free, single-molecule detection with optical microcavities. *Science* **317**, 783–787 (2007).
14. Cui, Y., Wei, Q.Q., Park, H.K. & Lieber, C.M. Nanowire nanosensors for highly sensitive and selective detection of biological and chemical species. *Science* **293**, 1289–1292 (2001).
15. Gaster, R.S. *et al.* Matrix-insensitive protein assays push the limits of biosensors in medicine. *Nat. Med.* **15**, 1327–1332 (2009).
16. Fan, R. *et al.* Integrated barcode chips for rapid, multiplexed analysis of proteins in microliter quantities of blood. *Nat. Biotechnol.* **26**, 1373–1378 (2008).
17. Thaxton, C.S. *et al.* Nanoparticle-based bio-barcode assay redefines "undetectable" PSA and biochemical recurrence after radical prostatectomy. *Proc. Natl. Acad. Sci. USA* **106**, 18437–18442 (2009).
18. Bao, Y.P. *et al.* Detection of protein analytes via nanoparticle-based bio bar code technology. *Anal. Chem.* **78**, 2055–2059 (2006).
19. Anderson, N.L. & Anderson, N.G. The human plasma proteome: history, character, and diagnostic prospects. *Mol. Cell. Proteomics* **1**, 845–867 (2002).
20. Gorris, H.H., Rissin, D.M. & Walt, D.R. Stochastic inhibitor release and binding from single-enzyme molecules. *Proc. Natl. Acad. Sci. USA* **104**, 17680–17685 (2007).
21. Rissin, D.M., Gorris, H.H. & Walt, D.R. Distinct and long-lived activity states of single enzyme molecules. *J. Am. Chem. Soc.* **130**, 5349–5353 (2008).
22. Rissin, D.M. & Walt, D.R. Digital readout of target binding with attomole detection limits via enzyme amplification in femtoliter arrays. *J. Am. Chem. Soc.* **128**, 6286–6287 (2006).
23. Rissin, D.M. & Walt, D.R. Digital concentration readout of single enzyme molecules using femtoliter arrays and Poisson statistics. *Nano Lett.* **6**, 520–523 (2006).
24. Tan, W. & Yeung, E.S. Monitoring the reactions of single enzyme molecules and single metal ions. *Anal. Chem.* **69**, 4242–4248 (1997).
25. Rissin, D.M. & Walt, D.R. Duplexed sandwich immunoassays on a fiber-optic microarray. *Anal. Chim. Acta* **564**, 34–39 (2006).
26. Ferguson, R., Yu, H., Kalyvas, M., Zammit, S. & Diamandis, E. Ultrasensitive detection of prostate-specific antigen by a time-resolved immunofluorometric assay and the Immulite immunochemiluminescent third-generation assay: potential applications in prostate and breast cancers. *Clin. Chem.* **42**, 675–684 (1996).
27. Jackson, T.M. & Ekins, R.P. Theoretical limitations on immunoassay sensitivity. Current practice and potential advantages of fluorescent Eu³⁺ chelates as non-radioisotopic tracers. *J. Immunol. Methods* **87**, 13–20 (1986).
28. Bock, J.L. & Klee, G.G. How sensitive is a prostate-specific antigen measurement? How sensitive does it need to be? *Arch. Pathol. Lab. Med.* **128**, 341–343 (2004).
29. Trock, B.J. *et al.* Prostate cancer-specific survival following salvage radiotherapy vs observation in men with biochemical recurrence after radical prostatectomy. *Jama-Journal of the American Medical Association* **299**, 2760–2769 (2008).

Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000005

© 2010 Nature America, Inc.  All rights reserved.

## ONLINE METHODS

**Materials.** Optical fiber bundles were purchased from Schott North America. Nonreinforced gloss silicone sheeting was obtained from Specialty Manufacturing. Hydrochloric acid, anhydrous ethanol and molecular biology–grade Tween-20 were all from Sigma-Aldrich. Carboxyl-terminated magnetic beads (2.7-μm diameter) were purchased from Varian. Monoclonal capture antibody to human TNF-α, polyclonal detection antibody to human TNF-α and recombinant human TNF-α were purchased from R&D Systems. Monoclonal capture antibody to PSA, monoclonal detection antibody to PSA and purified PSA were purchased from BiosPacific; the detection antibody was biotinylated using standard methods. 1-ethyl-3-(3-dimethylaminopropyl) carbodiimide hydrochloride, N-hydroxylsulfosuccinimide and SuperBlock T-20 Blocking Buffer were purchased from Thermo Scientific. Purified DNA was purchased from Integrated DNA Technologies. SβG was conjugated in the laboratory using standard protocols. RGP was purchased from Invitrogen. The fiber polisher and polishing consumables were purchased from Allied High Tech Products.

**Preparation of magnetic beads presenting biotin-labeled DNA and capture of enzyme conjugate (Fig. 2).** Beads functionalized with DNA capture probe (5′-NH₂/C12-GTT GTC AAG ATG CTA CCG TTC AGA G-3′) were prepared according to the manufacturer's instructions. These beads were incubated with 1 μM of biotinylated complementary DNA (5′-biotin-C TCT GAA CGG TAG CAT CTT GAC AAC-3′) overnight (16 h) in TE buffer containing 0.5 M NaCl and 0.01% Tween-20. After incubation the beads were washed three times in PBS buffer containing 0.1% Tween-20. The bead stock was distributed into a microtiter plate giving 400,000 beads per well in 100 μl. The buffer was aspirated from the microtiter plate wells; the beads were resuspended and incubated with various concentrations of SβG in Superblock containing 0.05% Tween-20 for 4 h. The beads were then separated and washed six times with 5× PBS buffer containing 0.1% Tween-20. For detection of enzyme, the beads were either (i) resuspended in 20 μl of PBS containing 0.1% Tween-20, and 10-μl aliquots were loaded onto two femtoliter-volume well arrays for SiMoA detection; or (ii) resuspended in 100 μl of 100 μM RGP in PBS, incubated for 1 h at 23 °C and read on a fluorescence plate reader (Infinite M200, Tecan).

**Capture of proteins on magnetic beads and formation of enzyme-labeled immunocomplex (Figs. 3 and 4).** Beads functionalized with an antibody to the target protein were prepared according to the manufacturer's instructions. Test solutions (100 μl) containing the protein of interest were incubated with suspensions of 200,000 magnetic beads for 2 h at 23 °C. The beads were then separated and washed three times in PBS and 0.1% Tween-20. The beads were resuspended and incubated with solutions containing detection antibody (typically ~1 nM) for 45 min at 23 °C. The beads were then separated and washed three times in PBS and 0.1% Tween-20. The beads were incubated with solutions containing SβG (1–50 pM) for 30 min at 23 °C, separated and washed six times in PBS and 0.1% Tween-20. The beads were then resuspended in 10 μl of PBS and loaded onto a femtoliter-volume well array. The total time of the assay was ~6 h.

**Capture of DNA on magnetic beads and formation of enzyme-labeled complex (Supplementary Fig. 2).** A total of 200,000 beads functionalized with DNA capture probe were incubated with 100-μl solutions containing the target DNA (5′-TT GAC GGC GAA GAC CTG GAT GTA TTG CTC C TCT GAA CGG TAG CAT CTT GAC AAC-3′) for 2 h. After incubation, the DNA target solution was removed and the beads were washed three times in 0.2× SSC buffer containing 0.1% Tween-20. The beads were then resuspended and mixed with 10 nM biotinylated signal probe (5′-TAC ATC CAG GTC TTC GCC GTC AA/Biotin/-3′) that is also specific to the target DNA for 1 h. The beads were then washed three times in 0.2× SSC buffer containing 0.1% Tween-20 after removing the signal probe. A solution of 10 pM SβG was then added to the bead pellet, resuspended and mixed for 1 h. The beads were separated and washed six times in 5× PBS buffer containing 0.1% Tween-20. The beads then resuspended in 10 μl of PBS and loaded onto a femtoliter-volume well array.

**Preparation of femtoliter-volume well arrays.** Optical fiber bundles approximately 5 cm long were sequentially polished on a polishing machine using 30-, 9- and 1-μm-sized diamond lapping films. The polished fiber bundles were chemically etched in a 0.025 M HCl solution for 130 s and then immediately submerged into water to quench the reaction. The etched fibers were sonicated for 5 s in water, washed in water for 5 min and dried under vacuum. The differential etch rate of the core and cladding glass of the fiber bundle arrays caused 4.5-μm-diameter wells to be formed in the core fibers[30]. Different etch times resulting in different well depths were initially investigated. If wells were too deep, then multiple beads were deposited in each well and sealing was disrupted; if wells were too shallow, then the beads were not retained in the wells and poor loading efficiencies were observed. Well depths of 3.25 ± 0.5 μm were optimal for retaining single beads in wells while maintaining good seals.

**Loading of beads into femtoliter-volume well arrays.** A short length of PVC tubing was placed on the etched end of a fiber bundle to create a reservoir to hold the bead solution. Ten microliters of the concentrated bead solution were pipetted into this reservoir. The fiber bundle was then centrifuged at 1,300*g* for 10 min to force the beads into the etched wells. The PVC tubing was removed after centrifugation. The fiber bundle was dipped in PBS solution to wash off excess bead solution, and the surface was swabbed with deionized water. In addition to well depth (see above), bead concentration was an important parameter for maximizing bead loading efficiencies. Above concentrations of 200,000 beads per 10 μl loaded, typically 40–60% of wells in a 50,000-well array were occupied by a single bead, resulting in percentage active beads with acceptable Poisson noise. At concentrations below 200,000 beads per 10 μl loaded, bead loading efficiency dropped, resulting in fewer active beads and higher Poisson noise. In these experiments, therefore, at least 200,000 beads per reaction were used and loaded onto the arrays.

**Detection of beads and enzyme-labeled beads in femtoliter-volume well arrays.** A custom-built imaging system containing a mercury light source, filter cubes, objectives and a CCD camera was used for acquiring fluorescence images[21,23]. Fiber bundles were mounted on the microscope stage using a custom fixture. A droplet of β-galactosidase substrate (RGP) was placed on the silicone gasket material and placed in contact with the well arrays. A precision mechanical platform moved the silicone sheet into contact with the end of the fiber bundle, creating an array of isolated femtoliter-volume reaction wells. Fluorescence images were acquired (558 nm excitation; 577 nm emission) with an exposure time of 1,011 ms. Five frames (at 30-s intervals) were taken for each femtoliter-volume well array. The product of the enzymatic reaction used in these studies—resorufin—has high photostability with a low photobleaching rate (rate of photobleaching, $k_{ph}$ = 0.0013 s⁻¹)[21], making multiple exposures possible. We performed time-course fluorescence measurements (i) to allow stable fluorescent artifacts to be removed from images and (ii) to ensure that the signal from a beaded well was from an enzyme. For (i), the first fluorescent image was subtracted from fluorescent images acquired at each subsequent time point. This process removed light intensity that did not change with time; for example, fluorescence from dust and scattered light. For (ii), a positive or "on" well was identified only where fluorescence intensity in a beaded well increased in every frame and by at least 20% over four frames. This process removed false positives from random changes in fluorescence during image acquisition. **Supplementary Figure 1** shows histograms of fluorescence from wells with and without enzymes, showing the good distinction between "on" and "off" wells. Arrays were also imaged with white light to identify those wells that contain beads. After acquiring the fluorescence images, the arrays were illuminated with white light and imaged on the CCD camera. Due to scattering of light by the beads, those wells that contained a bead appeared brighter in the image than wells without beads. The fluorescence and white-light images were analyzed using customized software.

30. Pantano, P. & Walt, D.R. Ordered nanowell arrays. *Chem. Mater.* **8**, 2832–2835 (1996).

doi:10.1038/nbt.1641

Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000006

**Supplementary Information**

**1) Supplementary Figures and Legends**



**Supplementary Figure 1. Histograms of the average fluorescence intensity of wells in a SiMoA experiment.** A representative set of images from a SiMoA experiment (Figure 1) were analyzed to determine populations of wells that: a) contained no beads; b) contained a bead (from white light scatter) but no enzyme (no increase in fluorescence intensity); and, c) contained a bead (from white light scatter) and an enzyme (increasing fluorescence intensity over four consecutive images, and an overall increase in fluorescence of at least 20%). Using this method of calling "on" wells, the occurrence of false positives in the absence of background proteins is very small (<1 in a 50,000-well array, see Figure 2). In the presence of background proteins, e.g., serum samples, there is a significant number of "on" wells from non-specific binding that sets the background signal and limits of detection (see discussion in main text). The fraction of beads within each population is plotted against the average intensity of wells with a bin size of 120 rfu. The red line represents data from empty wells; the green line represents wells with a bead but no enzyme ("off" well); and the blue line represents beads with both a bead and enzymatic activity ("on" well). While a range of enzyme activities are observed as anticipated[21], there is good separation between on and off wells to allow digital quantification.



**Supplementary Figure 2. Detection of DNA using digital counting of enzyme labels.** Plots of % active beads against different concentrations of DNA spiked into buffer. Experimental details are provided in the Methods section. The plot on the left hand side show the assay response over the

Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000007

concentration range tested in log-log space. The plot on the right hand side show the assay response in the femtomolar range in linear-linear space. Error bars are plotted as the standard deviation over three replicates. LODs were determined by extrapolating the concentration from the signal equal to background signal plus three standard deviations of the background signal; the dashed lines show the signal at the LOD. The LOD of the digital DNA sandwich assay was ~150 aM, corresponding to about 8000 copies. While these results are preliminary—the DNA was detected in buffer in the absence of non-target DNA—and the sensitivity does not approach that that can be achieved with PCR, they do illustrate that SiMoA can be used to detect nucleic acids without recourse to molecular replication.



**Supplementary Figure 3. The R&D Systems HS-ELISA for TNF-α.** A TNF-α calibration curve yielded an LOD of 21 fM in whole serum using a Tecan Infinite M200 plate reader. The non-specific binding (NSB) background in this high sensitivity assay was equivalent to about 85 fM of TNF-α.

## 2) Supplementary Tables

|  | Column A | Column B | Column C | Column D | Column E | Column F |
|---|---|---|---|---|---|---|
| [SβG] (aM) | Average % active beads observed (Figure 2) | Enzyme/bead ratio from Poisson distribution | Total # of enzymes on 400,000 beads | Background corrected # of enzymes on beads | Calculated # of enzymes in 100-µL sample | Capture Efficiency |
| 0 | 0.0016% | 0.000016 | 7 | --- | --- | --- |
| 0.35 | 0.0086% | 0.000086 | 34 | 28 | 21 | 132% |
| 0.7 | 0.0099% | 0.000099 | 40 | 33 | 42 | 79% |
| 3.5 | 0.0413% | 0.000413 | 165 | 159 | 211 | 75% |
| 7 | 0.0713% | 0.000713 | 285 | 279 | 421 | 66% |
| 35 | 0.4461% | 0.004471 | 1789 | 1782 | 2107 | 85% |
| 70 | 0.8183% | 0.008217 | 3287 | 3280 | 4214 | 78% |
| 350 | 3.3802% | 0.034387 | 13755 | 13748 | 21070 | 65% |
| 700 | 7.5865% | 0.078897 | 31559 | 31552 | 42140 | 75% |
| 3500 | 30.6479% | 0.365974 | 146390 | 146383 | 210700 | 69% |
| 7000 | 44.5296% | 0.589320 | 235728 | 235722 | 421400 | 56% |

Nature Biotechnology: doi: 10.1038/nbt.1641

Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000008

**Supplementary Table 1. Calculations of the SiMoA capture efficiency of enzyme label from 0.35 aM to 7000 aM.** From the fraction of beads that were active in Figure 2 (Column A), the enzyme/bead ratio (Column B) can be determined from the Poisson distribution[23]. In this experiment, ~400,000 beads were incubated with each solution of enzyme (although only ~50,000 beads (~12.5%) on average were interrogated because of the current size of the femtoliter arrays (~50,000 wells)), so the number of enzymes on these beads is determined by multiplying Column B by 400,000 (Column C). After background subtraction, the total number of enzyme molecules captured on the beads can be determined (Column D). The ratio of this number to the total calculated number of enzymes in 100 $\mu$L at the start of the experiment (Column E; Volume × Concentration × Avogadro's Number) yields a capture efficiency (Column F). The overall efficiency of capture and detection of enzyme using SiMoA is high (65-85%) in the range where Poisson noise is acceptable (<20%, from 3.5 aM to 3500 aM), and is probably only limited in this experiment by the slow diffusion of the large S$\beta$G conjugate (MW ~ 515 kDa). At 7000 aM, where the % active beads > 40%, the % active starts to deviate from linearity (giving rise to an apparent lower capture efficiency) because of difficulties in image analysis at these high fractions (see main text).

| NSB Dropout Experiment (SiMoA PSA assay) | | | | | |
|---|---|---|---|---|---|
| | Average | SD | CV | | % NSB |
| No dAb; No PSA | 0.110% | 0.162% | 147% | from SbG | 20% |
| No SbG; No PSA | 0.000% | 0.000% | --- | from dAb | 80% |
| NSB | 0.541% | 0.194% | 36% | Total NSB | 100% |

**Supplementary Table 2. A dropout experiment isolating the sources of NSB in the PSA digital ELISA.** By comparing 'no detection antibody NSB' (No dAb) and 'no S$\beta$G NSB' (No S$\beta$G) to total NSB (NSB), the contribution of detection antibody and S$\beta$G to the NSB of the assay was determined.

| | Centaur ng/mL | SiMoA ng/mL |
|---|---|---|
| Bio-Rad Control 1 | 0.838 | 1.06 ± 0.21 |
| Bio-Rad Control 2 | 2.47 | 2.66 ± 0.36 |
| **Normals** | | |
| ProMedDx S376 | 2.1 | 1.60 |
| ProMedDx S378 | 2.3 | 1.70 |
| ProMedDx S381 | 2.9 | 2.14 |
| ProMedDx S388 | 4.1 | 3.95 |
| ProMedDx S395 | 0.93 | 0.63 |
| ProMedDx S396 | 0.9 | 0.77 |
| ProMedDx S397 | 1.2 | 0.66 |

**Supplemental Table 3. Specificity of the PSA digital ELISA.** Specificity of the digital ELISA was confirmed using PSA samples from Bio-Rad (controls) and ProMedDx (serum from healthy individuals) that had previously been tested on a commercial immunoanalyzer (ADVIA Centaur, Siemens). While there was good correlation between the two methods ($r^2$ = 0.96), the PSA concentrations of the healthy

Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000009

serum samples determined using SiMoA were (24±12)% lower than those originally determined on the ADVIA Centaur. There are two possible explanations for this systematic bias between the two technologies. First, the ADVIA Centaur values were obtained on fresh serum, whereas digital ELISA values were obtained after the sera had been frozen for extended periods of time and had experienced a freeze-thaw cycle. Second, there were likely differences between the PSA calibrators used to generate the calibration curves that would result in differences in PSA concentrations determined. We used Complex PSA from the World Health Organization (WHO) as calibrators; the ADVIA Centaur calibration PSA is unknown.

### 3) Supplementary Discussion

**Sensitivity to Enzyme Label as Sample Volume Increases**. For some applications, volumes larger than 100 μL might need to be tested for very low concentrations of analyte. As the volume of sample increases, detecting small numbers of enzyme labels with high efficiency becomes more challenging technically. To achieve the same detection efficiencies in 1 mL and 10 mL of sample that we achieved in 100 μL, would require 10 and 100 times more beads, respectively, both from thermodynamic and kinetic perspectives. These larger numbers of beads (2 million and 20 million) would require much bigger arrays and also larger imaging (CCD) chips or multiple images per array. While these experiments are feasible, they would require a much more complex instrument and longer read times, so might not be justified in a diagnostic setting.

**Optimization of Labeling of Captured Proteins in Digital ELISA**. The choice of the concentrations of detection antibody and enzyme conjugate (SβG) used to label the captured protein is important for optimizing digital ELISA. The relatively high background signals of ELISAs caused by the non-specific interactions between the capture beads and detection antibody and enzyme conjugate (see Supplementary Table 2), combined with the high sensitivity to label provided by SiMoA, means that often only a fraction of the capture proteins need to be labeled to avoid saturating SiMoA signals. For example, the background levels observed in digital ELISA are equivalent to ~1–2 fM of target protein (see main text), so the ratio of analyte to bead is about 0.3–0.6. At these ratios, the number of active beads would be 25–40% if every protein was labeled with an enzyme, i.e., at the upper end of the digital dynamic range. To ensure that these background signals are closer to the lower end of the digital dynamic range—1% active beads provides a reasonable noise floor for background in digital ELISA—appropriate labeling of the captured protein can be achieved by kinetic control of the labeling steps, either by minimizing the concentrations of both labeling reagents or by using shorter incubation times. We have chosen to minimize label concentrations and use standard ELISA incubation times; as a result, the total assay time is ~6 h. This length of time is acceptable for testing that tolerates a daily turnaround time for samples. For shorter turnaround times of, say, <1 h (e.g., for point-of-care applications), the assay could be performed with short incubations of higher concentrations of labeling reagents.

Fujirebio Diagnostics, Inc. v. Quanterix Corp.
EX-1005
000010