IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FUJIREBIO DIAGNOSTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 25-659 (GBW) |
| v. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| QUANTERIX CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| QUANTERIX CORPORATION, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FUJIREBIO DIAGNOSTICS, INC., | ) | |
| FUJIREBIO EUROPE N.V., | ) | |
| | ) | |
| Counter-Defendants. | ) | |
| | ) | |

**DEFENDANT AND COUNTER-PLAINTIFF QUANTERIX CORPORATION'S OPPOSITION BRIEF TO FUJIREBIO DIAGNOSTICS, INC.'S MOTION TO DISMISS AMENDED COUNTERCLAIM PURSUANT TO FED. R. CIV. P. 12 (B)(6)**

OF COUNSEL:

Elizabeth M. Flanagan (#5891)
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
bflanagan@cooley.com

Orion Armon
COOLEY LLP
1144 15th Street
Suite 2300
Denver, CO 80202
aormon@cooley.com

October 24, 2025

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
Ben Yenerall (#7132)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
cclark@morrisnichols.com
byenerall@morrisnichols.com

*Attorneys for Defendant and Counter-Plaintiff Quanterix Corporation*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................... 1

II.    NATURE AND STAGE OF PROCEEDINGS ............................................ 1

III.   SUMMARY OF ARGUMENT ................................................................. 2

IV.  STATEMENT OF FACTS ....................................................................... 2

V.    LEGAL STANDARDS ............................................................................ 7

     A.     Rule 12(b)(6) ................................................................................. 7

     B.     The Two-Part Patent Eligibility Test .................................................. 7

VI.  THE '092 PATENT CLAIMS ARE PATENT ELIGIBLE............................. 8

     A.     The Claims Pass Step One and Are Eligible.......................................... 8

           1.     The Claims Are Directed to an Improved Process for Preparing a Bodily Fluid Sample Using Human-Engineered Parameters.................... 8

           2.     FDI's Step One Arguments Incorrectly Consider Whether Aspects of the Claims Were Known, and Examine Limitations in Isolation Rather Than Considering the Claims in Their Entirety .......................... 10

           3.     The Step One Cases Cited By FDI Are Distinguishable ........................ 11

     B.     Step Two: The Claims Recite an Inventive Concept ........................................... 13

           1.     The '092 Patent Claims Recite an Inventive Concept ............................ 13

           2.     FDI Failed to Prove by Clear and Convincing Evidence that the Steps of the '092 Patent Claims Were Routine or Well-Known ............. 14

     C.     FDI's Representative Claim Analysis Is Deficient ............................................. 19

VII. CONCLUSION..................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aatrix Software v. Green Shades Software*,
  882 F.3d 1121 (Fed. Cir. 2018)................................................................7, 18

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016)........................................................................10

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015)........................................................................12

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
  915 F.3d 742 (Fed. Cir. 2019)..........................................................11, 12, 13, 14

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018)........................................................16, 17, 18, 19

*Berkheimer v. HP Inc.*,
  890 F.3d 1369 (Fed. Cir. 2018) (en banc)........................................................7

*Beteiro, LLC v. DraftKings Inc.*,
  104 F.4th 1350 (Fed. Cir. 2024) ........................................................................7

*CardioNet, LLC v. InfoBionic, Inc.*,
  955 F.3d 1358 (Fed. Cir. 2020)........................................................................10

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019)................................................................7, 18, 19

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
  859 F.3d 1352 ....................................................................................................12

*Coop. Ent. v. Kollective Tech., Inc.*,
  50 F.4th 127 (Fed. Cir. 2022) ....................................................................15, 18

*Exergen Corp. v. Kaz USA, Inc.*,
  725 F. App'x 959 (Fed. Cir. 2018)..................................................12, 16, 17, 18

*Illumina, Inc. v. Ariosa Diagnostics, Inc.*,
  967 F.3d 1319 (Fed. Cir. 2020)................................................................. *passim*

*Internet Patents Corp. v. Active Network, Inc.*,
  790 F.3d 1343 (Fed. Cir. 2015)........................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   566 U.S. 66 (2012) ..........................................................................................8, 11, 12

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016) ..........................................................................11

*Mobile Acuity Ltd. v. Blipper Ltd.*,
   110 F.4th 1280 (Fed. Cir. 2024) ........................................................................19

*Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc.*,
   No. 17-cv-1353, 2018 WL 1419082 (D. Del. Mar. 22, 2018) .............................16

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
   827 F.3d 1042 (Fed. Cir. 2016) ..............................................................7, 8, 9, 10

**Statutes**

35 U.S.C. §101 ..........................................................................................7, 8, 20

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ..........................................................................................7, 18

Fed. R. Civ. P. 16 ..........................................................................................2

# I. INTRODUCTION

The claims of the '092 Patent satisfy the requirements for patent eligibility, and Fujirebio Diagnostics Inc.'s ("FDI") motion does not demonstrate otherwise by clear and convincing evidence. The entire basis of FDI's motion is that the claimed methods allegedly recite nothing more than "admittedly" widely available, standard techniques for measuring tau in blood. Not so. To make its argument, FDI glosses over important claim language, mischaracterizes the intrinsic record, and wholly ignores the well-pleaded allegations in the counterclaim.

When the Supreme Court's two-step *Alice*/*Mayo* eligibility test is properly applied, the claims' patent eligibility is plain. The '092 Patent's claims cover methods for creating a bodily fluid sample that does not occur in nature, according to human-engineered parameters that dramatically improved the sensitivity of measuring minute concentrations of tau protein by as much as 1,000-fold compared to then-existing commercially-available methods. The methods recited by the claims were not well-known, routine or conventional as of the 2011 priority date.

"This is not a diagnostic case. And it is not a method of treatment case. It is a method of preparation case." *Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 967 F.3d 1319, 1325 (Fed. Cir. 2020). The claimed methods are "directed to" innovative steps for preparing a bodily fluid sample that allowed for the accurate measurement of tau protein in human plasma, rather than a natural phenomenon. Even if the Court finds otherwise, the limitations of the claims considered individually and as an ordered whole include inventive concepts that dramatically improved the measurement of tau protein in blood, and therefore satisfy step two of the *Alice*/*Mayo* test. Accordingly, FDI's motion should be denied.

# II. NATURE AND STAGE OF PROCEEDINGS

This case began with FDI's complaint seeking a declaratory judgment of non-infringement of Quanterix's U.S. Patent No. 11,275,092 on May 28, 2025. (D.I. 1.) In parallel, FDI filed a

petition for *inter partes* review of the '092 Patent, institution of which was denied on October 17, 2025. On June 23, 2025, Quanterix answered the Complaint and asserted a Counterclaim for infringement of the '092 Patent. (D.I. 12.) On July 14, 2025, Quanterix filed an Amended Counterclaim. (D.I. 20 (the "Amended Counterclaim").) On September 5, 2025, FDI filed its motion (D.I. 25) and Fujirebio Europe filed a motion to dismiss. (D.I. 22.) The Rule 16 conference has not been set. No discovery has occurred.

## III. SUMMARY OF ARGUMENT

All claims of the '092 Patent satisfy the Supreme Court's two-step eligibility framework because they recite patent-eligible methods for preparing a bodily fluid sample for assay that dramatically improved on then-existing commercially-available methods.

The claims are "directed to" a bodily fluid sample preparation technique that produces an improved assay result by combining (i) the dilution of a bodily fluid sample so that endogenous tau protein concentration is below a human engineered limit of 5 pg/ml, with (ii) an assay having a limit of quantification (LOQ) of tau less than about 0.2 pg/mL. The result of the claimed combination was an assay that was up to 1,000-fold more sensitive at quantifying tau protein and that for the first time provided highly accurate results not confounded by endogenous interferences.

Because the claims pass step one, the Court need not reach step two. But step two is also satisfied because the claims include concrete parameters for preparing a bodily fluid sample for measuring tau protein in blood plasma that overcame problems with prior art methods by providing more specific measurement of tau (not background noise) with up to 1,000-fold better sensitivity.

## IV. STATEMENT OF FACTS

The '092 Patent concerns two primary inventive fields: methods for determining a treatment protocol and/or a prognosis of a patient's recovery from a brain injury, and methods for measuring a concentration of tau protein in a patient sample suspected of containing tau. ('092

2

Patent, 1:36-45.)[1]  Only the latter field, methods for measuring tau protein, are reflected in the

'092 Patent's claims, of which there is a single independent claim, claim 1.  Claim 1 reads:

> A method of producing a bodily fluid sample of a patient suspected of having a neurological condition containing an analytically quantified amount of endogenous tau protein, said method comprising:
>
> (A) obtaining a volume of bodily fluid comprising blood, or a blood component selected from plasma and serum,
>
> (B) diluting the volume of bodily fluid, and
>
> (C) quantifying through the use of an analytical protein concentration measurement assay a concentration of tau protein in the volume of bodily fluid to produce the bodily fluid sample containing the analytically quantified amount of endogenous tau protein;
>
> wherein the analytically quantified concentration of endogenous tau protein contained in the bodily fluid sample is less than about 5 pg/mL, and a limit of quantification of the analytical protein concentration measurement assay used in step (C) for quantifying the concentration of tau protein is less than about 0.2 pg/mL.

Claim 1 does not recite any correlation between the amount of tau protein measured and

any disease state, prognosis, or disease risk.  Rather, it recites a specific bodily fluid sample

preparation technique that produces a dramatically improved assay result by combining (i) the

dilution of a bodily fluid sample so that endogenous tau protein concentration is below a human

engineered limit of 5 pg/ml, with (ii) an assay having a specified sensitivity to tau protein (here,

an LOQ of tau less than about 0.2 pg/mL)).  Claims 2-21 depend from claim 1.  Claims 2-5 and

12-13 specify details about the physical steps in the assay used to quantify tau.  Claims 6-11 and

15-24 recite the type of tau measured or the characteristics of the fluid sample.  Claim 14 recites

that the assay must employ a particularly low limit of detection (LOD): 0.02 pg/mL.

The '092 Patent's background explains that tau protein is present in elevated levels in

---

[1] All citations to the '092 Patent refer to D.I. 20-1, Ex. A, which includes certificates of correction).

cerebrospinal fluid (CSF) of patients with neurodegenerative disease and head injuries, and that tau protein can move out of CSF and into blood, albeit in minute quantities. ('092 Patent, 1:65-2:4.) The '092 Patent does not purport to have made this discovery. Rather, it recognizes that "improved methods" are needed to measure the tau protein that enters blood because conventional assays could not do so. (*Id.*, 1:65-2:24; *see also id.*, 14:35-38, 30:4-6, 33:1-3.)

At the time of the claimed invention, "methods to analyze tau in blood [we]re at the experimental beginning." (D.I. 20, ¶¶22, 26; *see id.*, ¶¶19-33.) Then-available research results "highlight[ed] the need for improved assays with lower detection limit[s] and higher specificity in order to make them useful in the evaluation of patients with neurodegenerative diseases, in which the release of tau proteins to the peripheral circulation most likely is much lower than in acute stroke." (*Id.*, ¶22.) "While the scientific community acknowledged a clear need for blood-based Alzheimer's biomarkers (Humpel), the consensus was overwhelmingly that such a solution remained elusive, a great challenge, and efforts had [been] met with little success." (*Id.*, ¶32.)

Obtaining accurate measurements of the concentration of tau protein in blood plasma or serum was especially difficult because human blood contains many components that create endogenous interferences that drown out the signal desired to be measured by competing with, and binding to, antibodies designed to capture tau protein. (*Id.*, ¶33.)

The conventional method for measuring concentrations of biomarker molecules in bodily fluids was the ELISA immunoassay, which had a limit of detection of around 12-60 pg/ml. (*Id.*, ¶¶26-27; *see also* '092 Patent, 29:5-9 (referring to an immunoassay on serum with a 60 pg/mL limit of detection for tau).) Those conventional assays had high limits of detection, and even higher limits of quantification in comparison to the claimed methods, and were either unable to detect tau protein or produced false-positive measurements confounded by endogenous

interferences. (D.I. 20, ¶¶26-27, 36, 39; D.I. 26-1 at Ex. C at 9, 11.) Research published in 2012 used a commercially available ELISA assay to attempt to measure concentrations of tau in blood plasma and reported mean tau levels of 819.5 pg/mL ± 294.4 pg/mL in healthy controls, 729.8 pg/mL ± 225.6 pg/mL in individuals with mild cognitive impairment, and 530.4 pg/mL ± 193.6 pg/mL in individuals with Alzheimer's disease. (D.I. 20, ¶26.) These results were wildly inaccurate—the reported plasma concentrations of tau in individuals with mild cognitive impairment were more than 185 times greater than the actual concentration of total tau present in that group, and paradoxically, concentrations of tau decreased as brain injury increased. This erroneous data resulted in low sensitivity and endogenous interferences. (*Id.*, ¶¶26, 36, 40 (describing ELISA assays as too insensitive and erroneously measuring background noise).)

The inventors solved these problems by developing a method of preparing a bodily fluid sample that paired an assay that was sensitive enough to detect tau with a bodily fluid sample that diluted the tau analyte below a defined threshold to reduce endogenous interferences. (*See* '092 Patent, 30:4-12; D.I. 20, ¶¶31, 33.) The claimed invention produced dramatically improved results by solving both of the problems identified with prior art assays—i.e., that they were not sensitive enough to detect tau in minute concentrations in blood, and their measurements were confounded by endogenous interferences. (D.I. 20, ¶22 (highlighting the need for assays with lower detection limits and higher specificity to tau.) Claim 1's requirements for bodily fluid sample tau concentration (0.5 pg/mL) and assay LOQ for tau (0.2 pg/mL) were developed specifically for the biomarker tau in blood, (D.I. 20, ¶¶31, 33), because "the LOQ and/or LOD may differ for each assay method and/or each biomarker determined with the same assay." ('092 Patent, 15:18-20.[2])

---

[2] The '092 Patent describes LOQ and LOD as follows: "[t]he LOD refers to the lowest analyte concentration likely to be reliably distinguished from background noise and at which detection is feasible. The LOD as used herein is defined as three standard deviations (SD) above background

The '092 Patent describes the benefits of the invention. Examples 1 and 2 describe embodiments having a 0.02 pg/mL LOD for tau, "making it approximately 1,000-fold more sensitive than typical conventional immunoassays." (*Id.*, 28:10-35:20 (describing sample preparation and benefits of improved method).) At the recited LOQ of the assay of claim 1 (0.2 pg/mL), the LOQ improvement over conventional assays would be 60 to 300-fold. (*See* '092 Patent, Cl. 1; D.I. 20, ¶¶26-27 (conventional tau immunoassay LOQ of 12 pg/mL; *see also* '092 Patent, 29:5-9 (describing conventional tau immunoassay LOQ of 60 pg/mL).)

The benefits that resulted from pairing a tau assay with an LOQ for tau below 0.2 pg/mL with a bodily fluid sample with tau diluted to a concentration below a human-engineered limit of 5 pg/mL were experimentally confirmed by the inventors: "The assay was calibrated from 0 pg/mL to 100 pg/mL total tau protein and was able to precisely measure serum tau protein in the patient samples. The extreme sensitivity of the method permits pre-dilution of the samples prior to assay, reducing potential endogenous interferences. All samples were prediluted 1:4 with a PBS-tween diluent prior to assay." ('092 Patent, 30:6-12; 34:30-32 ("Serum samples were pre-diluted 1:4 prior to assay with PBS/BSA as a precaution for sample quality and interference effects.").)

The Patent Examiner allowed the claims of the '092 Patent after finding that the claimed invention was "used by at least forty-two (42) groups **after** the effective filing date of 4/12/11," and that "**no group prior to the effective filing date had more than perhaps suggest using Simoa to detect tau**." (D.I. 20, ¶42; *see generally* D.I. 20, ¶¶34-42 (emphases added).) These fact findings establish that the claimed methods of the '092 patent recite inventive concepts that

---

noise. The LOQ refers to the lowest concentration at which the analyte can not only be reliably detected but at which some predefined goals for bias and imprecision are met. Generally, as is used herein, the LOQ refers to the lowest concentration above the LOD wherein the coefficient of variation (CV) of the measured concentrations less than about 20%." ('092 Patent, 14:52-62.)

were neither well-known nor conventional before the priority date of the '092 patent.  (*Id*.)

## V.      LEGAL STANDARDS

### A.      Rule 12(b)(6)

Patent eligibility under § 101 "can be determined at the Rule 12(b)(6) stage . . . only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law."  *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1355 (Fed. Cir. 2024) *(quoting Aatrix Software,Inc. v. Green Shades Software, Inc.*, 882 F.3d at 1125); *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1372 (Fed. Cir. 2018) (en banc) (stating that where "patent eligibility is challenged in a motion to dismiss," the motion "must be denied if 'in the light most favorable to the plaintiff and with every doubt resolved in the pleader's favor—but disregarding mere conclusory statements—the complaint states any legally cognizable claim for relief.'").  As such, "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" to defeat a motion to dismiss.  *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019).

### B.      The Two-Part Patent Eligibility Test

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. §101.  "Laws of nature and natural phenomena are not patentable, but applications and uses of such laws and phenomena may be patentable.  A claim to otherwise statutory subject matter does not become ineligible by its use of a law of nature or natural phenomenon."  *Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 967 F.3d 1319, 1324 (Fed. Cir. 2020).

Courts employ a "two-part test for distinguishing patents that claim one of the patent-ineligible exceptions from those that claim patent-eligible applications of those concepts."  *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1047 (Fed. Cir. 2016).  "Step one asks

whether the claim is directed to one of the patent ineligible concepts." *Id.* (cleaned up). "If the answer is no, the inquiry is over: the claim falls within the ambit of § 101." *Id.* "If the answer is yes, the inquiry moves to step two, which asks whether, considered both individually and as an ordered combination, 'the additional elements transform the nature of the claim into a patent-eligible application.'" *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78 (2012)). "Step two is described 'as a search for an inventive concept.'" *Id.* (quoting *Mayo*, 566 U.S. at 1294). "At step two, more is required than 'well-understood, routine, conventional activity already engaged in by the scientific community,' which fails to transform the claim into 'significantly more than a patent upon the' ineligible concept itself." *Id.* (quoting *Mayo*, 566 U.S. at 73-74, 80).

## VI. THE '092 PATENT CLAIMS ARE PATENT ELIGIBLE

### A. The Claims Pass Step One and Are Eligible

#### 1. The Claims Are Directed to an Improved Process for Preparing a Bodily Fluid Sample Using Human-Engineered Parameters

The '092 Patent claims pass the step-one "directed to" eligibility test because they are directed to an improved process for preparing a bodily fluid sample that results in a more specific and more accurate measurement of tau in blood that was up to 1,000-fold more sensitive than conventional methods and produced highly reliable results. ('092 Patent, 32:56-58 ("The assay described in this example has a detection limit (i.e., LOD) of 0.02 pg/mL and was linear to 100 pg/mL tau protein (R2>0.996, Patient J. J cal curve)[3]"; *id.*, 33:1-3 (increased sensitivity).) FDI mistakenly contends that the claims of the '092 are directed to "elevated blood levels of tau in patients with a neurological disorder," (D.I. 25 at 6) but the claims do not cover that phenomenon.

As shown in the Statement of Facts, the claims are directed to an improved bodily fluid

---

[3] An R2 of 0.996 and linear result indicates a near-perfect statistical and method validation.

sample preparation technique by combining: (i) the dilution of a bodily fluid sample so that tau protein concentration is below a human engineered limit of 5 pg/mL to reduce endogenous interferences, with (ii) an assay having a specified sensitivity to tau protein (an LOQ of tau less than about 0.2 pg/mL) to overcome prior assays' inability to measure low levels of tau in blood. (*Cf.* D.I. 20, ¶22.)  The claims are not about and do not require diagnosing disease or identifying what tau levels correspond to disease.  The claims say nothing about whether and/or how the quantified amount of tau in the blood sample produced by the claimed method correlates to having a neurological condition.

This case is analogous to *Illumina*, which also involved patent-eligible methods of preparation.  In *Illumina*, the Federal Circuit held that claims directed to an improved method of preparing a fraction of cell-free DNA that is enriched in fetal DNA according to human-engineered parameters created an improved product that was more useful for genetic testing than the original natural extracted blood sample.  *Illumina*, 967 F.3d at 1326.  The *Illumina* court noted that the claimed methods included "physical process steps that change the composition of the mixture, resulting in a DNA fraction that is different from the naturally occurring fraction in the mother's blood."  *Id*.  Based on those findings it held that Illumina's claimed methods were directed to more than merely a natural phenomenon and patent-eligible at *Alice/Mayo* step one.  *Id*. at 1329.

So too here.  The end-result of the claimed methods of preparation are a bodily fluid sample in which the natural concentration of tau has been modified to human engineered limits (here, tau below 5 pg/mL) that is combined with a particular assay having a limit of quantification of tau of less than about 0.2 pg/mL, to produce results that are not confounded by endogenous interferences and up to 1,000-fold more sensitive than prior assays.  The '092 Patent claims are also like those in *CellzDirect* in that they are directed to a new, useful, and better method of measuring tau protein

in blood than had ever been used before.  *See CellzDirect*, 827 F.3d at 1048.

Furthermore, the claims include additional concrete parameters the analytical measurement assay must include, like use of "capture objects" or "beads" that associate with the target tau protein (claims 2-3, 12-13), and segregating individual tau protein molecules into physically distinct locations to enable a statistical analysis for performing the quantification (claims 4-5). Claim 14 demands further assay sensitivity in the form of an LOD of less than about 0.02 pg/mL. Each of these claims requires additional human-engineered parameters for producing a more useful bodily fluid sample for measurement.  Each of the claims is directed to improved methods for preparing samples of bodily fluid that allowed the measurement of tau in blood with high accuracy and without the confounding effects of endogenous interferences.

### 2. FDI's Step One Arguments Incorrectly Consider Whether Aspects of the Claims Were Known, and Examine Limitations in Isolation Rather Than Considering the Claims in Their Entirety

Rather than meaningfully address the "directed to" inquiry based on the entirety of the claims, FDI mistakenly casts the claims as reciting a natural law and then mentions each method step in isolation to attempt to establish they employ "admittedly known prior art processes."  (D.I. 25 at 6, 10-11.)  FDI's approach to the step one analysis is mistaken for two reasons.

First, it is irrelevant at step one "whether the prior art demonstrates that the idea or other aspects of the claim are known, unknown, conventional, unconventional, routine, or not routine." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372 (Fed. Cir. 2020).

Second, at step one, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter."  *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (stating first step "calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a

whole' is directed to excluded subject matter"); *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("[C]ourts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." (internal quotations omitted)).

### 3. The Step One Cases Cited By FDI Are Distinguishable

FDI wrongly seeks to position the '092 Patent's claims as "akin to diagnostic method claims" held ineligible in other cases, but those cases cannot and do not control the outcome here. (D.I. 25 at 14-16.) Again, "[t]his is not a diagnostic case. And it is not a method of treatment case. It is a method of preparation case." *Illumina*, 967 F.3d at 1325. FDI's reliance on "diagnostic" cases highlights that different considerations are at play here.

*Mayo* is distinguishable. Unlike the claims here, the *Mayo* claims expressly recited a law of nature—the "relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm." *Mayo*, 566 U.S. at 77. "Claim 1, for example, states that *if* the levels of [metabolite] 6-TG in the blood (of a patient who has taken a dose of a thiopurine drug) exceed [certain levels,] *then* the administered dose is likely to produce toxic side effects." *Id.* This is explicit in the claim's "wherein" clauses. *See id.* at 74-75, 78. The '092 Patent's claims do *not* recite any correlation between the amount of tau in blood and a diagnosis or risk state. The preamble's requirement that the blood sample must be from someone "*suspected*" of having a neurological condition cannot and does not convert the claims from methods of sample preparation into methods to diagnose disease. FDI's portrayal of the challenged claims as setting forth a law of nature—"an elevated concentration of tau in the blood of a patient **having** a neurological condition"—in invoking *Mayo* (and *Athena*, too) is simply wrong. Further, the patent at issue in *Mayo* admitted that "[t]he level of a 6-MP metabolite can be determined by methods well known in the art" (U.S. Patent No. 6,355,623 at 9:12-65), which

effectively matched the "determining" claim limitation and thus "tells doctors to engage in well understood, routine, conventional activity *previously engaged in by scientists who work in the field*." *Mayo*, 566 U.S. at 79 (emphasis added). But here, the Examiner found that scientists were *not* already routinely engaging in the methods claimed in the '092 Patent. (D.I. 20, ¶42.)

*Ariosa* involved methods for "detecting" paternally inherited cffDNA in a maternal blood sample and the claims were held ineligible because the recited detection steps were admittedly standard and well-known, as reflected in the patent's specification, the patentee's prosecution statements, and expert testimony. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1377-78 (Fed. Cir. 2015). Here, the claims are not directed to methods of detection, but rather methods of preparing a bodily fluid sample, and the recited claim steps for doing so were not admittedly standard or conventional.[4]

The claims held ineligible in *Cleveland Clinic* are not like those at issue here either. The patent in *Cleveland Clinic* disclosed the discovery that patients with cardiovascular disease had elevated amounts of MPO in blood, and the challenged "testing patent" claims recited methods of assessing risk for disease by comparing the amount of MPO in a patient sample against a control sample. *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1356-58, 1361 (listing the challenged testing patent claims). The "testing patent" claims were held ineligible because they started and ended with a natural law—MPO in blood as correlated to risk for disease, and again, as in *Mayo*, the patents admitted methods to measure MPO in blood were well known. *Id.* at 1361-62. Here, the '092 Patent claims do not involve correlating the amount of tau in blood

---

[4] In both *Ariosa* and *Mayo*, unlike here, the parties did not dispute that the challenged method claims recited conventional method steps. *Exergen Corp. v. Kaz USA, Inc.*, 725. F. App'x 959, 967 (Fed. Cir. 2018) ("In *Ariosa*, like *Mayo*, there was no dispute that the claimed methods were well-known, routine, and conventional.").

with disease, and the recited sample preparation and assay steps were not routine or well known.

FDI's reliance on *Athena Diagnostics* also falls flat. In *Athena*, the patent disclosed the discovery that an autoantibody directed to the "MuSK" protein was one additional cause of the disease Myasthenia Gravis, and claimed methods for diagnosis by detecting the newly discovered autoantibodies in a patient sample. 915 F.3d 743, 747 (Fed. Cir. 2019). Various dependent claims specified how to detect the autoantibodies, and the patent admitted that those very detection steps were "known per se in the art" and "standard techniques in the art." *Id.* at 748. But here, again, the '092 claims do not recite a natural law; rather, they cover an improved method for preparing a bodily fluid sample that improves the quantification of tau in blood. The '092 Patent contains no admissions like those in *Athena* that the recited steps were "known per se" or "standard."

Properly considering the claims as a whole, they are directed to a patent-eligible method of preparation that uses non-routine and concrete steps for producing an improved bodily fluid sample. The claims therefore pass step one, ending the eligibility inquiry.

### B. Step Two: The Claims Recite an Inventive Concept

#### 1. The '092 Patent Claims Recite an Inventive Concept

The following record evidence, which is described in the Statement of Facts, establishes that the claims of the '092 Patent recite an inventive concept:

- At the time of the claimed invention, "methods to analyze tau in blood [we]re at the experimental beginning." (D.I. 20, ¶¶22, 26.) Conventional ELISA assays had high limits of detection and even higher limits of quantification, resulting in an inability to measure tau in blood, or false-positive measurements of background noise. (D.I. 20 at ¶¶26-27, 36, 39; D.I. 26-1 at Ex. C at 9, 11.)

- The inventors overcame these problems by combining (and claiming) (i) a dilute bodily fluid sample with tau protein concentration below a human engineered limit of 5 pg/mL, with (ii) an assay having a limit of quantification of tau of less than about 0.2 pg/mL.

- The benefits of diluting the bodily fluid sample as claimed and combining it with an assay having a limit of quantification of tau as claimed were experimentally proven to

generate highly sensitive measurements that were not affected by endogenous interferences. ('092 Patent, 30:6-12; 34:30-32 ("The extreme sensitivity of the method permits pre-dilution of the samples prior to assay, reducing potential endogenous interferences. All samples were prediluted 1:4 with a PBS-tween diluent prior to assay."); *see also id.* at 34:30-32 ("Serum samples were pre-diluted 1:4 prior to assay with PBS/BSA as a precaution for sample quality and interference effects.").)

- The benefits of the invention were experimentally measured as providing limits of detection for tau that were "approximately 1,000-fold more sensitive than typical conventional immunoassays." (*Id.* at 28:10-35:20 (describing sample preparation and benefits of improved method); 32:56-58.) At the recited limit of quantification of the assay of claim 1 (0.2 pg/mL), the LOQ improvement over conventional assays would be 60 to 300-fold. (*Cf. id.*, claim 1 *with* D.I. 20, ¶¶26-27 (describing conventional tau LOQ of 12 pg/mL; *see also* '092 Patent, 29:5-9 (describing tau LOQ of 60 pg/mL).)

- The Patent Examiner allowed the claims to issue after finding that the claimed invention was "used by at least forty-two (42) groups **after** the effective filing date of 4/12/11," and that "**no group prior to the effective filing date had more than perhaps suggest using Simoa to detect tau**." (D.I. 20, ¶42 (emphasis added).)

This evidence establishes that the claimed methods recite inventive concepts that were neither well-known nor conventional before the priority date of the '092 Patent.

## 2. FDI Failed to Prove by Clear and Convincing Evidence that the Steps of the '092 Patent Claims Were Routine or Well-Known

The record contains no admissions that would warrant a finding of ineligibility based on the implementation of only routine assay method steps. FDI reads more into the specification's discussion of assay methods than is warranted to suggest the asserted claims reflect only well-known and routine methodology. *See* (D.I. 25 at 5, 7 (citing '092 Patent, 14:33-38, 16:27-17:41, 20:61-63, 27:60-64, 35:21-29).) None say as much. For example, FDI selectively cites and quotes from column 14 of the '092 Patent, which discloses in part awareness of "a variety of assay methods and systems that may be used in connection with the methods of the present invention." (*E.g.*, D.I. 25 at 8 and 11 (both quoting '092 Patent at 14:33-35).) But reading that passage in full reveals it is drawing a distinction between known techniques that do *not* have low limits of detection and the disclosed assay methods that do. ('092 Patent at 14:35-37 ("Generally, the

methods employed have low limits of detection and/or limits of quantification as compared to bulk analysis techniques (e.g., ELISA methods)."); *id.* at 14:43-49 (explaining "the limits of detection and/or limits of quantification *needs to be substantially lower than the LOD and/or LOQ provided by common ELISA techniques*") (emphasis added).) The same is true at column 20, which merely points out that certain "components, steps, and/or other aspects" of assay techniques, and not the recited LOQ and sample concentration, are known and understood. (*Id.* at 20:61-21:7.) And the portion of column 27 FDI invokes again calls out the inventive method's use of stringent LOD requirements without attributing them to conventional methods known in the art. (*Id.* at 27:60-65.) The specification's reference to "analyzers" that are "commercially available" does not render the claimed methods ineligible either—the claims don't even recite a particular analyzer.

FDI represents that the disclosure at columns 16-17 of various patent applications "describ[e] 'ultra sensitive' assays" for use in the patented methods. (D.I. 25 at 8.) But the specification merely introduces that list of patent applications as disclosing "[c]ertain methods and systems which employ spatially segregating analyte molecules (e.g., biomarkers)," such that the methods are just "known" in the prior art sense, not that they are used as a matter of routine in the field, and, in any event, does not mention how LOD, sample concentration, or dilution must be tailored to measure tau. ('092 Patent, 16:27-29.) The other list of patent applications in the specification FDI relies on as describing the assays in Example 1 and 2 all published *after* the April 2011 priority date, such that their contents were *not* known or conventional. (*Id.* at 35:21-59.)

At best, FDI's argument establishes that individual claim limitations were disclosed in the prior art. Such a showing is insufficient as a matter of law to carry FDI's burden of proof. First, inventive concepts are reflected in the ordered combination of claim elements. *Coop. Ent. v. Kollective Tech., Inc.*, 50 F.4th 127, 135 (Fed. Cir. 2022). Second, proving that something was

well-known and conventional in the art requires much more than showing what the prior art discloses. In *Berkheimer*, the Federal Circuit explained that "[t]he mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." 881 F.3d at 1369. Shortly thereafter, the Federal Circuit decided *Exergen Corp. v. Kaz USA, Inc.*, where it reiterated that "[s]omething is not well-understood, routine, and conventional merely because it is disclosed in a prior art reference. There are many obscure references that nonetheless qualify as prior art." 725 F. App'x at 965-66.

In sum, while the specification acknowledges that certain basic assay principles were known, it in no way suggests or concedes that the *claimed methods* as a whole were routine or conventional. The facts here are much stronger than in *Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc.*, where Judge Stark concluded at *Alice/Mayo* step two that Oxford had not shown by clear and convincing evidence that the claims did not capture an inventive concept. No. 17-cv-1353, 2018 WL 1419082, at *7 (D. Del. Mar. 22, 2018). Judge Stark reasoned that even though the claim elements were allegedly disclosed independently and as an ordered combination in eight prior art references cited in the patent's specification, Oxford could not carry its burden of proof because the record contained conflicting evidence that "the sequencing concept has not worked so far," that "there were still major hurdles to be overcome," and that the field of nanopore sequencing was still "emerging" around the time of the patent's priority date. Accordingly, Judge Stark denied Oxford's motion to dismiss. *Id*. at *8.

FDI's suggestion that the file history concedes the routine and conventional nature of the claimed assay steps, including the claimed LOQ and LOD, is misleading and wrong. (D.I. 25 at 8-9.) When considered in full, the cited portions of the file history do not "admit" that the claims employ only routine and conventional steps. Instead, the file history evidences that scientists **were**

*not* employing any known "highly sensitive assay techniques" (the LOQ and LOD of which is not identified) to measure tau within the blood, serum, or plasma. Indeed, the file history states that "the conventional wisdom was that the measurement of tau in blood was not useful or sufficiently reliable for research/clinical purposes." (D.I. 26-1, Ex. C at 11-12.) As such, the file history does not admit the claims involve any "conventional" or "routine" application of some general "highly sensitive assay technique" that was "known". In fact, the file history states the opposite:

> Despite published reports purportedly quantifying tau in blood (examples of which are discussed above), and *the general existence of multiple highly sensitive assay techniques being known for years prior to the effective filing date of this Application (more than a decade)*, the state of knowledge and reasonable expectation of skilled artisans can be inferred by the lack of reports demonstrating analytical quantification of tau in blood at levels and sensitivities here claimed before this application published.

(*Id.* at 12 (emphasis reflecting FDI's selective quoting.) FDI's cited passage illustrates exactly how the fact that general highly sensitive assays were "known" cannot be equated to being "well-understood and conventional." *Berkheimer*, 881 F.3d at 1369 ("Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art."). The view of applicant's representative, Dr. Duffy, on the prior art as reflected in the prosecution record and which FDI invokes (D.I. 25 at 8-9), also fails to amount to an admission that the claims employ routinely used and conventional techniques. *Id.* at 9; (*see also* D.I. 26-1, Ex. C at 10.) Quanterix's IPR submission likewise does not support FDI's position. (*See* D.I. 25 at 9.) As held in *Berkheimer*, Quanterix's mere description of a prior art reference's content is not an admission that content is "routine, conventional, or well-understood activity." *See Berkheimer*, 881 F.3d at 1369; *Exergen Corp*, 725 F. App'x at 965-66.

Specifically, for claim 12, FDI invokes the "Rissin I" and "Rissin II" references as purportedly rendering the claimed methods steps routine and conventional. (D.I. 25 at 12-14.) Those references establish no such thing. As an initial matter, Rissin I—a patent application—

had not even published before the '092 Patent's April 2011 priority filing date. Further, neither Rissin reference describes measuring tau, much less how to accurately and specifically measure tau in blood. Furthermore, the mere publication of patent applications does not mean the applications' methods were conventional or well-known to scientists in the field. FDI has provided no support for such an argument and cites no case holding so. As shown, the cases hold the opposite. *Berkheimer*, 881 F.3d at 1369; *Exergen Corp*, 725 F. App'x at 965-66. Further, Rissin II does not employ standard, routine technology. Its method section relies on "custom built" machinery that obviously was not widely available and routinely used in the field. (D.I. 26-1, Ex. D at 600 (Online Methods).)

At minimum, there is a dispute of fact about whether it would have been routine and conventional for scientists to have known how to apply the claimed sample preparation techniques to the detection of tau in blood at the priority date, which precludes an ineligibility determination on a motion to dismiss. The Federal Circuit has repeatedly emphasized that disputed questions of fact concerning what is well-understood, routine, or conventional cannot be resolved at the Rule 12(b)(6) stage. "Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018); *Coop. Ent.*, 50 F.4th at 133 ("Determining whether the claimed network is well-understood, routine, or conventional is a question of fact that cannot be resolved at the Rule 12(b)(6) stage, and the district court erred in resolving this factual issue against Cooperative."); *Aatrix Software*, 882 F.3d at 1125 (reversing and finding error because factual allegations in proposed amended complaint established that the claimed combination contained inventive concepts and improved the working of computers); *Cellspin Soft, Inc.*, 927 F.3d at 1317-18 ("While we do not read *Aatrix* to say that any allegation about inventiveness, wholly divorced

from the claims or the specification, defeats a motion to dismiss, plausible and specific factual allegations that aspects of the claims are inventive are sufficient."). Here, there can be no doubt that the facts summarized in Section VI(B)(1) above include plausible and specific allegations that the claims include an inventive concept. *Id*.

### C. FDI's Representative Claim Analysis Is Deficient

FDI's motion substantively addresses only claims 1 and 12, but they are not representative of every claim of the '092 Patent and FDI has failed to show otherwise. FDI has the burden of showing that the alleged representative claims, claim 1 and claim 12, are "substantially similar and linked to the same" ineligible concept.[5] *See Mobile Acuity Ltd. v. Blipper Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024) ("The patent challenger who identifies a claim as representative of a group of claims bears the initial burden to make a prima facie showing that the group of claims are "substantially similar and linked to the same" ineligible concept."). FDI has presented only conclusory allegations that "the remaining claims are linked to the same natural phenomenon— elevated levels of tau in the blood of patients with a neurological disorder" and "the remaining dependent claims are immaterial under both steps of the *Alice* test." (D.I. 25 at 4-5.) Providing no support for its assertions, FDI fails to make a prima facie showing that all claims of the '092 Patent claims are "substantially similar and linked to the same" ineligible concept.

For example, Claims 2 and 3 require "immobilizing at least a portion of the tau protein molecules" with a "plurality of capture objects" "such that at least some of the capture objects associate with at least one tau protein molecule and a statistically significant fraction of the capture objects do not associate with any tau protein molecules," and "determining a proportion of the

---

[5] A district court "may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer*, 881 F.3d at 1365. Both situations are inapplicable here.

plurality of capture objects that associated with a tau protein molecule." ('092 Patent, Cl. 2.) And Claims 4-5 require "spatially segregating tau protein molecules into a plurality of locations, wherein a statistically significant fraction of the locations contain a single tau protein molecule and a statistically significant fraction of the locations do not contain any tau protein molecules." ('092 Patent, Cl. 4.) The patent specification describes that spatially segregating tau protein molecules and calculating the ratio of bound to unbound molecules as claimed enables the use of Poisson statistics to calculate an improved "binary signal" and that "concentrations of label (detector anti-Tau antibody and enzyme label) can be reduced relative to standard ELISAs," which "reduces their interaction with capture beads, resulting in reduced nonspecific binding enabling high signal to background ratios, even at extremely low concentrations of biomarker." ('092 Patent, 33:6-33; 18:5-30.) These benefits demonstrate that the claims recite inventive concepts, and FDI fails to show that these method steps were routine or conventional in general, much less that they were routinely or conventionally used to assay tau protein in blood. Accordingly, these claims recite additional inventive concepts that render them eligible for patenting under step two.

Additionally, Claim 14 is not directed at merely a "natural phenomenon of elevated levels of tau in the blood of patients with a neurological disorder." Unlike Claims 1 and 12, Claim 14 recites that the "limit of detection for the analytical protein concentration measurement assay is less than about 0.02 pg/mL." Claim 14 requires an assay for tau with an LOD "approximately *1000-fold more sensitive* than typical conventional immunoassays." ('092 Patent, 30:4-6 (emphasis added).) Far beyond just a mere implementation of a natural phenomenon, Claim 14 is directed at an improved assay technique that recites an inventive concept.

## VII. CONCLUSION

For all of the foregoing reasons, the Court should deny FDI's motion to dismiss and hold that the claims of the '092 Patent satisfy the eligibility requirements of 35 U.S.C. § 101.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

Elizabeth M. Flanagan
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
(312) 881-6383
bflanagan@Cooley.com

Orion Armon
COOLEY LLP
1144 15th Street
Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

October 24, 2025

Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
Ben Yenerall (#7132)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
cclark@morrisnichols.com
byenerall@morrisnichols.com

*Attorneys for Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 24, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October 24, 2025, upon the following in the manner indicated:

Monté T. Squire                                                          *VIA ELECTRONIC MAIL*
DUANE MORRIS LLP
1201 N. Market St., Suite 501
Wilmington, DE 19801
*Attorneys for Plaintiff*

Anthony J. Fitzpatrick                                                *VIA ELECTRONIC MAIL*
Christopher S. Kroon
Poornarchita H. Dwarakanath
DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110-1724
*Attorneys for Plaintiff*

Thomas J. Kowalski                                                   *VIA ELECTRONIC MAIL*
DUANE MORRIS LLP
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, NY 10017-4669
*Attorneys for Plaintiff*


                                        */s/ Jeremy A. Tigan*
                                        _____
                                        Jeremy A. Tigan (#5239)