# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FUJIREBIO DIAGNOSTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 25-659 (GBW) |
| | ) | |
| QUANTERIX CORPORATION, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendant. | ) | |
| QUANTERIX CORPORATION, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FUJIREBIO DIAGNOSTICS, INC., | ) | |
| FUJIREBIO EUROPE N.V., | ) | |
| | ) | |
| Counter-Defendants. | ) | |

**DEFENDANT QUANTERIX CORPORATION'S
ANSWER TO COMPLAINT AND
SECOND AMENDED COUNTERCLAIM**

Quanterix Corporation ("Quanterix") hereby files its answer, defenses, and

second amended counterclaim ("Answer") to the Complaint for Declaratory

Judgment filed May 28, 2025 ("Compl.", ECF No. 1) by Fujirebio Diagnostics, Inc.

("Fujirebio"). Each of the numbered paragraphs below corresponds to the same

numbered paragraph in the Complaint. Quanterix denies all allegations in the

Complaint, whether express or implied, that are not specifically admitted below.

Quanterix further denies that Fujirebio is entitled to the relief requested in the Complaint, or to any other relief. Any factual allegation admitted below is admitted only as to the specific admitted facts, not as to any purported conclusions, characterizations, implications, or speculations that may arguably follow from the admitted facts. The headings and subheadings in Quanterix's Answer are used solely for purposes of convenience and organization to mirror those appearing in the Complaint; to the extent that any headings or other non-numbered statements in the Complaint contain or imply any allegations, Quanterix denies each and every allegation therein.

## NATURE OF THE ACTION

1.     This is a civil action for declaratory judgment of patent non-infringement, arising under the patent laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201.

**ANSWER:** Quanterix admits that Fujirebio has asserted claims for declaratory judgment of patent non-infringement in this action under 35 U.S.C. § 1, et seq., and 28 U.S.C. § 2201. Quanterix denies that Fujirebio is entitled to any relief. All remaining allegations are denied.

## PARTIES

2.     Fujirebio is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 201 Great Valley Parkway, Malvern, Pennsylvania 19355.

**ANSWER:** Quanterix lacks sufficient information to form a belief as to the truth of the allegations in paragraph 2 and on that basis denies them.

3.     Quanterix is a corporation organized and existing under the laws of the State of Delaware, having a place of business at 900 Middlesex Turnpike, Billerica, Massachusetts 01821, and having the following registered agent in this judicial district: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

**ANSWER:** Admitted.

## JURISDICTION AND VENUE

4.     As this is a civil action for declaratory judgment of patent non-infringement, arising under the patent laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201.

**ANSWER:** Quanterix admits that the Complaint purports to be an action arising under the patent laws of the United States, including Title 35 and Title 28 of the United States Code. Quanterix admits that this Court has subject matter

jurisdiction over patent infringement and declaratory judgment actions under 28 U.S.C. §§ 1331, 1338(a) and 2201, provided that standing and other requirements are met. Quanterix denies that the allegations have any merit or that Fujirebio is entitled to any relief. All remaining allegations are denied.

5.     Quanterix's public statements about the '092 Patent and its threats toward Fujirebio give rise to an actual and justiciable controversy between Fujirebio and Quanterix as to non-infringement of the '092 Patent. Absent a declaration of non-infringement, Quanterix's continued wrongful assertion of infringement related to Fujirebio's diagnostic assays used to detect phosphorylated Tau 217 ("pTau 217") in patient blood plasma will cause Fujirebio harm.

**ANSWER**: Denied.

6.     This Court has personal jurisdiction over Quanterix because it is a corporation organized under the laws of the State of Delaware and maintains a registered agent in this judicial district.

**ANSWER**: Quanterix admits that this Court has personal jurisdiction over Quanterix for purposes of this action. All remaining allegations are denied.

7.     Venue is proper in this District under 28 U.S.C. § 1391.

**ANSWER**: Quanterix admits that venue is proper in this judicial district for purposes of this action under 28 U.S.C. § 1400(b). All remaining allegations are denied.

# FACTUAL BACKGROUND

## A.     The '092 Patent

8.     The '092 Patent issued on March 15, 2022. Quanterix claims to be the owner of all legal rights, title and interest in the '092 Patent, including the right to enforce the '092 Patent. A true and correct copy of the '092 Patent is attached as Exhibit A.

**ANSWER**: Quanterix admits that Exhibit A attached to the Complaint purports to be a copy of the '092 Patent. Quanterix admits that the '092 Patent issued on March 15, 2022. Quanterix admits that Quanterix owns all legal rights, title and interest in the '092 Patent, including the right to enforce the '092 Patent. All remaining allegations are denied.

9.     The '092 Patent is entitled "Methods Of Determining A Treatment Protocol For And / Or A Prognosis Of A Patient's Recovery From A Brain Injury."

**ANSWER:** Quanterix admits that the '092 Patent is entitled "Methods Of Determining A Treatment Protocol For And/Or a Prognosis Of A Patient's Recovery From A Brain Injury." All remaining allegations are denied.

10.     The '092 Patent claims a method for producing a patient bodily fluid sample having an analytically quantified amount of endogenous tau protein using an assay that is highly sensitive.

**ANSWER**: Quanterix admits that Claim 1 of the '092 Patent recites in part "a method for producing a bodily fluid sample of a patient suspected of having a neurological condition containing an analytically quantified amount of endogenous tau protein." The allegations of paragraph 10 contain legal conclusions that require no response.

## B. The Dispute Between Fujirebio and Quanterix

11. Relevant to this dispute, Fujirebio manufactures and sells two commercially available diagnostic assays used for the quantitative measurement of pTau 217 in human blood plasma: the "Lumipulse G pTau 217 Plasma Assay" and the "Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay."

**ANSWER**: Quanterix admits two commercially available diagnostic assays used for the quantitative measurement of pTau 217 in human blood plasma, the "Lumipulse G pTau 217 Plasma Assay" and the "Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay," are relevant to this dispute. Quanterix lacks knowledge of and denies all remaining allegations.

12. The Lumipulse G pTau 217 Plasma Assay (hereinafter, the "Lumipulse Plasma Assay") is used to detect and quantify the amount of a single protein, pTau 217, in human blood plasma to aid in the diagnosis of Alzheimer's disease. The Lumipulse Plasma Assay is currently sold for research use only ("RUO") to Fujirebio's customer LabCorp.

**ANSWER**: Quanterix admits that publicly available information describes the "Lumipulse Plasma Assay" as used to detect and quantify the amount of a single protein, pTau 217, in human blood plasma to aid in the diagnosis of Alzheimer's disease. Quanterix admits that publicly available information identifies LabCorp as offering for sale to end users Fujirebio's Lumipulse G pTau 217 Plasma Assay for the purpose of quantifying tau in a bodily fluid sample. Quanterix lacks knowledge of and denies all remaining allegations.

13.     The Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay (hereinafter, the "Lumipulse Plasma Ratio Assay") is capable of detecting and quantifying the amount of two proteins, pTau 217 and β-amyloid 1-42, in human blood plasma. The Lumipulse Plasma Ratio Assay calculates the numerical ratio of the levels of these two proteins. This ratio is then correlated to the presence or absence of amyloid plaques in the patient's brain as an indicator of the presence of Alzheimer's disease. As explained further below, on May 16, 2025, the United States Food and Drug Administration ("FDA") cleared the Lumipulse Plasma Ratio Assay for commercial marketing as the first in vitro diagnostic device that tests blood to aid in diagnosing Alzheimer's disease.

**ANSWER**: Quanterix admits that publicly available information describes the "Lumipulse Plasma Ratio Assay" as capable of detecting and quantifying the amount of two proteins, pTau 217 and β-amyloid 1-42, in human blood plasma.

Quanterix admits that publicly available information discloses that on May 16, 2025, the United States Food and Drug Administration ("FDA") cleared the "Lumipulse Plasma Ratio Assay" for commercial marketing. Quanterix lacks knowledge of and denies all remaining allegations.

14.     Both the Lumipulse Plasma Assay and the Lumipulse Plasma Ratio Assay (collectively referred to herein as the "Lumipulse Tau Assays") utilize Fujirebio's pTau 217 immunoassay cartridge to detect endogenous Tau levels in blood plasma of patients suspected of having Alzheimer's disease.

**ANSWER**: Quanterix admits that Fujirebio sells and offers for sale LumipulseG pTau 217 Plasma Immunoreaction Cartridges.  Quanterix further admits that publicly available product information describes Fujirebio's Lumipulse G pTau 217 Plasma Immunoreaction Cartridges as "[i]mmunoreaction cartridges to be used with the automated LUMIPULSE G1200 for the quantitative measurement of Tau phosphorylated at threonine 217 (pTau 217) in human K2EDTA plasma." Quanterix further admits that the "Lumipulse Tau Assays" are for detecting endogenous tau levels in blood plasma of patients suspected of having Alzheimer's disease. Quanterix lacks knowledge of and denies all remaining allegations.

15.     On March 20, 2024, Fujirebio's customer LabCorp announced "the launch and immediate availability of its test to identify the presence or absence of phosphorylated tau 217 (P-Tau217), a pivotal blood biomarker designed to aid in the

diagnosis of Alzheimer's disease and the subsequent monitoring of patients undergoing treatment with new Alzheimer's disease therapies." The test referred to in this LabCorp press release is the Lumipulse Plasma Assay, manufactured and supplied by Fujirebio.

**ANSWER**: Quanterix admits that Labcorp publicly made the statement quoted in paragraph 15 of the Complaint in a news release dated March 20, 2024. Quanterix lacks knowledge of and denies all remaining allegations.

16. Just two days after Labcorp's announcement, on March 22, 2024, Quanterix issued a press release concerning the '092 Patent. In that press release, Quanterix stated as follows regarding its patent portfolio, and the '092 Patent in particular:

> Quanterix has secured over thirty U.S. patents protecting our innovative ultra-sensitive research products and high-definition diagnostics, and we continue to secure additional patent protection, both in the United States and abroad. Multiple patents—including U.S. Patent No. 11,275,092—are directed specifically to our novel approach to measuring Tau protein levels in biologic samples.

**ANSWER**: Quanterix admits that Quanterix issued a press release on March 22, 2024 containing the statement quoted in paragraph 16. All remaining allegations are denied.

17.     Quanterix went on to state that "[p]arties currently measuring Tau protein in relation to a neurological condition in a research or diagnostic setting on any other platform risk infringement of Quanterix's intellectual property" (emphasis added).

**ANSWER**: Quanterix admits that Quanterix issued a press release on March 22, 2024 containing the statement quoted in paragraph 17. All remaining allegations are denied.

18.     Following its issuance of that press release, Quanterix conducted a special public conference call on March 25, 2024. During that conference call, Quanterix's CEO Masoud Toloue stated as follows: "We want to emphasize that those testing Tau quantities using the innovative approach claimed by the 092 patent risk infringing on our intellectual property. Specifically, a Tau test -- a test for Tau that quantitates risks infringing our patent if the testing measures levels of Tau protein in blood or blood derived samples less than about 5 picograms per milliliter and has a limit of quantitation less than about 0.2 picograms per milliliter."

**ANSWER**: Quanterix admits that Quanterix conducted a public conference call on March 25, 2024. Quanterix admits that Quanterix's CEO Masoud Toloue

made the following statement during that conference call: "We want to emphasize that those testing Tau quantities using the innovative approach claimed by the '092 Patent risk infringing on our intellectual property. Specifically, a Tau test – a test for Tau that quantitates – risks infringing our patent if the testing measures levels of Tau protein in blood or blood-derived samples less than about 5 picograms per milliliter and has a limit of quantitation less than about 0.2 picograms per milliliter." All remaining allegations are denied.

19. During that conference call, Mr. Toloue contended that the '092 Patent has a very broad scope, saying *inter alia:*

- The '092 Patent "refers to any test that measures Tau quantities in bodily fluid at levels identified in the band, irrespective of platform. So at a high level, a test that measures level of Tau protein in blood-derived samples less than about 5 picograms per ml and has a limited quantitation than about 0.2 picograms per ml risks infringement."
- "It's irrespective of immunoassay or mass spec platform."
- "[W]e do want to emphasize that those offering testing of Tau quantities in a bodily fluid at levels claimed in our patent, they do risk [in]fringing on our intellectual property."

**ANSWER**: Denied.

20. Mr. Toloue and his colleague on the call, Quanterix's CFO Vandana Sriram, indicated that the company could initiate litigation against alleged infringers. Mr. Toloue said that "we believe it's now the appropriate time to address any potential infringement," and "from a customer perspective, we believe that our license is the only avenue to offer Tau-based testing at the levels they identified in

our patent." And when asked about the cost of litigation, Ms. Sriram said that "we do have a strong balance sheet, and we will take the appropriate steps to both grow and protect the business. And frankly, if that comes with some level of short-term costs, we'll balance that out. But clearly, we have the balance sheet and the cash resources to do so.

**ANSWER**: Quanterix admits that Mr. Toloue made the following statements during a conference call on March 25, 2024: "we believe it's now the appropriate time to address any potential infringement," and "from a customer perspective, we believe that our license is the only avenue to offer Tau-based testing at the levels identified in our patent." Quanterix admits that Quanterix's CFO Vandana Sriram made the following statements during a conference call on March 25, 2024: "we do have a strong balance sheet, and we will take the appropriate steps to both grow and protect the business. And, frankly, if that comes with some level of short-term cost, we'll balance that out, but clearly we have the balance sheet and the cash resources to do so." All remaining allegations are denied.

21. On May 2, 2024, Laurie Churchill, Senior Vice President and General Counsel of Quanterix, sent a letter to Monte Wiltse, President and CEO of Fujirebio.

**ANSWER**: Admitted.

22. In her letter, Ms. Churchill wrote that "[m]ultiple of our patents - including U.S. Patent No. 11,275,092 (the '092 patent) - are directed specifically to

12

our novel approach to measuring Tau protein levels in blood and blood-derived samples."

**ANSWER:** Quanterix admits that Ms. Churchill's May 2, 2024 letter contains the statement quoted in Paragraph 22. All remaining allegations are denied.

23. Ms. Churchill continued as follows:

Currently, the only products on the market that are permitted to use the novel approach claimed in the '092 patent are Quanterix's Simoa® Tau Kits. No other manufacturers in the biomarker detection field are authorized by Quanterix to sell devices or kits that perform the novel method of measuring Tau that is claimed in the '092 patent.

**ANSWER:** Quanterix admits that Ms. Churchill's May 2, 2024 letter contains the statements quoted in Paragraph 23. All remaining allegations are denied.

24. Ms. Churchill expressly stated that Quanterix was prepared to take action to enforce its patents, writing as follows: "Quanterix has invested significant resources in its technology and patent portfolio and is prepared take whatever steps are necessary to prevent others from using our inventions without our permission."

**ANSWER:** Quanterix admits that Ms. Churchill's May 2, 2024 letter contains the statement quoted in Paragraph 24. All remaining allegations are denied.

25.     Ms. Churchill contended that "Quanterix has reason to believe that the use of Fujirebio's cartridges to test for pTau 217 in human plasma practices the novel method of measuring Tau that is claimed in the '092 patent . . . . [T]he testing that Labcorp provides, using Fujirebio's LUMIPULSE G chemiluminescent enzyme immunoassay, likely practices one or more claims of the '092 patent."

**ANSWER:** Quanterix admits that Ms. Churchill's May 2, 2024 letter contains the statement and phrase quoted in Paragraph 25.  All remaining allegations are denied.

26.     Ms. Churchill then wrote as follows:

It is important that we discuss this matter to ensure that Fujirebio is not selling and/or offering for sale products whose use infringes upon Quanterix's intellectual property rights. If you contend that the use of Fujirebio's immunoreaction cartridges for use with the LUMIPULSE G System to perform a quantitative measurement of pTau 217 in human plasma-by Labcorp or others-does not practice one or more claims of the '092 patent, I would like to understand the basis for your belief. Conversely, if, after reviewing the '092 patent, you conclude that Fujirebio is selling and offering for sale products that practice the patent's claim(s), then Fujirebio should cease doing so immediately.

**ANSWER:** Quanterix admits that Ms. Churchill's May 2, 2024 letter contains the statements quoted in Paragraph 26. All remaining allegations are denied.

27. Ms. Churchill concluded her letter by writing that "Quanterix would prefer to explore with you resolution to this potential dispute, *but it remains prepared to enforce its intellectual property if necessary*. Please contact me so we can discuss how best the parties can proceed going forward" (emphasis added).

**ANSWER:** Quanterix admits that Ms. Churchill's May 2, 2024 letter contains the statement quoted in Paragraph 27, without emphasis. All remaining allegations are denied.

28. Quanterix and Fujirebio subsequently exchanged further communications concerning their dispute about the '092 Patent and the Lumipulse Plasma Assay.

**ANSWER:** Quanterix admits that it communicated with Fujirebio after May 2, 2024. All remaining allegations are denied.

29. On January 16, 2025, Quanterix and Fujirebio entered into a Non-Disclosure Agreement (the "NDA") governing communications and confidential information relating to the dispute.

**ANSWER:** Quanterix admits that Quanterix and Fujirebio entered into a Non-Disclosure Agreement (the "NDA") in January 2025 related to the '092 Patent. All remaining allegations are denied.

30.     Quanterix and Fujirebio have been unable to resolve their dispute regarding the '092 Patent and the Lumipulse Plasma Assay.

**ANSWER:** Quanterix admits that Quanterix and Fujirebio have been unable to resolve their dispute regarding Fujirebio's infringement of the '092 Patent. All remaining allegations are denied.

31.     On May 1, 2025, Fujirebio sent to Quanterix a notice of termination of the NDA.

**ANSWER:** Admitted.

32.     Pursuant to Fujirebio's May 1, 2025 notice of termination, the NDA was terminated effective May 15, 2025.

**ANSWER:** Paragraph 32 contains legal conclusions that require no response.

33.     On May 16, 2025, the FDA cleared the Lumipulse Plasma Ratio Assay for marketing as "the first in vitro diagnostic device that tests blood to aid in diagnosing Alzheimer's disease." See FDA News Release entitled "FDA Clears First Blood Test Used in Diagnosing Alzheimer's Disease," issued May 16, 2025.

**ANSWER:** Quanterix admits that an FDA News Release dated May 16, 2025, and entitled "FDA Clears First Blood Test Used in Diagnosing Alzheimer's Disease" contains the quoted phrase in reference to clearing for marketing the Lumipulse G pTau271/ ß-Amyloid 1-32 Plasma Ratio test. All remaining allegations are denied.

34.     In its news release, the FDA stated that the Lumipulse Plasma Ratio Assay "is for the early detection of amyloid plaques associated with Alzheimer's disease in adult patients, aged 55 years and older, exhibiting signs and symptoms of the disease . . . . This new Lumipulse test only requires a simple blood draw, making it less invasive and much easier for patients to access . . . . [T]he new blood test can reliably predict the presence or absence of amyloid pathology associated with Alzheimer's disease at the time of the test in patients who are cognitively impaired."

**ANSWER:** Quanterix admits that an FDA News Release dated May 16, 2025, and entitled "FDA Clears First Blood Test Used in Diagnosing Alzheimer's Disease" states (1) "The Lumipulse G pTau271/ ß-Amyloid 1-32 Plasma Ratio is for the early detection of amyloid plaques associated with Alzheimer's disease in adult patients, aged 55 years and older, exhibiting signs and symptoms of the disease[,]" (2) "This new Lumipulse test only requires a simple blood draw, making it less invasive and much easier for patients to access[,]" and (3) "the new blood test can reliably predict the presence or absence of amyloid pathology associated with Alzheimer's disease at the time of the test in patients who are cognitively impaired." All remaining allegations are denied.

35.     The FDA granted Breakthrough Device designation for the Lumipulse Plasma Ratio Assay. This is a process designed to expedite the development and review of devices that provide for more effective treatment or diagnosis of life-

threatening or irreversibly debilitating diseases or conditions. In its news release, the FDA noted that the Lumipulse Plasma Ratio Assay "measures two proteins, pTau217 and β-amyloid 1-42, found in human plasma, a component of blood, and calculates the numerical ratio of the levels of the two proteins."

**ANSWER:** Quanterix admits that an FDA News Release dated May 16, 2025, and entitled "FDA Clears First Blood Test Used in Diagnosing Alzheimer's Disease" states "The Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio was granted Breakthrough Device designation, a process designed to expedite the development and review of devices that provide for more effective treatment or diagnosis of life-threatening or irreversibly debilitating diseases or conditions." Quanterix further admits the same News Release states "The Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio measures two proteins, pTau217 and β-amyloid 1-42, found in human plasma, a component of blood, and calculates the numerical ratio of the levels of the two proteins." All remaining allegations are denied.

### C.    Fujirebio's Lumipulse Tau Assays

36.    Both of Fujirebio's Lumipulse Tau Assays require the use of two separate components: (i) the LUMIPULSE G1200 Analyzer (the "analyzer"); and (ii) the "pTau cartridge".

**ANSWER:** Quanterix admits that publicly available information describes the "Lumipulse Tau Assays" as requiring the use of the LUMIPULSE G1200 Analyzer. Quanterix admits that publicly available information associates use of the Lumipulse G pTau 217 Plasma Immunoreaction Cartridges with the Lumipulse G pTau 217 Plasma Assay. Quanterix lacks knowledge of and denies all remaining allegations.

37.     The analyzer is a fully-automated, immunoassay instrument that can be used to detect dozens of different analytes at a speeds of over 120 tests per hour. The analyzer has achieved wide-spread adoption and use throughout the scientific community, over more than 30 years.

**ANSWER:** Quanterix admits that publicly available information describes the LUMIPULSE G1200 Analyzer as a "fully-automated immunoassay instrument." Quanterix admits that publicly available information describes the LUMIPULSE G1200 Analyzer as "us[ing] a unique mono test cartridge concept and among many other features performs a true throughput of 120 tests per hour." Quanterix lacks knowledge of and denies all remaining allegations.

38.     The pTau cartridge is a single-use disposable cartridge containing several immunoassay reagents reactive to pTau 217 analyte.

**ANSWER:** Quanterix admits that publicly available information describes the Lumipulse G pTau 217 Plasma Immunoreaction Cartridges as

"[i]mmunoreaction cartridges to be used with automated LUMIPULSE G System for the quantitative measurement of Tay phosphorylated at threonine 217 (pTau 217) in human K2EDTA plasma." Quanterix lacks knowledge of and denies all remaining allegations.

39.     Together, the analyzer and pTau cartridge can be used to measure the concentration of pTau 217 in a blood plasma sample with a limit of detection at or below that claimed in the '092 Patent to aid in the potential diagnosis of Alzheimer's disease.

**ANSWER:** Quanterix admits that Labcorp's marketing materials for the Lumipulse G pTau 217 Plasma Assay identify a validated limit of quantification of 0.06 pg/mL, which is at or below the limit of detection claimed in the '092 patent, and that the publicly-stated purpose of Fujirebio's Lumipulse G pTau 217 Plasma Assay is to aid in the potential diagnosis of Alzheimer's disease. Quanterix lacks knowledge of and denies all remaining allegations.

**D.      Fujirebio's Lumipulse Tau Assays Do Not Infringe the '092 Patent**

40.     The '092 Patent has one independent claim, claim 1, which recites as follows:

A method of producing a bodily fluid sample of a patient suspected of having a neurological condition containing an

analytically quantified amount of endogenous tau protein, said method comprising:

(A) obtaining a volume of bodily fluid comprising blood, or a blood component selected from plasma and serum,

(B) diluting the volume of bodily fluid, and

(C) quantifying through the use of an analytical protein concentration measurement assay a concentration of tau protein in the volume of bodily fluid to produce the bodily fluid sample containing the analytically quantified amount of endogenous tau protein;

wherein the analytically quantified concentration of endogenous tau protein contained in the bodily fluid sample is less than about 5 pg/nil, and a limit of quantification of the analytical protein concentration measurement assay used in step (C) for quantifying the concentration of tau protein is less than about 0.2 pg/mL.

**ANSWER:** Quanterix admits claim 1 of the '092 Patent contains the language quoted in paragraph 40 except for "5 pg/nil," which has been corrected to "5 pg/ml." Quanterix further admits that there is one independent claim in the '092 Patent, claim 1. All remaining allegations are denied.

41.    The specification of the '092 Patent describes only one type of assay that can be used to detect low concentration analytes, namely a well-known assay called a single-molecule array ("SIMOA").

**ANSWER:** Quanterix admits that the specification of the '092 patent describes assays that can be used to detect low concentration analytes. All remaining allegations are denied.

42.    As the name implies, a SIMOA assay interrogates analytes at the level of a single (individual) molecule. SIMOA assays typically utilize plate arrays comprising thousands to millions of tiny wells or compartments that each hold a femtoliter of liquid (i.e., a volume equal to one quadrillionth (10-15) of a liter). Thus, each well is capable of housing a single molecule or reaction event.

**ANSWER:** Quanterix admits that at least some single-molecule array assays interrogate analytes at the level of a single (individual) molecule and that at least some single-molecule array assays comprise thousands to millions of tiny wells or compartments that are capable of housing a single molecule or reaction event. Quanterix lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations recited in paragraph 42, and on that basis denies them.

43.    Physical separation and dilution play critical roles in a SIMOA assay to ensure that the concentration of target molecules is low enough for individual events to be spatially and temporally resolved. If the sample is too concentrated, multiple

molecules may occupy the same well, leading to signal overlap and inaccurate measurements. Thus, the analyte sample must be diluted prior to beginning quantification with the assay.

**ANSWER:** Quanterix admits that physical separation and dilution may play a critical role in at least some single-molecule array assays. Quanterix lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations recited in paragraph 43, and on that basis denies them.

44. Furthermore, the diagnostic methods claimed in the '092 Patent require three separate steps that must be performed in sequential order. That is, the "diluting" step—step (B)—must be performed after the volume of bodily fluid is first "obtained" (step A), and before the concentration of tau protein is then "quantified" (step C).

**ANSWER:** The allegations of paragraph 44 contain legal conclusions that require no response.

45. The ordered process set forth in the claims of the '092 patent is consistent with the operation of the singular SIMOA assay disclosed in the specification.

**ANSWER**: The allegations of paragraph 45 contain legal conclusions that require no response.

46.     Moreover, during prosecution, both the Applicant and the Examiner expressed their mutual understanding that the only assay taught in the specification and covered by the claims of the '092 patent was a SIMOA assay used to detect low concentrations of tau in blood (and not any assay capable of detecting low concentrations of tau in blood, as asserted in Ms. Churchill's May 2, 2024 letter, and by Mr. Toloue in his March 25, 2024 conference call).

**ANSWER**: Denied.

47.     The method claimed in the '092 Patent is different from that practiced by Fujirebio's Lumipulse Tau Assays.

**ANSWER**: Denied.

48.     Fujirebio's Lumipulse Tau Assays are not SIMOA assays. Instead, they are a fundamentally different type of assay, namely a chemiluminescent enzyme immunoassay. The Lumipulse Tau Assays are premised on quantifying analyte using an undiluted sample in a single reservoir.

**ANSWER**: Admitted that Fujirebio's presently-available Lumipulse Tau Assays are not marketed or described as SIMOA assays. Quanterix denies all remaining allegations.

49.     Unlike the SIMOA assays disclosed and claimed in the '092 Patent – wherein a plasma sample is first diluted and then spread across thousands of femtoliter-sized reaction vessels in order to isolate a single molecule of tau in each

reaction vessel to be quantified – Fujirebio's Lumipulse Tau Assays perform neither of these steps. In the Lumipulse Tau Assays, there is no "dilution" of the sample prior to quantification of the analyte. Moreover, in the Lumipulse Tau Assays, the entire sample is contained in a single reaction chamber wherein numerous molecules (potentially in the thousands) are analyzed together.

**ANSWER**: Denied.

50.    In view of the fundamental differences between the assay claimed in the '092 patent and Fujirebio's Lumipulse Tau Assays, the manufacture, sale, and use of Fujirebio's Lumipulse Tau Assays does not infringe the claims of the '092 patent.

**ANSWER**: Denied.

## COUNT I

**(Declaratory Judgment of Non-Infringement of U.S. Patent No. 11,275,092)**

51.    Fujirebio restates and incorporates by reference each of the allegations of the paragraphs above.

**ANSWER**: Quanterix restates and incorporates by reference its responses to each of the preceding paragraphs of the Complaint.

52.    Quanterix claims to be the owner of all legal rights, title and interests in the '092 Patent, including the right to enforce the '092 Patent.

**ANSWER**: Quanterix admits the allegations of Paragraph 52.

53.     An actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, has arisen and exists between Quanterix and Fujirebio concerning whether Fujirebio has infringed any valid and enforceable claim of the '092 Patent, as a result of Quanterix's contentions as to the breadth of the claims of the '092 Patent; Quanterix's statements that measuring Tau protein within a certain range in relation to a neurological condition risks infringement of Quanterix's intellectual property; Quanterix's statements that it is prepared to enforce the '092 Patent; and the parties' unresolved dispute as to whether the cartridges used to test for pTau 217 in Fujirebio's Lumipulse Tau Assays come within the scope of the claims of the '092 Patent.

**ANSWER**: Quanterix admits that a controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, has arisen and exists between Quanterix and Fujirebio over Fujirebio's infringement of the '092 Patent. Quanterix denies that Fujirebio is entitled to any relief.  All remaining allegations are denied.

54.     Fujirebio has not infringed and does not infringe – directly, contributorily, or by inducement – any claim of the '092 Patent.

**ANSWER**: Denied.

55.     Fujirebio seeks and is entitled to a declaration of non-infringement of the '092 Patent pursuant to Title 35 of the United States Code.

**ANSWER**: Denied.

56.     A judicial declaration is necessary and appropriate at this time so that the parties may proceed in accordance with their respective rights and duties determined by the Court.

**ANSWER**: Quanterix admits that a controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202, has arisen and exists between Quanterix and Fujirebio over Fujirebio's infringement of the '092 Patent. Quanterix denies that Fujirebio is entitled to any relief.  All remaining allegations are denied.

## FUJIREBIO'S PRAYER FOR RELIEF

WHEREFORE, Fujirebio prays for the following relief:

a.      A judgment declaring that Fujirebio does not infringe, and has not infringed, the '092 Patent in any manner;

b.      An award to Fujirebio of all of its costs in this action;

c.      An order finding that this is an exceptional case, and an award to Fujirebio of its reasonable attorneys' fees under 35 U.S.C. § 285 or otherwise; and

d.      Such other and further relief that the Court may deem just and proper.

**ANSWER:** Quanterix incorporates by reference all preceding paragraphs of this Answer as if fully set forth herein. Quanterix denies any and all allegations of patent non-infringement in the Complaint. Quanterix denies all allegations that Fujirebio is entitled to any relief requested in paragraphs "a-d" of the Complaint's Prayer for Relief, or any other relief.

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Quanterix respectfully demands a trial by jury on all issues triable by jury.

## QUANTERIX'S COUNTERCLAIMS

Quanterix Corporation ("Quanterix") hereby alleges the following counterclaims (the "Counterclaims") against Fujirebio Diagnostics, Inc. ("FDI") and Fujirebio Europe N.V. ("FENV") (collectively, "Fujirebio"):

## PARTIES

1.     Quanterix is a corporation organized and existing under the laws of Delaware, with its principal place of business at 900 Middlesex Turnpike, Billerica, Massachusetts 01821.

2.     On information and belief, FDI is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 201 Great Valley Parkway, Malvern, Pennsylvania 19355.

3.     On information and belief, FENV is a corporation organized and existing under the laws of Belgium, with its principal place of business Technologiepark-Zwinjaarde 6, 9052 Gent, Belgium.

4.     On information and belief, FDI and FENV are sister companies operating under the same corporate umbrella.  Both entities' Rule 7.1 disclosures identify Fujirebio Holdings, Inc. as their parent corporation and state that H.U.

Group Holding, Inc. indirectly owns 100% of the outstanding stock of each. (*See* ECF No. 4, ECF No. 23.)

5. On information and belief, Monte Wiltse, the President & Chief Executive Officer of FDI, and Christiaan De Wilde, the President & Chief Executive Officer of FENV, serve on the Board of Directors of Fujirebio Holdings, Inc., the parent company of both FDI and FENV—reflecting shared senior leadership across the Fujirebio corporate group. (*See* Ex. AC (Fujirebio Website, Global Leadership, https://www.fujirebio.com/en-us/about-fujirebio/global-leadership.)

6. The U.S. Fujirebio website used to market the accused Lumipulse assays and related reagents and components to U.S. customers, www.fujirebio.com/en-us, states in its Terms & Conditions that the site is "owned and maintained by Fujirebio Europe N.V.," evidencing FENV's role in U.S.-directed marketing and commerce. (*See* Ex. AD (Fujirebio Website, Terms and Conditions, https://www.fujirebio.com/en-us/terms-and-conditions) at 1.)

7. A December 22, 2023 press release available on the Fujirebio website that is titled "Fujirebio Expands Its Alzheimer's Disease Test Menu With the Much Awaited and Fully Automated Lumipulse® G pTau 217 Plasma Assay for Research Use Only (RUO)," and that issued from Gent, Belgium, Malvern, PA, United States, and Tokyo, Japan, announced the availability of the Fujirebio Lumipulse G pTau 217 Plasma assay. On information and belief, the press release issued from Gent,

Belgium, where FENV is located, and Malvern, PA, where FDI is located, because both FENV and FDI played a role in developing the assay and both were making the assay available to customers in the U.S. market, and encouraging the use of the assay in the United States. (*See* Ex. AE (Fujirebio Press Release, Fujirebio Expands Its Alzheimer's Disease Test Menu With the Much Awaited and Fully Automated Lumipulse® G pTau 217 Plasma Assay for Research Use Only (RUO) (Dec. 22, 2023).) Notably, the press release quotes Goki Ishikawa, President and CEO of Fujirebio Holdings, Inc., the same company on whose board the CEOs of both FENV and FDI sit, further demonstrating the close corporate relationship between the entities with respect to the accused assays.

## JURISDICTION AND VENUE

8. This action arises under the Patent Laws of the United States, 35 U.S.C. § 100 et seq., and in particular 35 U.S.C. §§ 271 and 281-285.

9. This Court has jurisdiction over Quanterix's counterclaim pursuant to 28 U.S.C. §§ 1331 and 1338.

10. This Court has personal jurisdiction over FDI because FDI has consented to personal jurisdiction in this Court by filing the Complaint in this action.

11. This Court has personal jurisdiction over FENV because, *inter alia*, FENV, itself and through its subsidiaries, agents, and/or affiliates, including FDI, has purposefully availed itself of the benefits and protections of Delaware's laws

such that it should reasonably anticipate being hailed into court here. On information and belief, FENV, itself and through its subsidiaries, agents, and/or affiliates, including FDI, develops, manufactures, imports, markets, offers to sell, sells, and/or distributes a broad range of diagnostic tests and related reagents and components throughout the United States, including in Delaware, and therefore transacts business within Delaware relating to Quanterix's counterclaim, and/or has engaged in systematic and continuous business contacts within Delaware.

12. In addition, this Court has personal jurisdiction over FDI and FENV because, among other things, on information and belief, (1) FDI and FENV collectively and/or in concert with one another, develop and manufacture the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay and related reagents and components accused of infringement herein, and (2) FDI and FENV collectively and/or in concert with one another, manufacture, distribute, market, use, offer for sale, sell and/or import the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay and related reagents and components in the United States, including in Delaware, and derive or will derive substantial revenue from the sale, use or consumption of those assays and reagents and components in Delaware.

13. In the alternative, this Court may exercise personal jurisdiction over FENV pursuant to Fed. R. Civ. P. 4(k)(2) because (a) Quanterix's counterclaim

arises under federal law; (b) FENV is a foreign company not subject to personal jurisdiction in the courts in any state, and (c) FENV has sufficient contacts with the United States as a whole, including but not limited to importing, marketing and/or selling diagnostic tests and related reagents and components that are sold and used throughout the United States, such that this Court's exercise of jurisdiction over FENV satisfies due process.

14.    Venue is proper in this Court with respect to FDI because Fujirebio filed the Complaint in this action.

15.    Venue is proper in this Court with respect to FENV pursuant to 28 U.S.C. § 1391(c)(3) because FENV is a foreign corporation and may be sued in any judicial district.

## FACTUAL BACKGROUND

### A. The '092 Patent

16.    U.S. Patent No. 11,275,092 (the "'092 patent") was filed on July 25, 2019, and duly and legally issued by the U.S. Patent and Trademark Office on March 15, 2022.

17.    The '092 patent, entitled "Methods Of Determining A Treatment Protocol For And/Or A Prognosis Of A Patient's Recovery From A Brain Injury" is attached hereto as **Exhibit A**.

18.     Quanterix is the assignee of the '092 patent and holds all right, title, and interest in the patent, including all rights of enforcement.

19.     The '092 patent is valid and enforceable.

20.     The term of the '092 patent will expire on or about April 12, 2032.

21.     Claim 1, the sole independent claim of the '092 patent recites:

A method of producing a bodily fluid sample of a patient suspected of having a neurological condition containing an analytically quantified amount of endogenous tau protein, said method comprising:

(A) obtaining a volume of bodily fluid comprising blood, or a blood component selected from plasma and serum,

(B) diluting the volume of bodily fluid, and

(C) quantifying through the use of an analytical protein concentration measurement assay a concentration of tau protein in the volume of bodily fluid to produce the bodily fluid sample containing the analytically quantified amount of endogenous tau protein;

wherein the analytically quantified concentration of endogenous tau protein contained in the bodily fluid sample is less than about 5 pg/ml, and a limit of quantification of the analytical protein concentration

measurement assay used in step (C) for quantifying the concentration of tau protein is less than about 0.2 pg/mL.

22.   Claim 12 of the '092 patent recites:

The method of claim 1, wherein the analytical protein concentration measurement assay used in step (C) comprises:

i. suspending a plurality of capture objects that each include a binding surface having affinity for tau protein molecules in the diluted volume of bodily fluid,

ii. immobilizing at least a portion of the tau protein molecules with respect to at least some of the plurality of capture objects suspended in the diluted volume of bodily fluid such that at least some of the capture objects associate with at least one tau protein molecule from the volume of bodily fluid,

iii. interrogating at least some of the capture objects associated with at least one tau molecule from the volume of bodily fluid; and

iv. determining a measure of tau protein molecule concentration in the volume of bodily fluid based at least in part on the interrogating step performed in step iii.

23.     Claims 1 and 12 of the '092 patent recite a method of producing a bodily fluid sample.   Claims 1 and 12 of the '092 patent do not recite, and are not directed to, a natural law or a diagnostic correlation.

24.     The methods of claims 1 and 12 of the '092 patent result in the preparation of a bodily fluid sample wherein the bodily fluid sample contains man-made components not found in nature that enable quantification of tau protein in bodily fluids comprising blood or blood components wherein the endogenous tau protein contained in the bodily fluid sample is less than about 5 pg/ml, and a limit of quantification of the analytical protein concentration measurement assay is less than about 0.2 pg/ml.

25.     Claims 1 and 12 of the '092 patent are directed to new and useful laboratory techniques for preparing a bodily fluid sample that can quantify tau present in a bodily fluid sample at extremely low levels.  Claims 1 and 12 of the '092 patent include physical process steps that change the composition of the obtained bodily fluid.

26.     In January 2010, an article was published in Experimental Gerontology titled "*Total and Phosphorylated Tau Protein as Biological Markers of Alzheimer's Disease*."  (Ex. C, Harald Hampel, et al., Exp Gerontol. 45(1):30 (Jan. 2010).)  The article described that "methods to analyze tau in blood are at the experimental beginning."  (*Id*. at 1.)  Later in the article, in a section titled "Tau proteins in

peripheral blood?" the authors noted that, "[t]here are very little data on tau levels in peripheral bodily fluids so much more research is needed to confirm and extend these studies as it is not entirely clear how increased brain levels of tau in AD might be reflected in elevated levels of tau in blood," and that "[i]n spite of considerable efforts, however, reliable methods to determine tau protein levels in serum or plasma in patients with neurodegenerative diseases are still lacking." (*Id*. at 6.) According to the authors, then-available data concerning tau in blood lacked "any clear relation" to dementia diagnoses and a reported study had found only "transient" increases in serum tau protein levels in a "subset" of stroke patients. (*Id*. at 6.) The authors concluded that, "[t]hese data are promising but highlights the need for improved assays with lower detection limit and higher specificity in order to make them useful in the evaluation of patients with neurodegenerative diseases, in which the release of tau proteins to the peripheral circulation most likely is much lower than in acute stroke." (*Id*.)

27. In January 2011, an article was published in Trends in Biotechnology titled "*Identifying and validating biomarkers for Alzheimer's disease*." (Ex. D, Christian Humpel, Trends in Biotechnology, Vol. 29, No. 1 (Jan. 2011).) The article reported that, "[t]he identification and validation of biomarkers for diagnosing Alzheimer's disease (AD) and other forms of dementia are increasingly important. To date, ELISA measurement of b-amyloid(1–42), total tau and phospho-tau-181 in

cerebrospinal fluid (CSF) is the most advanced and accepted method to diagnose probable AD with high specificity and sensitivity. However, it is a great challenge to search for novel biomarkers in CSF and blood by using modern potent methods, such as microarrays and mass spectrometry, and to optimize the handling of samples (e.g. collection, transport, processing, and storage), as well as the interpretation using bioinformatics. It seems likely that only a combined analysis of several biomarkers will define a patient-specific signature to diagnose AD in the future." (*Id.* at 26.) Concerning biomarkers for AD in blood, the author described the state of the art as follows: "The routine diagnosis of AD and mixed forms of dementia from CSF has several drawbacks: lumbar puncture and collection of CSF is an invasive treatment with potential side effects, and screening of patients is often difficult and follow-up analysis of the same patient over several years is problematic. Thus, there is a clear need to search for biomarkers in other body fluids to diagnose AD. Although saliva or urine can be easily collected, blood analysis is the gold standard; yet, it is still unknown how the concentration of analytes in the blood directly correlates with pathological changes in the brain, especially in AD. The search for blood biomarkers that correlate with AD should therefore begin with accepted CSF markers, such as Aβ and tau-related biomarkers, and further include factors involved in inflammation, protein aging and cell death, and cerebrovascular dysfunctions." (*Id.* at 27.)

28.     At the time of the invention, and as of the earliest effective filing date, April 11, 2011, the conventional belief in the field was that samples of cerebrospinal fluid (CSF) were required to measure tau.

29.     At the time of the invention, and as of the earliest effective filing date, April 11, 2011, the conventional wisdom was that tau was not reliably present in blood, either generally or due to the blood-brain barrier, or at least not present at levels that were consistent and meaningfully correlated to any neurological disorder.

30.     Further, to the extent some attempts had been made around that time to measure tau in blood, the same conventional ELISA techniques that had been used to measure tau in CSF were employed.  Those techniques were believed to be sufficient, but reported relatively high tau concentrations.  For example, an article published in the American Journal of Neurogenerative Disease on May 15, 2012 titled "*Tau is reduced in AD plasma and validation of employed ELISA methods*," acknowledged that "[t]he search for a reliable biomarker for Alzheimer's disease (AD) has been ongoing for the last decade or longer," and that "[a] number of the research groups – including the ADNI cooperative – have repeatedly reported on tau levels in CSF as a biomarker for AD without ever reporting circulating tau levels." (Ex. E, Larry D. Sparks, et al., Am. J. Neurodegener Dis 2012;1(1)99-106 (Epub May 15, 2012).)  The authors of the article noted that "[t]here is one report of antibodies to tau in human blood with higher levels to phosphorylated-tau occurring

in a limited number of patients with AD, and recently it was noted by the ADNI group that 'methods to analyze tau in blood are at the experimental beginning'." (*Id*. at 99.) The authors explained that "[i]nitial studies focused on measuring tau in the blood of individuals with AD were discouraging. Employing sandwich ELISA methods plasma tau was quantifiable in only 1 of 16 individuals with AD and 7 of 15 normal controls." (*Id*. at 99-100.) The article went on to state that, the authors of initial studies employing sandwich ELISA methods to attempt to quantify tau in blood "noted that plasma tau levels were not increased in AD and concluded that circulating tau levels cannot be utilized diagnostically for the disorder." (*Id*.) The study authors described the conclusions of their research results, which used ELISA assays to test for total tau in plasma, as follows: "The mean circulating tau level (picograms/ml) is depressed in plasma of patients with AD when compared to both cognitively normal control and individuals with mild cognitive impairment (MCI) (P< 0.0001 and p=0.0002, respectively). The mean Tau levels were also significantly reduced in MCI compared to control (P =0.048, Table 1). There was no correlation found between total tau levels and the neuropsychological tests within each group except for the correlation between tau and AVLT score in the AD group (r =0.45, P < 0.02)." (*Id*. at 102.) Most significantly, the authors' clinical data reported mean tau levels of 819.5 pg/ml +/- 294.4 pg/ml in healthy controls, mean tau levels of 729.8 pg/ml +/- 225.6 pg/ml in individuals with mild cognitive impairment, and

mean tau levels of 530.4 pg/ml +/- 193.6 pg/ml in individuals with AD." (*Id.* at 103.) Based on these results, the authors of the study concluded that "[s]ubstantial levels of tau are found in the blood of humans and they were significantly lower in plasma of AD patients compared with cognitively normal controls. Based on our unpublished data, the circulating levels of tau in elderly normal controls are 2-3 times greater than encountered in the CSF." (*Id.* at 104.) As these results demonstrate, the data generated from early attempts to quantify tau in blood using conventional methods 1) failed to obtain results that could be used diagnostically, and/or 2) produced results that had high margins of error a) that suggested the signal response was buried in background noise and b) that the data collected was unreliable. These conclusions are reinforced by Sparks, et al.'s 2012 publication, which erroneously reported concentrations of total tau in individuals with mild cognitive impairment that more recent studies have reported. (Compare Ex. E, Sparks et al., with Ex. F, Matthew P. Pase, et al., "*Assessment of Plasma Total Tau Level as a Predictive Biomarker for Dementia and Related Endophenotypes*," JAMA Neurol. 76(5):598-606 (Mar. 4, 2019) at 601 (reporting median plasma total tau concentrations of 4.09 pg/ml for patients with dementia and 3.93 pg/ml for patients with mild cognitive impairment).)

31.    At the time of the invention, improved methods for reliably measuring low concentrations of tau in blood, with sufficient accuracy and precision to provide

meaningful results at lower detection limits and higher specificity, were needed. (e.g.,'092 Patent at Col. 2:4-13 and Col. 14:33-49.)  At the time of the invention, the conventional method for measuring concentrations of biomarker molecules in bodily fluids was the ELISA assay, but at that time, the limit of detection of conventional ELISA assays was around 12 pg/ml.  (Ex. G, Po-Chou Liliang, et al., "$\tau$ *Proteins in Serum Predict Outcome After Severe Traumatic Brain Injury*," Journal of Surgical Research, 160:302-307 (2010) at 303 ("The minimum detectable dose of $\tau$ protein is 12 pg/ml.).)  In other words, at the time of the invention, conventional ELISA assays had limits of detection that were too high to be able to measure the concentrations of tau in plasma that were later proven to be present in individuals with dementia or mild cognitive impairment.  *See, e.g.,* Ex. F, Pase, et al. at 601.

32.    At the time of the invention, ultrasensitive assays having a limit of quantification at or below 0.2 pg/mL had not been developed or used to measure tau in blood samples.  At the time of the invention, persons ordinarily skilled in the art did not know methods for preparing blood samples that could be used to reliably and accurately quantify the concentration of tau in blood at high specificity and low detection limits.

33.    The methods of claims 1 and 12 reflect a solution to the problem of reliably and accurately measuring endogenous concentrations of tau in blood by reciting concrete steps for preparing a blood sample that enabled the accurate and

precise quantification of tau protein present in blood plasma or serum at low detection limits and with higher specificity.

34.    The methods of claims 1 and 12 include steps for preparing a bodily fluid sample that optimize the ability to perform accurate and precise quantification of tau protein in blood, and which contribute to the creation of an improved bodily fluid sample for quantification of tau protein that is more useful for analytical quantification than, and different from, the blood obtained from the patient for analysis.

35.    The method of claims 1 and 12 further specify a maximum tau concentration in the bodily fluid sample for quantification, which is a human-engineered parameter reflecting the inventors' optimized methods of sample preparation that were specific to accurately and reliably quantifying endogenous tau protein in the blood obtained from a patient for analysis.

36.    The inventors of the '092 patent were the first to discover methods for preparing blood samples for use in accurately and reliably analytically quantifying the concentration of endogenous tau protein contained in bodily fluid samples in which tau concentration was less than about 5 pg/ml.  While the scientific community acknowledged a clear need for blood-based Alzheimer's biomarkers (Humpel), the consensus was overwhelmingly that such a solution remained elusive, a great challenge, and efforts had met with little success. The invention did not

merely fulfill a known need with a predictable solution; rather, it provided a new and effective methodology for achieving previously unattainable results. The challenge was not just what to measure, but how to reliably measure it in a matrix that had resisted all prior attempts, particularly at the low concentrations of tau relevant to neurological conditions. The very recognition that tau could be reliably and meaningfully quantified in blood at these minute levels, given the pervasive skepticism and the failures of prior art methods using conventional techniques, represented a major shift in understanding, not merely an obvious application of existing knowledge.

37.    At the time of the invention, obtaining reliable and accurate measurements of the concentration of endogenous tau protein in blood plasma or serum was especially difficult because human blood contains many components that create background noise that can drown out the signal that is desired to be measured, and that may compete with the molecule of interest and bind to antibodies designed to capture a specific molecule such as tau protein. The inventors improved the specificity of assay results that measured low concentrations of tau present in blood plasma below 5 pg/ml by obtaining a volume of bodily fluid comprising blood or a component of blood and diluting the volume of bodily fluid (e.g., with the addition of a buffer or agent to the sample) before completing the quantification of the concentration of tau protein in the volume of bodily fluid, because the extreme

sensitivity of the assay method benefited from dilution to reduce endogenous interferences. *See* '092 Patent at Col. 30:4-12. The inventors additionally improved upon prior methods of analytically quantifying tau in plasma by devising methods of preparing bodily fluid samples for analytically quantifying the concentration of tau in blood plasma by using capture objects having a binding surface with an affinity for tau protein molecules that are suspended in the diluted volume of bodily fluid. *See* '092 Patent at Col. 34:19-30. The inclusion of a specified maximum tau concentration in the bodily fluid sample for quantification (e.g., less than about 5 pg/mL) in claims 1 and 12 is not merely a descriptive range, but a critical human engineered parameter reflecting the inventive choices in sample preparation. This limitation quantifies the inventors' unexpected ability to successfully measure tau at concentrations previously considered too low or too confounded by noise for reliable detection in blood. Prior art methods, with their inherently higher detection limits and lack of specificity, could not practically or reliably operate within the clinical relevance of such a low and precise measurement window. This parameter therefore defines the operational range enabled by, and intrinsically tied to, the inventors' novel sample preparation and assay methodologies, which lowered the detectable floor of meaningful tau quantification in blood.

38.     During examination of the patent application that matured into the '092 patent, the Examiner rejected pending claim 92, which ultimately matured into

issued claim 1, as obvious over "Duffy" (U.S. Patent Application Publication No. 2010/075407) in view of "Quanterix 2010a" (Quanterix IQT Technology Focus Day).   (Ex. H (1/8/2020 Claim Listing); Ex. I (3/16/2021 Non-Final Rejection) at 3.)   Duffy is attached hereto as Exhibit J.   Quanterix 2010a is attached hereto as Exhibit K.)

39.    The Examiner's obviousness rejection reasoned that "if a technique has been used to improve one method (i.e., Duffy's ultra-sensitive assay for measuring proteins in blood), and a person of ordinary skill would recognize that it would improve similar methods (i.e., measuring specifically tau protein in those recovering from brain injury) in the same way, using the technique is obvious unless its actual application is beyond his or her skill."  (Ex. I (3/16/2021 Non-Final Rejection) at 4.) The Examiner continued, "Quanterix 2010a teaches using SiMoA (single molecular array; p.1) which is the same assay as Duffy (see, e.g., Duffy title).  Whereas Duffy broadly teaches the assay is suitable to detecting any protein of interest in blood, Quanterix 2010a explicitly teaches the assay can detect tau in a blood sample (p.22) and suggests doing so in a subject recovering from a brain injury; p.29 teaches using the assay to detect tau in a subject who has suffered—and therefore is recovering from—TBI (traumatic brain injury).  Quanterix 2010a also makes clear that the assay detects single molecules (p.5) and detection in the aM range (p.4, 10, 11, 14.)." (*Id.* at 5.)

40.     The Examiner's conclusion that Quanterix 2010a at p.22 teaches use of SiMoA assay to detect tau in a blood sample was incorrect, which the Applicant pointed out in its subsequent remarks, clarifying that the reported data reflected Quanterix's in-house results obtained by performing conventional ELISA assays on blood samples. (Ex. L (7/16/2021 Remarks at 9 (Applicant explaining that "the early-stage experimental results depicted in the slide were produced using a conventional ELISA comparable to that used in Mortberg rather than any ultrasensitive technique such as Simoa®.").) The Examiner's initial belief that the Quanterix 2010a data presented on p.22 reflected use of SiMoA assay is plainly incorrect because the tau blood concentrations reported (i.e., for age matched disease free patients, ~60-80 pg/mL, and Alzheimer's disease patients, ~75-275 pg/mL), far exceed the ranges of plasma tau concentrations that more recent studies employing Quanterix's SiMoA Tau Kit and HD-1 analyzer have reported. As an illustration, Pase, et al. reported in 2019 in "*Assessment of Plasma Total Tau Level as a Predictive Biomarker for Dementia and Related Endophenotypes*" median plasma total tau concentrations of 4.09 pg/ml in patients with dementia and 3.93 pg/ml for patients with mild cognitive impairment using the Quanterix SiMoA Tau Kit and HD-1 analyzer. (Ex. F, Pase, et al. at 601.) The tau plasma concentrations reported by Pase, et al., are far lower than the Quanterix 2010a data, demonstrating that those reported results were erroneous, non-specific to tau, and likely reflected false

positive measurements that were distorted by background noise. (Ex. K (Quanterix 2010a) at slide 22; Ex. L (7/16/2021 Remarks) at 9).)

41. The Applicant responded to the Non-Final Rejection on July 16, 2021. The Applicant amended the preamble of pending claim 92 ("patient ~~recovering from a brain injury~~ <u>suspected of having a neurological condition</u>") and also replaced the word "body" with "bodily" in several locations within the claim. (Ex. L (7/16/2021 Claim Listing).) The Applicant also presented new claim 105, which ultimately issued as claim 12 in the '092 patent. (*See id.*)

42. The Applicant also responded to the obviousness rejection and summarized an interview conducted with the Examiner on June 30, 2021. (*Id.* at Remarks.)

43. During the interview, the Applicant's representatives "explained that claim 92, which is directed to preparing a sample from which to measure a level of tau that is derived from a bodily fluid comprising blood (or a blood component selected from plasma and serum) that was contraindicated, as samples derived from cerebrospinal fluid (CSF) were conventionally believed to be required, and that recites limitations related to an analytically quantified amount of tau (less than about 5 pg/mL) and a level of quantification (less than about 0.2 pg/mL) that a person of ordinary skill at that time would not have believed to be necessary, useful or appropriate for patients suspected of having a neurological condition (e.g., as a

successful tool for treatment/diagnosis). The representatives noted while there were a handful of experimental attempts in the prior art purporting to measure tau in blood (at higher levels generally lacking reliability and with high control levels making it questioning whether, in at least the controls, tau was actually being measured), the publication of the assays and data disclosed in Applicant's Application resulted in a clear line of demarcation and sea-change in the field that effectively created or contributed to creating the reasonable expectation of success that was absent at the time Applicant's invention was made and first filed for patent protection." (*Id.* (Remarks) at 7.)

44.     In explaining this sea change, Applicant's representative referenced an article by C.E. Teunissen, published in 2020, which was an "example of recent commentary on the promise of plasma tau assays for Alzheimer's disease blood test, as underscoring the dramatic rise in and importance of tau blood tests following this sea-change." (*Id.* at 9; Ex. M (Charlotte E. Teunissen et al., *Plasma p-tau217: from 'new kid' to most promising candidate for Alzheimer's disease blood test*, Brain, A J. of Neurology (2020)).)   Applicant's representative also "described the few examples of which he was aware of investigators trying to measure tau in blood using conventional ELISA approaches.  As an example, [representative] Dr. Duffy pointed to the very large error bars and signal response buried in noise in Mortberg's "Assessment of the Cerebral Ischemic/Reperfusion Injury after Cardiac Arrest" *Acta*

*Universitatis Upsaliensis Uppsala* 2010 ("Mortberg") and how it was evident to him why the field did not view such data as sufficiently reliable or repeatable to be adopted by the field or drive investigations to deviate from measurement of tau in CSF using industry accepted ELISA techniques." (Ex. L (Remarks) at 8.) Mortberg is attached hereto as Exhibit N.

45. During the interview, the Applicant's representatives referred the Examiner to the Ding article, published in 2021 in Translational Neurodegeneration, which was "a recent meta-analysis review article on ultrasensitive plasma tau assays." The Ding article is attached hereto as Exhibit O. The Applicant summarized that "the timeline evident in Ding (see Table 1 and Table 2) shows that it was not until abruptly after the publication of the subject matter of the present Application in 2012 ("post publication period") that, a vast majority of studies (by numerous different research groups) began measuring tau in blood with high sensitivity assays. . . . [Representative] Dr. Duffy noted that the dramatic rise in publications with clinically relevant measurements of tau in blood <u>only after</u> publication of the techniques and results disclosed in this Application, and the high prevalence of use of Simoa assays in Ding is clear and objective support for the contention that the industry did not 'catch on' (i.e., have a reasonable expectation of success of measuring tau in blood with sufficient accuracy and reproducibility to be

useful as an indicator of neurological function or injury) until, and in response to, the teaching of the present Application." (Ex. L (Remarks) at 8.)

46. The Examiner issued a notice of allowability on November 2, 2021, following consideration of Applicant's July 16, 2021 Remarks. The Examiner's Reasons for Allowance states:

> "Of particular relevance Ding table 1 lists Applicant's claimed assay (tau Simoa) used by at least forty-two (42) groups <u>after</u> the effective filing date of 4/12/11. This is in contrast to the obviousness conclusion set forth by the Examiner, which articulated why it would have been obvious to use Simoa to detect tau, but also recognizing that no group had actually done so." The Examiner continued, "[i]n this case, no group prior to the effective filing date had done more than perhaps suggest using Simoa to detect tau (see Quanterix document previously discussed), while dozens of groups utilized Simoa to detect tau after the date of Applicant's contribution. It is on this fact that the Examiner finds the argument persuasive and concludes that the rebuttal evidence is sufficient to overcome the obviousness rejection."

(Ex. P (11/2/2021 Notice of Allowance and Fees Due).)

**B. Fujirebio's Tau Assays**

47. On information and belief, FDI and FENV manufacture, import into the United States, use, offer for sale and sell two commercially available diagnostic assays used for the quantitative measurement of pTau 217 in human blood plasma in persons suspected of having Alzheimer's disease: the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay,

along with reagents and components, including Lumipulse G pTau 217 Plasma Immunoreaction Cartridges, Lumipulse pTau 217 Plasma Controls, and Lumipulse G pTau 217 Plasma Calibrators, for performing those assays.

48.     The Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay employ a chemiluminescent enzyme immunoassay system (CLEIA) that is run on FDI and FENV's Lumipulse G1200 automated immunoassay instrument according to instructions for use provided by FENV and utilizes Lumipulse G pTau 217 Plasma Immunoreaction Cartridges, Lumipulse pTau 217 Plasma Controls, and Lumipulse G pTau 217 Plasma Calibrators.

49.     Safety Data Sheets ("SDS") for the Lumipulse G pTau 217 Plasma Immunoreaction Cartridges, Lumipulse pTau 217 Plasma Controls, and Lumipulse G pTau 217 Plasma Calibrators identify "FUJIREBIO EUROPE N.V." as the "Manufacturer/Supplier," and identify "Fujirebio Diagnostics, Inc." as the distributor and/or information contact, thereby attributing at least manufacture/supply/importation to FENV and sales/distribution/support to FDI for the same accused components.  (*See* Ex. U (Safety Data Sheet for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 1-2; Ex. V (Safety Data Sheet for Lumipulse G pTau 217 Plasma Calibrator) at 1; Ex. W (Safety Data Sheet for Lumipulse pTau 217 Plasma Controls) at 1.)

50.     The Instructions for Use ("IFUs") for the Lumipulse G pTau 217/β-Amyloid 1-42 Plasma Ratio Assay lists "Fujirebio Diagnostics, Inc." as the manufacturer and sets forth the instructions for U.S. labs to follow to perform the accused methods (which incorporate the Instructions For Use for the Lumipulse G pTau 217 Plasma and Lumipulse G β-Amyloid 1-42-N Plasma assays), thereby attributing at least manufacture/supply/sales of the accused Lumipulse G pTau 217/β-Amyloid 1-42 Plasma Ratio Assay to FDI.    (*See generally* Ex. AA (Instructions for Use for Lumipulse G pTau 217/β-Amyloid 1-42 Plasma Ratio Assay) at 4-6, 26.)

51.     The IFU for the Lumipulse G pTau 217 Plasma Immunoreaction Cartridges used with the accused Lumipulse assays lists "Fujirebio Europe N.V." as the manufacturer and "Fujirebio Diagnostics, Inc." as the distributor and sets forth the instructions for U.S. labs to follow to perform the accused methods, thereby attributing at least manufacture/supply/importation of the reagents and components to FENV and at least the distribution/sales/marketing of the reagents and components to FDI.    (*See* Ex. AB (Instructions for Use for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 1-4.)



■ CONTACT

https://eifu.fujirebio.com/hcp/USA/products/?keycode=FRUS00643

**Fujirebio Europe N.V.**
Technologiepark 6, 9052 Gent, Belgium
℡ +32-9 329 13 29

Distributor **Fujirebio Diagnostics, Inc.**
201 Great Valley Parkway, Malvern, PA 19355 USA
Toll Free: +1 844-544-3787
℡ +1 610 240 3800
customersupport.us@fujirebio-us.com

■ GLOSSARY OF SYMBOLS

| IVD | *In vitro* diagnostic medical device | LOT | Batch code |
| Consult instructions for use | REF | Catalogue number |
| Use-by date | Manufacturer |

(Ex. AB (Instructions for Use for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 4 (highlighting added).)

52.     In addition, the IFU for reagents and components used with the accused Lumipulse assays list "Fujirebio Europe N.V." below the product name and again in the "Distributed by" field, and set forth the instructions U.S. labs follow to perform the accused methods on the Lumipulse platform, thereby attributing manufacture/supply/importation of the reagents and components to FENV. (*See* Ex. X (Instructions for Use for Lumipulse G Specimen Diluent) at 1; Ex. Y (Instructions for Use for Lumipulse G Wash Solution) at 1; Ex. Z (Instructions for Use for Lumipulse G Substrate Solution) at 1.)

53.     Lumipulse G1200 instruments are widely available in clinical laboratories throughout the United States.

54. The Lumipulse G pTau 217 Plasma Immunoreaction Cartridges contain three components:  (1) 150 µL of an antibody-coated particle solution (0.025% anti-phosphorylated Tau (217) monoclonal antibody (mouse)-coated particles, protein stabilizers (bovine) in 50 mM Tris buffer; Preservative: 0.1% ProClin 300); (2) 220 µL of enzyme-labeled antibody solution (0.5 µg/mL alkaline phosphatase (ALP)-labeled anti-Tau monoclonal antibodies (mouse) conjugate, protein (bovine) and chemical stabilizers in 50 mM MOPS buffer; Preservative: 0.1% ProClin 300); and (3) 80 µL of assay specific solution (3.45% chemical stabilizers in 50 mM Tris buffer; Preservative: 0.1% ProClin 300). (Ex. Q, 5/16/2025 FDA Letter re Fujirebio Premarket Notification at Section IV(A)(1); Ex. AB (Instructions for Use for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 1-2.)

55. The assay specific solution serves as a diluent and helps optimize analyte detection and improve the assay's signal specificity. (Ex. R, Manu Vandijck et al., Alzheimer's & Dementia, *Preliminary performance of the Lumipulse G pTau 217 Plasma prototype assay on plasma samples* (Dec. 2023).)  Use of the assay specific diluent improves clinical performance of the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay.  (Ex. S, Charlotte Lambrechts, et al., *Performance of optimized prototype LUMIPULSE G immunoassays for plasma pTau 181 and pTau 217*, Alzheimer's Dement. 2023;19 (Suppl. 24) at 1-2.)

56. The Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay employ an immunoassay method on the Lumipulse G System that involves a first reaction step wherein plasma and assay specific diluent are added to the antibody coated particle solution, followed by washing to remove unbound materials, followed by exposure to the enzyme-labeled antibody solution, followed by washing, followed by exposure to substrate solution and subsequent luminescence measurement. (Ex. Q, 5/16/2025 FDA Letter re Fujirebio Premarket Notification at Section IV(B)(3); Ex. T, Mayo Clinic BioPharma Diagnostics Test Definition: B217P (Phosphorylated Tau 217, Plasma) at 8.)

57. On May 16, 2025, FDI received 510(k) clearance from FDA for the Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay. (*See* Ex. Q (5/16/2025 FDA Letter re Fujirebio Premarket Notification) at 1.)

58. On information and belief, for all times relevant to this Complaint, FDI and FENV have been making, using, importing, selling, and/or offering to sell within the United States the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay, and the Lumipulse G pTau 217 Plasma Immunoreaction Cartridges, Lumipulse pTau 217 Plasma Controls, and Lumipulse G pTau 217 Plasma Calibrators necessary for carrying out those assays.

59. FDI and FENV sell the Lumipulse G pTau 217 Plasma Assay, including the Lumipulse G pTau 217 Plasma Immunoreaction Cartridges, Lumipulse pTau 217 Plasma Controls, and Lumipulse G pTau 217 Plasma Calibrators necessary for carrying out that assay, to customers in the United States, including Labcorp, which in turn offers the assay for sale to end users desiring to analyze bodily fluid samples of patients suspected of having Alzheimer's disease.

60. FDI and FENV sell the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay, including Lumipulse G pTau 217 Plasma Immunoreaction Cartridges, Lumipulse pTau 217 Plasma Controls, and Lumipulse G pTau 217 Plasma Calibrators necessary for carrying out that assay, to clinical laboratories across the United States, including its customer Labcorp, which in turn offers the assay for sale to end users desiring to analyze bodily fluid samples of patients suspected of having Alzheimer's disease.

61. FDI and FENV have taken actions, for example by providing training, guidance, instructions for use, and transfer of know-how in the form of instructions for use, manuals, and online and in-person trainings on how to perform the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay, including proper use of and information about the Lumipulse G pTau 217 Plasma Immunoreaction Cartridges, Lumipulse pTau 217 Plasma Controls, and Lumipulse G pTau 217 Plasma Calibrators necessary for

carrying out those assays, and by advertising, marketing, offering for sale and selling the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay. (*See, e.g.*, Ex. AA (Instructions for Use for Lumipulse Plasma Ratio Assay); Ex. AB (Instructions for Use for Lumipulse Immunoreaction Cartridges); *see also* Ex. X (Instructions for Use for Lumipulse G Specimen Diluent); Ex. Y (Instructions for Use for Lumipulse G Wash Solution); Ex. Z (Instructions for Use for Lumipulse G Substrate Solution).)

62. On information and belief, FDI and/or FENV have contracted with Labcorp, providing financial benefit to Labcorp, such that Labcorp performs the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay for commercial profit.

63. FDI and FENV's actions have induced at least customer Labcorp to perform the method of at least claim 1 of the '092 patent, and thereby directly infringe claim 1 of the '092 patent.

64. FDI and FENV hves taken the above actions knowing and intending that (or being willfully blind to the fact that) their actions would induce actual infringements of at least claim 1 of the '092 patent, since at least May 2, 2024.

65. The Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay are diagnostic tests to aid in the

biological identification of Alzheimer's disease. (*See* Ex. AA (Instructions for Use for Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay) at 1-2.)

66.     Both assays require obtaining a plasma sample from a patient suspected of having Alzheimer's disease, diluting the plasma sample, including by exposure to reagents within Lumipulse G pTau 217 Plasma Immunoreaction Cartridges, and quantifying the amount of tau protein in the patient's plasma through use of an analytical protein concentration measurement assay—Fujirebio's CLEIA assay. The result of the method is the production of a bodily fluid sample containing an analytically quantified amount of endogenous tau protein, wherein the tau protein is labeled with a detectable marker.

67.     The Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay that Labcorp performs measures tau at a concentration of less than about 5 pg/mL, including for example in the range of 0.05-2 pg/mL.

68.     The Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay that Labcorp performs has a limit of quantification of the concentration of tau protein less than about 0.2 pg/mL, and more specifically has a lower limit of quantification of 0.035 pg/mL.

69.     Labcorp's performance of the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay, which include

the use of Lumipulse G pTau 217 Plasma Immunoreaction Cartridges, Lumipulse pTau 217 Plasma Controls, and Lumipulse G pTau 217 Plasma Calibrators, results in direct infringement of at least claims 1 and 12 of the '092 patent, as demonstrated in the claim chart attached hereto as Exhibit B, which is expressly incorporated by reference.

## COUNTERCLAIM 1

### (Infringement of the '092 Patent)

70.    Quanterix realleges and incorporates by reference the preceding paragraphs of the Counterclaims as though set forth fully herein.

71.    The claims of the '092 patent are presumed valid pursuant to 35 U.S.C. § 282.

72.    FDI, FENV, and their customers, including at least Labcorp, have actual knowledge of the '092 patent.

73.    On information and belief, FDI and FENV became aware of the '092 patent no later than when it was issued by the Patent Office, no later than Quanterix's public call dated March 26, 2024, or no later than May 2, 2024 when Quanterix sent a letter to FDI CEO Monte Wiltse concerning the '092 patent, about which, on information and belief FDI informed FENV on or around May 2, 2024.

74.    On information or belief, FDI personnel, including Monte Wiltse (the CEO of FDI who serves on the Board of Directors of Fujirebio Holdings, Inc.—FDI

and FENV's parent company) communicated the substance of Quanterix's May 2, 2024 letter to FENV personnel, including Christiaan De Wilde who sits on the Board of Directors of Fujirebio Holdings, Inc. alongside Mr. Wiltse.

75. FDI and FENV directly infringe the '092 patent, including but not limited to claims 1 and 12, in violation of 35 U.S.C. § 271(a), by carrying out the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay according to the Instructions For Use. (*See* Ex. AA (Instructions for Use for Lumipulse G pTau 217/ß-Amyloid 1-42 Plasma Ratio Assay) at 4-6, 26; Ex. AB (Instructions for Use for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 1-4.)

76. FENV directly infringes under 35 U.S.C. § 271(a) by making, using, offering for sale, selling, importing, and/or distributing the accused Lumipulse assays and related reagents and components (including immunoreaction cartridges, plasma calibrators, and plasma controls) for use with the accused Lumipulse assays in the United States, as reflected in the SDSs and IFUs[1], and by providing U.S.-

---

[1] *See* Ex. U (Safety Data Sheet for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 1; Ex. V (Safety Data Sheet for Lumipulse G pTau 217 Plasma Calibrator) at 1; Ex. W (Safety Data Sheet for Lumipulse pTau 217 Plasma Controls) at 1; Ex. X (Instructions for Use for Lumipulse G Specimen Diluent) at 1; Ex. Y (Instructions for Use for Lumipulse G Wash Solution) at 1; Ex. Z (Instructions for Use for Lumipulse G Substrate Solution) at 1; Ex. AA (Instructions for Use for Lumipulse G pTau 217/β-Amyloid 1-42 Plasma Ratio Assay) at 1; Ex. AB (Instructions for Use for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 4.

directed marketing through Fujirebio's website, which is "owned and maintained" by FENV (*see* Ex. AD (Fujirebio Website, Terms and Conditions, https://www.fujirebio.com/en-us/terms-and-conditions)). FDI directly infringes by making, using, offering for sale, selling, importing, and/or distributing the same products in the United States as shown in the SDSs and IFUs. (*See* Ex. U (Safety Data Sheet for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 1; Ex. V (Safety Data Sheet for Lumipulse G pTau 217 Plasma Calibrator) at 1; Ex. W (Safety Data Sheet for Lumipulse pTau 217 Plasma Controls) at 1; Ex. AA (Instructions for Use for Lumipulse G pTau 217/β-Amyloid 1-42 Plasma Ratio Assay) at 26; Ex. AB (Instructions for Use for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 4.)

77. FDI and FENV infringe the '092 patent, including but not limited to claims 1 and 12, in violation of 35 U.S.C. § 271(b), by actively inducing infringement of the '092 patent, literally or under the doctrine of equivalents, by knowingly and intentionally encouraging others, including but not limited to their customer Labcorp and other end users of the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay, to directly infringe the '092 patent with knowledge that such conduct infringes the '092 patent. Specifically, FDI and FENV's marketing materials and Instructions For Use direct end users to use the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G

pTau217/ß-Amyloid 1-42 Plasma Ratio Assay in a manner that results in direct infringement of at least claims 1 and 12 of the '092 patent. (Ex. AA (Instructions for Use for Lumipulse G pTau 217/β-Amyloid 1-42 Plasma Ratio Assay) at 4-6, 26; Ex. AB (Instructions for Use for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges) at 4; *see also* Ex. U (Safety Data Sheet for Lumipulse G pTau 217 Plasma Immunoreaction Cartridges); Ex. V (Safety Data Sheet for Lumipulse G pTau 217 Plasma Calibrator); Ex. W (Safety Data Sheet for Lumipulse pTau 217 Plasma Controls); Ex. X (Instructions for Use for Lumipulse G Specimen Diluent); Ex. Y (Instructions for Use for Lumipulse G Wash Solution); Ex. Z (Instructions for Use for Lumipulse G Substrate Solution).) Furthermore, on information and belief, FDI and FENV sales representatives, affiliates, and agents encourage at least end users of the Lumipulse G pTau 217 Plasma Assay and the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay to directly infringe at least claims 1 and 12 of the '092 patent with FDI and FENV's knowledge that such conduct constitutes infringement of claims 1 and 12 of the '092 patent.

78.     FDI and FENV infringe the '092 patent, including but not limited to claims 1 and 12, in violation of 35 U.S.C. § 271(c) by contributing to infringement of the '092 patent, literally or under the doctrine of equivalents, by among other things selling or offering to sell the Lumipulse G pTau 217 Plasma Assay, the Lumipulse G pTau217/ß-Amyloid 1-42 Plasma Ratio Assay, the Lumipulse G pTau

217 Plasma Immunoreaction Cartridges, Lumipulse pTau 217 Plasma Controls, and the Lumipulse G pTau 217 Plasma Calibrators, with knowledge of the '092 patent and knowing that such components are especially made or especially adapted for use in the infringement of at least claims 1 and 12 of the '092 patent, are a material part of the invention of claims 1 and 12 of the '092 patent, and are not staple articles or commodities of commerce suitable for substantial non-infringing use. As explained above, FENV is identified as the manufacturer, supplier, importer, seller and distributor of the accused assays and related reagents and components and FDI is identified as the U.S. manufacturer, marketer, seller and distributor of the accused assays and related reagents and components, thereby tying each entity to the acts of infringement. (*See supra* Counterclaim paragraphs 47-51.)

79. FDI's and FENV's infringement of the '092 patent is willful, because FDI and FENV are and have long been aware of the '092 patent. Specifically, FDI and FENV have had knowledge of their infringement of the '092 patent, since at least May 2, 2024 and have intentionally infringed and induced their customers to infringe and contributed to the infringement of the '092 patent. Furthermore, on information and belief, FDI and FENV actively monitor Quanterix's patent portfolio and thus have been aware of the '092 patent at least since the time that the patent issued.

80.    FDI and FENV's infringement of the '092 patent has caused and will continue to cause Quanterix injury, including but not limited to a loss of market share, goodwill, and profits.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Quanterix respectfully demands a trial by jury on all issues triable by jury.

## PRAYER FOR RELIEF

Wherefore, Quanterix prays that this Court enter judgment in its favor and against Fujirebio as follows:

A.    A finding in favor of Quanterix, and against FDI and FENV, thereby dismissing the Fujirebio's Complaint with prejudice, with FDI taking nothing by the way of its claim;

B.    A finding that all asserted claims of the '092 patent are valid and enforceable;

C.    An adjudication that FDI and FENV have infringed one or more claims of the '092 patent directly and/or indirectly and literally and/or through equivalents;

D.    An award of damages to Quanterix adequate to compensate it for Fujirebio's past infringement, together with pre-judgment and post-judgment interest, as well as damages adequate to compensate Quanterix for any continuing or future infringement in the form of ongoing royalties, including costs,

expenses, and an accounting for all infringing acts, including such acts that may transpire through any trial and/or the conclusion of any appeal(s);

E.     A finding that FDI and FENV's infringement has been and continues to be willful, and an award of enhanced damages, up to and including treble damages per 35 U.S.C. § 284;

F.     A finding that this case is exceptional and an award of Quanterix's reasonable attorney fees pursuant to 35 U.S.C. § 285; and

G.     Any such other and further relief as this Court deems necessary and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Elizabeth M. Flanagan
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
(312) 881-6383
bflanagan@Cooley.com

Orion Armon
COOLEY LLP
1144 15th Street
Suite 2300
Denver, CO 80202
(720) 566-4000
oarmon@cooley.com

October 24, 2025

*/s/ Jeremy A. Tigan*

_____

Jeremy A. Tigan (#5239)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
cclark@morrisnichols.com

*Attorneys for Quanterix Corp.*

## CERTIFICATE OF SERVICE

I further certify that I caused copies of the foregoing document to be served

on October 24, 2025, upon the following in the manner indicated:

Monté T. Squire                                     *VIA ELECTRONIC MAIL*
DUANE MORRIS LLP
1201 N. Market St., Suite 501
Wilmington, DE 19801

Anthony J. Fitzpatrick                              *VIA ELECTRONIC MAIL*
Christopher S. Kroon
Poornarchita H. Dwarakanath
DUANE MORRIS LLP
100 High Street, Suite 2400
Boston, MA 02110-1724

Thomas J. Kowalski                                  *VIA ELECTRONIC MAIL*
DUANE MORRIS LLP
22 Vanderbilt
335 Madison Avenue, 23rd Floor
New York, NY 10017-4669

*Attorneys for Fujirebio Diagnostics, Inc.*
*and Fujirebio Europe N.V.*


*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)